# 16-3708-cr

United States Court of Appeals
For the Second Circuit

Docket No. 16-3708-cr

UNITED STATES OF AMERICA,

Appellee,

-against-

ROBERT ALEXANDER,

Defendant-Appellant.

APPEAL FROM A JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

**APPENDIX FOR DEFENDANT-APPELLANT ROBERT ALEXANDER**

Federal Defenders of New York, Inc.
 Appeals Bureau
52 Duane Street, 10th Floor
New York, New York 10007
Tel. No.:  (212) 417-8742

Attorney for Defendant-Appellant
 ROBERT ALEXANDER

ALLEGRA GLASHAUSSER,
 Of Counsel

A000001

**TABLE OF CONTENTS**

Page

District court docket sheet, ECF No. 15-cr-00635....................................................A  03

Indictment
  Filed January 11, 2015.............................................................................................A  12

Government Hearing Exhibits, No. 2-6.................................................................A  17

Defense Hearing Exhibits .......................................................................................A  22

Transcript of Suppression Hearing
  March 31, 2016.........................................................................................................A  24

Transcript of April 28, 2016 (excerpt p. 1-17 and 40-41).........................................A 233

Transcript of May 3, 2016 (excerpt p. 1-3)..................................................................A 262

Transcript of May 6, 2016 (excerpt p. 1-13)................................................................A 265

Judgment of Conviction and Sentence,
  Filed October 31, 2016............................................................................................A 278

Notice of Appeal,
  Filed October 31, 2016 ............................................................................................A 284

CLOSED,APPEAL

# U.S. District Court
## Eastern District of New York (Brooklyn)
## CRIMINAL DOCKET FOR CASE #: 1:15–cr–00635–CBA–1

Case title: USA v. Alexander
Other court case number:  12–CR–187 EDNY
Magistrate judge case number:  1:15–mj–01112–JO

Date Filed: 12/11/2015
Date Terminated: 10/31/2016

Assigned to: Judge Carol Bagley
Amon

**Defendant (1)**

| | |
|---|---|
| **Robert Alexander**<br>*TERMINATED: 10/31/2016* | represented by **Michael L. Brown , II**<br>Federal Defenders of New York, Inc.<br>One Pierrepont Plaza – 16th Floor<br>Brooklyn, NY 11201<br>718–407–7408<br>Fax: 718–855–0760<br>Email: michael_l_brown@fd.org<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>Designation: Public Defender or Community<br>Defender Appointment<br><br>**Michelle A. Gelernt**<br>Federal Defenders of New York<br>One Pierrepont Plaza, 16th Floor<br>Brooklyn, NY 11201<br>718–330–1204<br>Fax: 718–855–0760<br>Email: michelle_gelernt@fd.org<br>*ATTORNEY TO BE NOTICED*<br>Designation: Public Defender or Community<br>Defender Appointment |

| **Pending Counts** | **Disposition** |
|---|---|
| UNLAWFUL TRANSPORT OF FIREARMS, ETC.<br>(1) | IMPRISONMENT: 51 Months; SUPERVISED RELEASE: 3 Years with special conditions; SPECIAL ASSESSMENT: $100.00. Fine waived. |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| POSSESSION OF DEFACED FIREARM<br>(2) | Dismissed on Govt motion. |

**Highest Offense Level (Terminated)**

Felony

**A000003**

| **Complaints** | **Disposition** |
|---|---|
| 18:922A.F | |

**Plaintiff**

| | | |
|---|---|---|
| **USA** | represented by | **Ryan C Harris**<br>U.S. Attorney's Office, Eastern District of New York<br>271a Cadman Plaza East<br>Brooklyn, NY 11201<br>718–254–6489<br>Fax: 718–254–6076<br>Email: ryan.harris2@usdoj.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Government Attorney* |

| Date Filed | # | Docket Text |
|---|---|---|
| 11/19/2015 | 1 | SEALED COMPLAINT as to Robert Alexander (1). (Sica, Michele) [1:15–mj–01112–JO] (Entered: 11/20/2015) |
| 11/25/2015 | 3 | Order to Unseal Case as to Robert Alexander.. Ordered by Magistrate Judge Lois Bloom on 11/25/2015. (Sica, Michele) [1:15–mj–01112–JO] (Entered: 11/25/2015) |
| 12/07/2015 | 4 | Minute Entry for proceedings held before Magistrate Judge Vera M. Scanlon:Arraignment as to Robert Alexander on Complaint held on 12/7/2015, Initial Appearance as to Robert Alexander held on 12/7/2015, Attorney Appointment of federal defender Michael Brown for the defendant present. AUSA Ryan Harris present. Mag Clerk SM Yuen– Defense counsel presented a bail package proposing defendant's mother as a cosigner on a bond. Gov't opposed for reasons stated on the record. Court denied bail. Order of detention entered. Preliminary hearing set 12/21 at 11am. (Tape #2;51–3;09, 3;20–3;24.) (Yuen, Sui–May) [1:15–mj–01112–JO] (Entered: 12/08/2015) |
| 12/07/2015 | | Attorney update in case as to Robert Alexander. Attorney Ryan C Harris for USA,Michael L. Brown, II for Robert Alexander added. (Yuen, Sui–May) [1:15–mj–01112–JO] (Entered: 12/08/2015) |
| 12/07/2015 | 5 | ORDER OF DETENTION as to Robert Alexander. Ordered by Magistrate Judge Vera M. Scanlon on 12/7/2015. (Yuen, Sui–May) [1:15–mj–01112–JO] (Entered: 12/08/2015) |
| 12/11/2015 | 6 | INDICTMENT as to Robert Alexander (1) count(s) 1, 2. (Attachments: # 1 Criminal Information Sheet) (Chee, Alvin) (Entered: 12/14/2015) |
| 12/16/2015 | 7 | Notice of Related Case (Harris, Ryan) (Entered: 12/16/2015) |
| 12/21/2015 | 8 | Minute Entry for proceedings held before Chief Mag. Judge Steven M. Gold: AUSA Ryan Harris for the United States and Defense Counsel Michael Brown. Arraignment as to Robert Alexander (1) Count 1,2 held on 12/21/2015, Plea entered by Robert Alexander Not Guilty on All Counts. (Tape #3:02–3:04, 3:34–3:45.) (Gillespie, Saudia) (Entered: 01/05/2016) |
| 12/22/2015 | | ORDER REASSIGNING CASE as to Robert Alexander. Reassigned to Chief Judge Carol Bagley Amon as related to 12cr187. Judge Edward R. Korman no longer assigned to the case. Please download and review the Individual Practices of the assigned Judges, located on our website. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Ordered by Chief Judge Carol Bagley Amon on 12/22/2015. (Bowens, Priscilla) (Entered: 12/22/2015) |
| 01/05/2016 | 9 | APPLICATION AND ORDER OF EXCLUDABLE DELAY as to Robert Alexander Time excluded from 12/21/2015 until 1/20/2016. Ordered by Chief Mag. Judge Steven |

**A000004**

| | | M. Gold on 12/21/2015. (Gillespie, Saudia) (Entered: 01/05/2016) |
|---|---|---|
| 01/05/2016 | 10 | Letter *detailing discovery provided to date* as to Robert Alexander (Harris, Ryan) (Entered: 01/05/2016) |
| 01/07/2016 | 11 | Minute Entry for proceedings held before Chief Judge Carol Bagley Amon:Status Conference as to Robert Alexander held on 1/7/2016. Counsel for parties present. Chief Amon concurs with excludable delay previously entered on 1/5/16 through 1/20/16 by USMJ Gold. Status Conference set for 1/20/2016 at 11:30 AM in Courtroom 10D South before Chief Judge Carol Bagley Amon. (Court Reporter Lisa Schwam.) (Fernandez, Erica) (Entered: 01/08/2016) |
| 01/14/2016 | 12 | Letter *detailing Rule 16 discovery provided to date* as to Robert Alexander (Harris, Ryan) (Entered: 01/14/2016) |
| 01/20/2016 | 13 | Minute Entry for proceedings held before Chief Judge Carol Bagley Amon:Status Conference as to Robert Alexander held on 1/20/2016. Counsel for parties present. Govt has provided deft w/agreement to cover both cases.Dft seeks additional discovery on CR15−635. Suppression motion under consideration (statements & evidence) OED cont'd (plea discussions) 15CR635; Further conference set for 1/29/16 at noon in Courtroom 10D South before Chief Judge Carol Bagley Amon. (Court Reporter Sherry Bryant.) (Fernandez, Erica) (Entered: 01/22/2016) |
| 01/20/2016 | 14 | ORDER TO CONTINUE – Ends of Justice as to Robert Alexander Time excluded from 1/20/16 until 1/29/16. Ordered by Chief Judge Carol Bagley Amon on 1/20/2016. (Fernandez, Erica) (Entered: 01/22/2016) |
| 01/27/2016 | 15 | Letter *providing Rule 16 discovery* as to Robert Alexander (Harris, Ryan) (Entered: 01/27/2016) |
| 01/29/2016 | 17 | Minute Entry for proceedings held before Chief Judge Carol Bagley Amon:Status Conference as to Robert Alexander held on 1/29/2016. Counsel for parties present. Dft not produced due to illness as reported by the USMO. Further Conference set for 2/17/2016 at 10:00 AM in Courtroom 10D South before Chief Judge Carol Bagley Amon. OED ent'd (unavailability of deft; plea discussions) (Court Reporter Angela Grant.) (Fernandez, Erica) (Entered: 02/12/2016) |
| 01/29/2016 | 18 | ORDER TO CONTINUE – Ends of Justice as to Robert Alexander Time excluded from 1/29/16 until 2/17/16. Ordered by Chief Judge Carol Bagley Amon on 1/29/2016. (Fernandez, Erica) (Entered: 02/12/2016) |
| 02/04/2016 | 16 | Letter *providing Rule 16 discovery* as to Robert Alexander (Harris, Ryan) (Entered: 02/04/2016) |
| 02/17/2016 | 19 | Minute Entry for proceedings held before Chief Judge Carol Bagley Amon:Status Conference as to Robert Alexander held on 2/17/2016. Counsel for parties present. Deft's oral motion to suppress statement and evidence deemed made by the Court today. Formal motion papers to be submitted by 3/2/16; Govt to respond by 3/16/16. Status Conference set for 3/25/2016 at 09:30 AM in Courtroom 10D South before Chief Judge Carol Bagley Amon. Jury Selection set for 4/18/2016; Deft consents to selection by USMJ. Pretrial Conference set for 4/18/2016 at 04:30 PM in Courtroom 10D South before Chief Judge Carol Bagley Amon. Trial set for 4/25/2016 at 09:30 AM. OED cont'd (pending motion) (Court Reporter Anthony Frisolone.) (Fernandez, Erica) (Entered: 02/18/2016) |
| 02/24/2016 | 20 | Letter *enclosing Rule 16 discovery* as to Robert Alexander (Harris, Ryan) (Entered: 02/24/2016) |
| 03/02/2016 | 21 | First MOTION for Hearing by Robert Alexander. (Brown, Michael) (Entered: 03/02/2016) |
| 03/07/2016 | 22 | Letter *disclosing Rule 16 discovery* as to Robert Alexander (Harris, Ryan) (Entered: 03/07/2016) |
| 03/09/2016 | 23 | Letter *requesting an adjournment of the trial date* as to Robert Alexander (Harris, Ryan) (Entered: 03/09/2016) |

| 03/11/2016 | 24 | Letter *regarding Rule 16 Discovery* as to Robert Alexander (Brown, Michael) (Entered: 03/11/2016) |
|---|---|---|
| 03/14/2016 | | NOTICE OF TIME CHANGE as to Robert Alexander: Please be advised that the time of the status conference set for 3/15/16 has been changed to 4:00 pm in Courtroom 10D South before Chief Judge Carol Bagley Amon. (Holley, Vanessa) (Entered: 03/14/2016) |
| 03/15/2016 | 26 | Minute Entry for proceedings held before Chief Judge Carol Bagley Amon: Status Conference as to Robert Alexander held on 3/15/2016. A.U.S.A Ryan Harris present for Government. Michael Brown, F/D present for defendant. Defendant not produced due to illness. Defense counsel consents to waiving defendant's appearance. Government application for trial adjournment granted. Jury Selection and Trial adjourned to 5/2/2016 in Courtroom 10D South before Chief Judge Carol Bagley Amon. Suppression Hearing adjourned to 3/31/2016 10:00 AM in Courtroom 10D South before Chief Judge Carol Bagley Amon. (Court Reporter Michele Nardone.) (Basnight, Jasmine) (Entered: 03/16/2016) |
| 03/16/2016 | 25 | Letter *requesting an adjustment of the trial schedule* as to Robert Alexander (Harris, Ryan) (Entered: 03/16/2016) |
| 03/16/2016 | 27 | RESPONSE in Opposition re 21 First MOTION for Hearing (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit) (Harris, Ryan) (Entered: 03/16/2016) |
| 03/16/2016 | | ORDER as to Robert Alexander re 25 Letter: The government's application for trial schedule adjustment is hereby granted. The jury selection shall remain scheduled for 5/2/16 (time to be set by assigned U.S.M.J.). The trial shall commence on 5/9/16 at 9:30. So Ordered by Chief Judge Carol Bagley Amon on 3/16/2016. (Holley, Vanessa) (Entered: 03/16/2016) |
| 03/17/2016 | 28 | Letter *disclosing Rule 16 discovery* as to Robert Alexander (Harris, Ryan) (Entered: 03/17/2016) |
| 03/24/2016 | 29 | Letter *enclosing 3500 material* as to Robert Alexander (Harris, Ryan) (Entered: 03/24/2016) |
| 03/29/2016 | 31 | Letter *enclosing Rule 26.2 material* as to Robert Alexander (Brown, Michael) (Entered: 03/29/2016) |
| 03/30/2016 | 32 | RESPONSE to Motion re 21 First MOTION for Hearing *& Gov't Subsequent Application* (Brown, Michael) (Entered: 03/30/2016) |
| 03/31/2016 | 33 | Minute Entry for proceedings held before Chief Judge Carol Bagley Amon:Suppression Hearing as to Robert Alexander held on 3/31/2016. Counsel for parties present. Officer Genaro Barreiro sworn & examined. Officer Daniel Golat sworn & examined. Govt Rests. Charnae Alexander sworn & examined. Defense Rests. Oral Argument heard. Post Hrg submissions due as follows: defense 4/11; govt 4/21. Pretrial Conference set for 4/28/2016 09:30 AM in Courtroom 10D South before Chief Judge Carol Bagley Amon. OED cont'd (interest of justice) (Court Reporter Victoria Torres−Butler.) (Fernandez, Erica) (Entered: 04/04/2016) |
| 03/31/2016 | 34 | ORDER TO CONTINUE – Ends of Justice as to Robert Alexander Time excluded from 3/31/16 until 4/28/16. Ordered by Chief Judge Carol Bagley Amon on 3/31/16. (Fernandez, Erica) (Entered: 04/04/2016) |
| 04/07/2016 | | ORDER as to Robert Alexander: This case has been referred to me for selection of a trial jury on May 2, 2016. Counsel must appear promptly at 9:00 AM that day in Courtroom 10D South to begin selection. The parties must submit no later than noon on April 25, 2016 the following (to the extent not previously submitted): proposed questions to ask prospective jurors during voir dire, a short description of the case and a list of the names of all persons, entities, and locations that the party expects may be mentioned during the trial. Only questions specifically addressing the issues to be tried should be submitted; routine background questions are not necessary. Ordered by Magistrate Judge Vera M. Scanlon on 4/7/2016. (Quinlan, Krista) (Entered: 04/07/2016) |

| 04/11/2016 | 35 | Letter *regarding Evidentiary Hearing & VOSR matter* as to Robert Alexander (Brown, Michael) (Entered: 04/11/2016) |
| 04/11/2016 | 36 | MEMORANDUM in Support re 21 First MOTION for Hearing *to Suppress Evidence* (Brown, Michael) (Entered: 04/11/2016) |
| 04/14/2016 | 37 | Letter *enclosing Rule 16 discovery* as to Robert Alexander (Harris, Ryan) (Entered: 04/14/2016) |
| 04/21/2016 | 38 | MEMORANDUM in Opposition re 21 First MOTION for Hearing (Attachments: # 1 Exhibit, # 2 Exhibit) (Harris, Ryan) (Entered: 04/21/2016) |
| 04/22/2016 | 39 | Letter *containing expert disclosures* as to Robert Alexander (Harris, Ryan) (Entered: 04/22/2016) |
| 04/22/2016 | 40 | First MOTION in Limine by USA as to Robert Alexander. (Harris, Ryan) (Entered: 04/22/2016) |
| 04/25/2016 | 41 | First MOTION in Limine by Robert Alexander. (Brown, Michael) (Entered: 04/25/2016) |
| 04/25/2016 | 42 | Proposed Jury Instructions by Robert Alexander, Proposed Voir Dire by Robert Alexander (Brown, Michael) (Entered: 04/25/2016) |
| 04/25/2016 | 43 | Proposed Voir Dire by USA as to Robert Alexander (Harris, Ryan) (Entered: 04/25/2016) |
| 04/26/2016 | 44 | RESPONSE in Opposition re 41 First MOTION in Limine (Harris, Ryan) (Entered: 04/26/2016) |
| 04/28/2016 | 45 | Minute Entry for proceedings held before Judge Carol Bagley Amon: Oral Argument as to Robert Alexander held on 4/28/2016. Oral Argument heard re post trial Suppression hearing brieffs. Ruling to be rendered 5/3/16 at 11:30 AM. Jury selection to proceed on 5/2/16 as previously scheduled. (Court Reporter Gene Rudolph.) (Fernandez, Erica) (Entered: 04/29/2016) |
| 04/29/2016 | 46 | NOTICE OF ATTORNEY APPEARANCE: Michelle A. Gelernt appearing for Robert Alexander (Gelernt, Michelle) (Entered: 04/29/2016) |
| 04/29/2016 | 47 | Second MOTION in Limine by USA as to Robert Alexander. (Harris, Ryan) (Entered: 04/29/2016) |
| 05/01/2016 | 48 | Letter *enclosing Rule 16 discovery* as to Robert Alexander (Harris, Ryan) (Entered: 05/01/2016) |
| 05/01/2016 | 49 | Letter *containing expert disclosures* as to Robert Alexander (Harris, Ryan) (Entered: 05/01/2016) |
| 05/02/2016 | 50 | Letter *enclosing 3500 material* as to Robert Alexander (Harris, Ryan) (Entered: 05/02/2016) |
| 05/02/2016 | 51 | Second MOTION in Limine by Robert Alexander. (Brown, Michael) (Entered: 05/02/2016) |
| 05/02/2016 | 52 | Proposed Jury Instructions by Robert Alexander (Brown, Michael) (Entered: 05/02/2016) |
| 05/02/2016 | 54 | Letter dated 4/29/16 from Michael Brown II to Magistrate Scanlon as to Robert Alexander advising the Court that there was an error with respect to the name of a possible defense witness. (Fernandez, Erica) (Entered: 05/03/2016) |
| 05/02/2016 | 56 | Minute Entry for proceedings held before Magistrate Judge Vera M. Scanlon:Jury Selection as to Robert Alexander held on 5/2/2016. Appearances: Michael Brown and Michelle Gelernt present with the Defendant Robert Alexander; AUSAs Ryan Harris, Whitman Knapp and Special Agent Brittany Raffa present. Case Called. Jurors' voir dire. The parties exercise their peremptory challenges. The jurors are selected but not sworn. The trial will commence before Judge Amon on 5/9/16 at 09:00 AM in Courtroom 10D South before Judge Carol Bagley Amon. Court Reporter: Nicole Canales (FTR: 9:51–2:50.) (Fernandez, Erica) (Entered: 05/03/2016) |

| 05/03/2016 | 53 | Proposed Jury Instructions by USA as to Robert Alexander (Harris, Ryan) (Entered: 05/03/2016) |
| 05/03/2016 | 55 | First MOTION to Compel *MDC to permit Appropriate Clothing for Trial* by Robert Alexander. (Brown, Michael) (Entered: 05/03/2016) |
| 05/03/2016 | 57 | WITNESS LIST by USA as to Robert Alexander (Harris, Ryan) (Entered: 05/03/2016) |
| 05/03/2016 | 58 | EXHIBIT LIST by USA as to Robert Alexander (Harris, Ryan) (Entered: 05/03/2016) |
| 05/03/2016 | 61 | Minute Entry for proceedings held before Judge Carol Bagley Amon:Pretrial Conference as to Robert Alexander held on 5/3/2016. Suppression Hearing Ruling. Dft's Motion to Suppress guns denied. Dft's motion to suppress bottle granted. O/A held re, new issues.( Pretrial Conference set for 5/6/2016 12:00 PM in Courtroom 10D South before Judge Carol Bagley Amon.) AUSA Ryan Harris & Whitman Knapp; Defense Counsel, Robert Alexander. (Court Reporter Charleane Heading.) (Piper, Francine) (Entered: 05/05/2016) |
| 05/04/2016 | 59 | ORDER: ORDERED, that the Bureau of Prisons (Metropolitan DetentionCenter–MDC) accept the following clothing for Robert Alexander,Register Number 80042–053, in advance of his trial scheduled to begin on Monday, May 9, 2016. ORDERED, that the MDC permit Mr. Alexander to wear such clothing and that the U. S. Marshal Service accept and transport Mr.Alexander to Court wearing such clothing on May 9, 2016, and anydate thereafter until his trial is concluded. Ordered by Judge Carol Bagley Amon on 5/3/2016. (Basnight, Jasmine) (Entered: 05/04/2016) |
| 05/05/2016 | 60 | Third MOTION in Limine by Robert Alexander. (Brown, Michael) (Entered: 05/05/2016) |
| 05/05/2016 | 62 | Letter *regarding Defendant's Proposed Jury Instructions* as to Robert Alexander (Attachments: # 1 Exhibit A) (Harris, Ryan) (Entered: 05/05/2016) |
| 05/05/2016 | 63 | Letter *regarding objections to Government's proposed Jury Instructions* as to Robert Alexander (Brown, Michael) (Entered: 05/05/2016) |
| 05/05/2016 | 64 | RESPONSE in Opposition re 51 Second MOTION in Limine , 60 Third MOTION in Limine (Harris, Ryan) (Entered: 05/05/2016) |
| 05/06/2016 | 65 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Alexander held on 4/28/16, before Judge Amon. Court Reporter/Transcriber Rudolph. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 5/27/2016. Redacted Transcript Deadline set for 6/6/2016. Release of Transcript Restriction set for 8/4/2016. (Rudolph, Gene) (Entered: 05/06/2016) |
| 05/06/2016 | 66 | Minute Entry for proceedings held before Judge Carol Bagley Amon: Pretrial Conference as to Robert Alexander held on 5/6/2016. Counsel for parties present. Court's findings read into the record re suppression motion. Open issues resolved. Discussions held re jury instructions. (Court Reporter Charleane Heading.) (Fernandez, Erica) (Entered: 05/09/2016) |
| 05/09/2016 | 67 | DRAFT JURY INSTRUCTIONS: A revised draft of the Jury Charge is attached. The Court draws the parties' attention to two revisions in particular. First, the charge with respect to possession has been substituted with the corresponding portion of Instruction 35–49 in Sand, Modern Federal Jury Instructions. Second, upon further reflection, the Court has removed the charge concerning "Consciousness of Guilt from Flight." The parties should be prepared to make any remaining objections to the Jury Charge to the Court tomorrow. (Chabot, Ryan) (Entered: 05/09/2016) |
| 05/09/2016 | 68 | Letter *regarding 3500 disclosures* as to Robert Alexander (Harris, Ryan) (Entered: 05/09/2016) |
| 05/09/2016 | 73 | Minute Entry for proceedings held before Judge Carol Bagley Amon:Jury Trial as to Robert Alexander held on 5/9/2016. Counsel for parties present. Charging conference held. Witnesses sworn and examined. Trial adjourned to 5/10/2016 at 09:30 AM in Courtroom 10D South before Judge Carol Bagley Amon. (Court Reporter Stacey |

| | | |
|---|---|---|
| | | Mace.) (Fernandez, Erica) (Entered: 05/17/2016) |
| 05/10/2016 | 69 | DRAFT VERDICT SHEET. See attached. (Chabot, Ryan) (Entered: 05/10/2016) |
| 05/10/2016 | 74 | Minute Entry for proceedings held before Judge Carol Bagley Amon: Jury Trial as to Robert Alexander held on 5/10/2016. Counsel for parties present. Witnesses sworn and examined. Jury Trial set for 5/11/2016 at 09:30 AM in Courtroom 10D South before Judge Carol Bagley Amon. (Court Reporter Stacey Mace.) (Fernandez, Erica) (Entered: 05/17/2016) |
| 05/11/2016 | 70 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Alexander held on 05–09–2016, before Judge CBA. Court Reporter/Transcriber Stacy Mace. Email address: smacerpr@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 6/1/2016. Redacted Transcript Deadline set for 6/13/2016. Release of Transcript Restriction set for 8/9/2016. (Mace, Stacy) (Entered: 05/11/2016) |
| 05/11/2016 | 71 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Alexander held on 05–10–2016, before Judge CBA. Court Reporter/Transcriber Stacy Mace. Email address: smacerpr@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 6/1/2016. Redacted Transcript Deadline set for 6/13/2016. Release of Transcript Restriction set for 8/9/2016. (Mace, Stacy) (Entered: 05/11/2016) |
| 05/11/2016 | 72 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Alexander held on 05–11–2016, before Judge CBA. Court Reporter/Transcriber Stacy Mace. Email address: smacerpr@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 6/1/2016. Redacted Transcript Deadline set for 6/13/2016. Release of Transcript Restriction set for 8/9/2016. (Mace, Stacy) (Entered: 05/11/2016) |
| 05/11/2016 | 75 | Minute Entry for proceedings held before Judge Carol Bagley Amon: Jury Trial as to Robert Alexander held on 5/11/2016. Counsel for parties present. Govt's rebuttal held. Jury trial resumes. Jury trial ends. Guilty Verdict on Count one (1) and not Guilty Verdict on Count two (2). Referred to Probation Dept for PSI Report. Sentencing schedule set as follows: PSI disclosure 8/3/16; deft's submission 8/17/16; Govt's response 8/24/16; Sentencing set for 8/31/2016 at 10:00 AM in Courtroom 10D South before Judge Carol Bagley Amon. (Court Reporter Stacey Mace.) (Fernandez, Erica) (Entered: 05/17/2016) |
| 05/11/2016 | 77 | COURT EXHIBIT #1 – Jury Charge as to Robert Alexander. (Fernandez, Erica) (Entered: 05/17/2016) |
| 05/11/2016 | 79 | JURY VERDICT as to Robert Alexander (1) Guilty on Count 1; Robert Alexander (1) Not Guilty on Count 2. (Fernandez, Erica) (Entered: 05/18/2016) |
| 05/17/2016 | 76 | ORDER as to Robert Alexander: The Court's Order the U.S. Probation Officer is authorized to testify in Federal Court and release supervision records, if necessary. Ordered by Judge Carol Bagley Amon on 5/10/2016. (Fernandez, Erica) (Entered: 05/17/2016) |
| 05/18/2016 | 78 | Jury Notes as to Robert Alexander (Fernandez, Erica) (Entered: 05/18/2016) |
| 07/21/2016 | 80 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Alexander held on May 3, 2016, before Judge Amon. Court Reporter/Transcriber Charlene M. Heading, Telephone number 718–613–2643. Email address: cheading@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of |

|  |  | Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 8/11/2016. Redacted Transcript Deadline set for 8/22/2016. Release of Transcript Restriction set for 10/19/2016. (Heading, Charleane) (Entered: 07/21/2016) |
|---|---|---|
| 07/22/2016 | 81 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Alexander held on May 6, 2018, before Judge Amon. Court Reporter/Transcriber Charleane M. Heading, Telephone number 718–613–2643. Email address: cheading@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 8/12/2016. Redacted Transcript Deadline set for 8/22/2016. Release of Transcript Restriction set for 10/20/2016. (Heading, Charleane) (Entered: 07/22/2016) |
| 08/03/2016 | 82 | ORDER as to Robert Alexander: An adjournment of sentence is acceptable. The new date will be 9/14/16 at 10:00 AM in Courtroom 10D South before Judge Carol Bagley Amon. PSI disclosure due 8/17/16; Deft's sentencing letter by 8/31/16; Govt's response due 9/7/16. Ordered by Judge Carol Bagley Amon on 8/1/2016. (Fernandez, Erica) (Entered: 08/03/2016) |
| 08/31/2016 |  | RESCHEDULING NOTICE as to Robert Alexander: Please be advised that the Sentencing has been rescheduled to 9/20/16 at 10:00 before Judge Carol Bagley Amon, USDJ in Courtroom #10D South. (Holley, Vanessa) (Entered: 08/31/2016) |
| 08/31/2016 | 83 | SENTENCING MEMORANDUM by Robert Alexander (Brown, Michael) (Entered: 08/31/2016) |
| 09/07/2016 | 84 | SENTENCING MEMORANDUM by USA as to Robert Alexander (Harris, Ryan) (Entered: 09/07/2016) |
| 09/16/2016 | 85 | Letter *Addendum to Sentencing Memorandum* as to Robert Alexander (Brown, Michael) (Entered: 09/16/2016) |
| 09/19/2016 | 86 | Letter *Addendum to Sentencing Memorandum* as to Robert Alexander (Brown, Michael) (Entered: 09/19/2016) |
| 09/20/2016 | 87 | Minute Entry for proceedings held before Judge Carol Bagley Amon: Status Conference as to Robert Alexander held on 9/20/2016. Counsel for parties present. Deft not produced due to illness. Appearance waived. Violation guideline range identified for the Court by AUSA. USPD to issue revised report. Sentencing set for 9/28/2016 at 11:00 AM in Courtroom 10D South before Judge Carol Bagley Amon. (Court Reporter Charleane Heading.) (Fernandez, Erica) (Entered: 09/22/2016) |
| 09/23/2016 | 88 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Alexander held on December 7, 2015, before Judge SCANLON. Court Reporter/Transcriber Transcriptions Plus II, Inc.. Email address: laferrara44@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 10/14/2016. Redacted Transcript Deadline set for 10/24/2016. Release of Transcript Restriction set for 12/22/2016. (Hong, Loan) (Entered: 09/23/2016) |
| 09/23/2016 | 89 | Letter *Addendum to Sentencing Memorandum* as to Robert Alexander (Brown, Michael) (Entered: 09/23/2016) |
| 09/28/2016 | 90 | Minute Entry for proceedings held before Judge Carol Bagley Amon: Status Conference as to Robert Alexander held on 9/28/2016. Counsel for parties present. Pending issues; crime of violence; altered/obliterated serial #; Oral Argument heard. Supplemental letters to be submitted as follows: govt 10/6/16; dft 10/13/16. Sentencing adjourned to 10/24/2016 at 12:00 PM in Courtroom 10D South before Judge Carol Bagley Amon. (Court Reporter Nicole Canales.) (Fernandez, Erica) (Entered: 09/30/2016) |

| 10/06/2016 | 91 | SENTENCING MEMORANDUM by USA as to Robert Alexander (Harris, Ryan) (Entered: 10/06/2016) |
|---|---|---|
| 10/11/2016 | 92 | TRANSCRIPT of Proceedings as to Robert Alexander held on December 21, 2015, before Judge Gold. Court Transcriber: Transcriptions Plus II, Inc.. Email address: laferrara44@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 11/1/2016. Redacted Transcript Deadline set for 11/11/2016. Release of Transcript Restriction set for 1/9/2017. (Rocco, Christine) (Entered: 10/11/2016) |
| 10/13/2016 | 93 | SENTENCING MEMORANDUM SUPPLEMENT by Robert Alexander (Brown, Michael) (Entered: 10/13/2016) |
| 10/24/2016 | 95 | Minute Entry for proceedings held before Judge Carol Bagley Amon: Sentencing held on 10/24/2016 for Robert Alexander (1), Count(s) 1. Counsel for parties present. IMPRISONMENT: 51 Months; SUPERVISED RELEASE: 3 Years with special conditions; SPECIAL ASSESSMENT: $100.00. Fine waived.; Count(s) 2, Dismissed on Govt motion. (Court Reporter Lisa Schwam.) (Fernandez, Erica) (Entered: 10/31/2016) |
| 10/31/2016 | 94 | NOTICE OF APPEAL from 96 Judgment entered 10/31/16 by Attorney for Robert Alexander. No fee. Appellant represented by Federal Defenders of New York. Service done electronically. Please Note: This Notice of Appeal was originally filed 10/27/16. (Brown, Michael) Modified on 11/1/2016 to reflect what is being appealed, fee status and service. (McGee, Mary Ann). (Entered: 10/27/2016) |
| 10/31/2016 | 96 | JUDGMENT as to Robert Alexander (1), Count(s) 1, IMPRISONMENT: 51 Months; SUPERVISED RELEASE: 3 Years with special conditions; SPECIAL ASSESSMENT: $100.00. Fine waived.; Count(s) 2, Dismissed on Govt motion. Ordered by Judge Carol Bagley Amon on 10/31/2016. (Fernandez, Erica) (Entered: 10/31/2016) |
| 11/01/2016 | | Electronic Index to Record on Appeal as to Robert Alexander sent to US Court of Appeals 94 Notice of Appeal – Final Judgment, Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (McGee, Mary Ann) (Entered: 11/01/2016) |
| 12/07/2016 | 98 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Alexander held on 10–24–2016, before Judge Amon. Court Reporter/Transcriber Lisa Schwam, Telephone number 718–613–2268. Email address: LisaSchwam@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 12/28/2016. Redacted Transcript Deadline set for 1/9/2017. Release of Transcript Restriction set for 3/7/2017. (Schwam, Lisa) (Entered: 12/07/2016) |
| 03/02/2017 | 99 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Alexander held on September 20, 2016, before Judge Amon. Court Reporter/Transcriber Charleane Heading, Telephone number 718–613–2643. Email address: cheading@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 3/23/2017. Redacted Transcript Deadline set for 4/3/2017. Release of Transcript Restriction set for 5/31/2017. (Heading, Charleane) (Entered: 03/02/2017) |

A000011

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ DEC 11 2015 ★

**BROOKLYN OFFICE**

BWB:RCH
F.#2015R01965

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

ROBERT ALEXANDER,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**I N D I C T M E N T**

**CR 15 - 635**

(T. 18, U.S.C., §§ 922(g)(1), 922(k),
924(a)(1)(B), 924(a)(2), 924(d) and 3551
et seq.; T. 21, U.S.C., § 853(p); T. 28,
U.S.C., § 2461(c))

**KORMAN, J.**

**ORENSTEIN, M.J.**

THE GRAND JURY CHARGES:

<u>COUNT ONE</u>
(Felon in Possession of a Firearm)

      1.    On or about October 31, 2015, within the Eastern District of New York,

the defendant ROBERT ALEXANDER, having previously been convicted in a court of a

crime punishable by a term of imprisonment exceeding one year, did knowingly and

intentionally possess in and affecting commerce one or more firearms, to wit: one Intratec

AB-10 9 millimeter semi-automatic pistol, and one Calico M950 9 millimeter semi-

automatic pistol.

      (Title 18, United States Code, Sections 922(g)(1), 924(a)(2) and 3551 et seq.)

<u>COUNT TWO</u>
(Possession of a Defaced Firearm)

      2.    On or about October 31, 2015, within the Eastern District of New York,

the defendant ROBERT ALEXANDER did knowingly and intentionally possess a firearm, to

A000012

wit: a Calico M950 9 millimeter semiautomatic pistol, which firearm had the manufacturer's serial number removed, obliterated and altered, and which had been shipped and transported in interstate commerce.

(Title 18, United States Code, Sections 922(k), 924(a)(1)(B) and 3551 et seq.)

### CRIMINAL FORFEITURE ALLEGATION

3.      The United States hereby gives notice to the defendant ROBERT ALEXANDER, that, upon his conviction of either Count One or Count Two, the government will seek forfeiture in accordance with Title 18, United States Code, Section 924(d) and Title 28, United States Code, Section 2461(c), which require the forfeiture of any firearm or ammunition involved in or used in any knowing violation of Title 18, United States Code, Section 922, including but not limited to one Intratec AB-10 9 millimeter semiautomatic pistol and one Calico M950 9 millimeter semiautomatic pistol, both recovered on or about October 31, 2015.

4.      If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a)      cannot be located upon the exercise of due diligence;

(b)      has been transferred or sold to, or deposited with, a third party;

(c)      has been placed beyond the jurisdiction of the court;

(d)      has been substantially diminished in value; or

(e)      has been commingled with other property which cannot be divided without difficulty; it is the intent of the United States, pursuant to Title 21, United

2

**A000013**

States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 924(d); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

A TRUE BILL

_____ FOREPERSON

ROBERT L. CAPERS
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

By: _____
Assistant U.S. Attorney

3

A000014

F. #2015R01965
FORM DBD-34
JUN. 85

No.

# UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

THE UNITED STATES OF AMERICA

*vs.*

*ROBERT ALEXANDER,*

Defendant.

# INDICTMENT

(T. 18, U.S.C., §§ 922(g)(1), 922(k), 924(a)(1)(B), 924(a)(2), 924(d)(1) and 3551 et seq.;
T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

*A true bill.*

_____
                                                                    *Foreperson*

*Filed in open court this* _____ *day,*

*of* _____ *A.D. 20* __ __

_____
                                                                         *Clerk*

*Bail. $* _____

*Ryan C. Harris, Assistant U.S. Attorney (718) 254-6489*

A000015

# CR 15 - 635 ─

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ DEC 1 1 2015 ★
BROOKLYN OFFICE

## INFORMATION SHEET

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

1.  Title of Case: United States v. Robert Alexander

2.  Related Magistrate Docket Number(s):    15-M-1112

3.  Arrest Date: 12/7/2015

4.  Nature of offense(s):   ☒  Felony
                           ☐  Misdemeanor

**KORMAN, J.**

**ORENSTEIN, M.J.**

5.  Related Cases - Title and Docket No(s). (Pursuant to Rule 50.3.2 of the Local
    E.D.N.Y. Division of Business Rules): 12-CR-187

6.  Projected Length of Trial:   Less than 6 weeks   ☒
                                 More than 6 weeks   ☐

7.  County in which crime was allegedly committed: Richmond
    (Pursuant to Rule 50.1(d) of the Local E.D.N.Y. Division of Business Rules)

8.  Was any aspect of the investigation, inquiry and prosecution giving rise to the case
    pending or initiated before March 10, 2012.[1]      ☐ Yes  ☒ No

9.  Has this indictment/information been ordered sealed?      ☐ Yes  ☒ No

10. Have arrest warrants been ordered?                        ☒ Yes  ☐ No

11. Is there a capital count included in the indictment?      ☐ Yes  ☒ No

ROBERT L. CAPERS
UNITED STATES ATTORNEY

By: _____
Ryan C. Harris
Assistant U.S. Attorney
(718) 254-6489

---

[1]   Judge Brodie will not accept cases that were initiated before March 10, 2012.

Rev. 10/04/12

**A000016**



GOVERNMENT
EXHIBIT
2
15-CR-635 (CBA)

A000017

GOVERNMENT
EXHIBIT
3
15-CR-635 (CBA)

A000018



GOVERNMENT
EXHIBIT
4
15-CR-635 (CBA)

A000019

Case 1:15-cr-00635-CBA   Document 27-5   Filed 03/16/16   Page 1 of 1 PageID #: 100



GOVERNMENT
EXHIBIT
5
15-CR-635 (CBA)

A000020

Case 1:15-cr-00635-CBA   Document 27-6   Filed 03/16/16   Page 1 of 1 PageID #: 101



GOVERNMENT
EXHIBIT
6
15-CR-635 (CBA)

A000021



144 Harrison Avenue

Shed

A000022



A000023

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA,    : 15-CR-00635(CBA)
    :
    :
    :
    -against-    : United States Courthouse
    : Brooklyn, New York
    :
    :
ROBERT ALEXANDER,    : Thursday, March 31, 2016
    : 10:00 p.m.
    Defendant.    :
    :
    :

- - - - - - - - - - - - - X


TRANSCRIPT OF CRIMINAL CAUSE FOR SUPPRESSION HEARING
BEFORE THE HONORABLE CAROL B. AMON
UNITED STATES CHIEF JUDGE


A P P E A R A N C E S :

For the Government: ROBERT L. CAPERS, ESQ.
    United States Attorney
    Eastern District of New York
    271 Cadman Plaza East
    Brooklyn, New York 11201
    BY:  RYAN HARRIS, ESQ.
    NATHAN DANIEL REILLY, ESQ.
    Assistant United States Attorney


For the Defendant:    FEDERAL DEFENDERS OF NEW YORK
    16 Court Street
    3rd Floor
    Brooklyn, New York  11201
    BY:MICHAEL BROWN, II, ESQ.
    MICHELLE A. GELERNT, ESQ.

Court Reporter:    VICTORIA A. TORRES BUTLER, CRR
    225 Cadman Plaza East/Brooklyn, NY 11201
    VButlerRPR@aol.com
Proceedings recorded by mechanical stenography, transcript
produced by Computer-Aided Transcription.

1          (In open court.)

2          (Judge CAROL B. AMON enters the courtroom.)

3          THE COURT:  Are we prepared to proceed?

4          THE COURTROOM DEPUTY:  We are just waiting for the

5     defendant, Judge.

6          (Defendant enters the courtroom.)

7          THE COURTROOM DEPUTY:  United States against

8     Alexander.

9          Please, state your appearances for the record.

10         MR. HARRIS:  Ryan Harris for the United States.

11         With me is Nathan Reilly.  Also with me is Agent

12    Brittany Raffa with the Bureau of Alcohol Tobacco and

13    Firearms.

14         S.A. RAFFA:  Good morning.

15         MR. REILLY:  Good morning.

16         THE COURT:  Good morning.

17         MR. BROWN:  Good morning, Your Honor.

18         Michael Brown, Federal Defenders of New York.

19    Present next to me is Michelle Gelernt.

20         MS. GELERNT:  Good morning, Your Honor.

21         MR. BROWN:  Next to her is Mr. Alexander, and

22    present next to him is Ms. Emma Schindler, a paralegal in our

23    office.

24         MS. SCHINDLER:  Good morning.

25         THE COURT:  Good morning.

1          Are we ready to proceed?

2               MR. HARRIS:  Yes, we are, Your Honor.

3               THE COURT:  Call your first witness.

4               MR. HARRIS:  Yes, Judge.  Just two preliminary

5     matters.

6               THE COURT:  Okay, sure.

7               MR. HARRIS:  First, is that I believe Defense

8     Counsel indicated that they were going to call a witness and

9     if that witness is present in the courtroom, we would ask that

10    they be cleared from the courtroom during the testimony of the

11    other witnesses.

12              THE COURT:  Okay.

13              MR. BROWN:  She is not.

14              THE COURT:  Who is not?

15              MR. BROWN:  The witness that he is referring to is

16    not present in the courtroom, she is waiting outside.

17              THE COURT:  All right.

18              MR. HARRIS:  The second preliminary issue,

19    Your Honor, the Government filed a _Giglio_ disclosure and

20    motion to preclude cross-examination on certain CCRB citations

21    as well as a civil lawsuit.

22              THE COURT:  Right.

23              MR. HARRIS:  I am happy to speak to that, unless the

24    Court would like to rely on my papers.

25              THE COURT:  I take it you do not intend in this

1  proceeding to cross-examine on those materials.  Isn't that

2  something we can take up later with respect to the trial?

3          MR. BROWN:  Well, Your Honor, at a suppression

4  hearing I believe we need to make a determination regarding

5  credibility.

6          THE COURT:  Right.

7          MR. BROWN:  What the Government turned over were

8  their summaries of these incidents and not the actual

9  underlying documents.  I did ask for them to turn them over.

10  I think because credibility is an issue that it would be

11  relevant for me to be able to inquire.

12          THE COURT:  Well, the Government is aware of its

13  obligation under <u>Brady</u>.

14          Is there additional information in these reports

15  that you need to turn over, Counsel?  Because you have turned

16  over summaries.

17          MR. HARRIS:  No, Your Honor, there is no additional

18  information.  There have been no credibility determinations as

19  to these officers.

20          THE COURT:  There were no adverse credibility

21  determinations made on any of the officers?

22          MR. HARRIS:  No, Your Honor.  In fact, in the

23  majority of these CCRB investigations, none of these officers

24  were investigated.  They just happened to be present at the

25  scene and failed to make memo book entries as to the events.

1           THE COURT:  Is that the only thing with which they
2    were charged; failing to make memo book entries?  Is that all
3    that relates to these witnesses who are being called;
4    witnesses Barreiro and Golat?
5           MR. HARRIS:  That's true with respect to
6    Officer Barreiro.
7           With respect to Officer Golat he was investigated
8    for use of force, specifically on one occasion he brandished
9    his firearm.  He was exonerated for those allegations.  It was
10   determined that use of force was appropriate under the
11   circumstances.
12          And the second is that he was investigated for a
13   stop of a car.  Those charges were determined to be
14   unsubstantiated.
15          THE COURT:  All right.
16          With respect to the memo book entries, were they
17   substantiated?
18          MR. HARRIS:  There wasn't a specific allegation that
19   the CCRB investigated.  However, during the course of the
20   investigation they turned over their memo book entries and
21   observed that they did not have memo book entries related to
22   these specific events.
23          THE COURT:  Is that true with Mr. Barreiro and
24   Mr. Golat, that they did not make memo book entries?
25          MR. HARRIS:  Correct, Your Honor.

1          Just to be clear, I'm speaking about the events that

2     were the subject of the CCRB investigation, not this case.

3          THE COURT:  Not this case.

4          MR. HARRIS:  Yes, Your Honor.

5          THE COURT:  Why is any of that relevant?

6          MR. BROWN:  Particularly with the one incident that

7     the Government has turned over a summary for, July 30th, 2014

8     where both officers were involved.  There appears to be a

9     substantiated allegation with respect to a search of a vehicle

10    and a bag found inside that vehicle without leave or

11    justification.  Both Officer Golat and Officer Barreiro failed

12    to make memo book entries in those cases, along with other

13    cases from those summaries that I got from Mr. Harris.

14         From a defense perspective, without having the

15    underlying documents, the presumption would be that they

16    intentionally did not make memo book entries in those cases in

17    an effort to either cover up or -- I don't know the reason why

18    when I don't have the underlying documents, but I do think

19    it's relevant.

20         THE COURT:  Is this the search issue that was not

21    substantiated?

22         MR. BROWN:  So my understanding, again not having

23    the documents but just having the summary, allegations that

24    two of the officers -- not Barreiro or Golat -- searched the

25    complainants vehicle and a bag was found within the vehicle

1   without legal justification were deemed substantiated.  That's

2   what I have from the summary.  I don't have the underlying.

3          And with respect to Officer Golat, with respect to

4   the issue of the brandishing of the firearm, again, without

5   any of the underlying documents --

6          THE COURT:  But this case has nothing to do with

7   excessive force.

8          MR. BROWN:  I understand that.

9          THE COURT:  So, I don't understand why the

10  brandishing of a firearm is relevant.

11         MR. HARRIS:  And, Your Honor, just to clarify the

12  record, the July 30th, 2014 incident which Defense Counsel is

13  speaking about, neither of these two officers were

14  investigated for the search, neither of these two officers

15  were involved in the search.  They were called as backup by

16  other officers investigated for the search.  The only

17  investigation of these two officers in relation to that

18  incident was for Officer Golat for the brandishing of his

19  firearm and for which he was exonerated.

20         THE COURT:  So, the memo book entries did not apply

21  to the July 13th.

22         MR. HARRIS:  They did, Your Honor, but it was not an

23  allegation or investigation by the CCRB specifically of the

24  memo book entries.  During the course of that investigation

25  they found that these officers did not have memo book entries

1   related to this specific event.

2           THE COURT:  Were they present at the search?

3           MR. HARRIS:  Your Honor, my information is that

4   another set of officers stopped a vehicle for unreasonable

5   noise and obstruction of a windshield.  When the driver of the

6   vehicle refused to exit, these two officers along with one or

7   two other officers were called as backup.  At this point, the

8   driver of the vehicle reached under the driver's seat and

9   Officer Golat brandished his firearm, at that point not

10  knowing what the driver was reaching for.  Once he became

11  aware that the driver was not reaching for anything, he

12  reholstered his firearm.

13          So, did not participate in this initial search of

14  the car.  They didn't participate in the, assisting the

15  officers.

16          THE COURT:  But they were there during the course of

17  whatever happened.

18          MR. HARRIS:  Not the initial stop, Your Honor, but

19  subsequent to their arrival yes, they were.

20          THE COURT:  But it was the search that was

21  determined to be bad?

22          MR. HARRIS:  Correct, Your Honor, but again, not

23  with respect to these two officers.

24          THE COURT:  And the claim is they made no memo book

25  entries of that event?

1      MR. HARRIS:  Correct, Your Honor.

2      THE COURT:  Is there a memo book issue here?

3      MR. BROWN:  So, Your Honor, during the course of

4  questioning I could see how there could be an issue of

5  credibility with respect to the memo books just in terms of

6  matching up with other documentations of times in this case,

7  Your Honor.  But again, I think this is the most I've gotten

8  about that incident.  I did know there was a firearm

9  allegation as to Golat and I might have thought it didn't

10  relate to the search, but saying that Officer Golat brandished

11  a firearm, because he thought there was a search, clearly he

12  was there for some part of a search.

13      And not entering memo book entries in an effort to

14  cover up a bad search that was later deemed substantiated as

15  without legal expectation is important credibility as to how

16  these officers act if there is a bad search at play.  So,

17  again without having an underlying documents...

18      THE COURT:  I do not think the underlying

19  documents -- can you provide the underlying documents on this

20  one transaction?

21      MR. HARRIS:  Your Honor, I do have the underlying

22  documents.  I am happy to provide them to the Court for an

23  in camera inspection if the Court would like, but I don't

24  believe there is any relevant information in them that would

25  be of further use here.

1        Defense Counsel just spoke to the purpose for these

2   officers not entering memo books to cover up an investigation.

3   There was no allegation of that.  There was no allegation that

4   these officers obstructed justice or attempted to not make

5   memo book entries in order to sabotage an investigation of the

6   stop.  They were simply cited for not complying with the

7   Patrol Guide in making memo book entries.

8        THE COURT:  You just provide me with the full

9   document and I will take a look at it.  But let's get started.

10       MR. BROWN:  Your Honor, am I allowed to just inquire

11  with limits to that one particular incident?  On July 30th

12  they were both involved and there was a bad search that

13  involved a bag.

14       When the Government says no allegations, for a CCRB

15  complaint there has to be knowledge of the officer's names.

16  If the other officers happened to be the arresting officers,

17  the person wouldn't even have known how to make an allegation

18  against these two, but they were clearly there.

19       THE COURT:  I do not understand why it is relevant.

20  They are not the ones who did the search.

21       MR. BROWN:  Well, Your Honor, my understanding is

22  they were present for the search.  They don't stop the search.

23  Somehow Officer Golat is involved in brandishing his firearm

24  because he thinks there's a search.  It's very hard without

25  the documents.

1          THE COURT:  I will review the documents.  Let's just

2    move on and I will see whether any inquiry is warranted.

3          MR. HARRIS:  Your Honor, I will provide to the Court

4    just one small clarification.

5          There was an initial search that three officers were

6    investigated for.  Officer Golat, there was an investigation

7    for him for searching the underneath the driver's seat to see

8    if there was a firearm there.  However, he did not participate

9    in the search of the car otherwise.

10         THE COURT:  Was that search found to be bad?

11         MR. HARRIS:  No, Your Honor.  He was exonerated for

12   that.  The CCRB determined he had legal justification to look

13   under the driver's seat to determine if there was a firearm

14   there.  And I will provide the CCRB materials.

15         THE COURT:  How extensive is it?

16         MR. HARRIS:  Less than ten pages, Your Honor.

17         THE COURT:  Okay.

18         Do you want to call your first witness?

19         MR. HARRIS:  Yes, Your Honor.

20         I will also provide the Court with a copy of the

21   Government's Exhibits.

22         The Government calls Officer Genaro Barreiro.

23         MR. BROWN:  I don't want to delay, I just want to

24   clarify so I don't ask questions that I shouldn't be asking,

25   Your Honor.

1           THE COURT:  I will just look through this.

2           MR. BROWN:  I will save that to the end, I suppose.

3           THE COURT:  Yes.

4           MR. BROWN:  And I will look for your direction.

5           THE COURT:  Okay, thank you.

6           (Witness enters and takes stand.)

7           THE COURTROOM DEPUTY:  Please, raise your right

8    hand.

9

10          (Continued on following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   **G E N A R O    B A R R E I R O,**

2           called by The Government, having been

3           first duly sworn, was examined and testified

4           as follows:

5           THE COURTROOM DEPUTY:  You may be seated.

6           Please, state and spell your name for the record.

7           THE WITNESS:  My name is Genaro Barreiro --

8   G-E-N-A-R-O, B-A-R-R-I-E-I-R-O.

9           THE COURT:  You may proceed.

10  DIRECT EXAMINATION

11  BY MR. HARRIS:

12  Q    Good morning.

13  A    Good morning, sir.

14  Q    Where do you work?

15  A    NYPD.  New York City Police Department, sir.

16  Q    What is your job title?

17  A    Police officer.

18  Q    How long have you been a police officer with the NYPD?

19  A    Around four years-and-a-half.

20  Q    And where are you currently assigned?

21  A    Staten Island Warrant Squad.

22  Q    What do you as a member of the Staten Island Warrant

23  Squad?

24  A    We look for people that were wanted with warrants,

25  fugitive people.

1  Q    How long have you been assigned to the Staten Island

2  Warrant Squad?

3  A    Around three months.

4  Q    Where were you assigned before the Staten Island Warrant

5  Squad?

6  A    121 Precinct.

7  Q    And where is the 121 Precinct located?

8  A    Located in Staten Island.  Richmond County.

9  Q    Which neighborhoods in Staten Island does the

10 121 Precinct cover?

11 A    Port Richmond area, Mariners Harbor, Howland.

12 Q    How long were you assigned to the 121 Precinct?

13 A    Around two years.

14 Q    What was your assignment at the 121 Precinct?

15 A    121 Anti-Crime.

16 Q    What did you do as a member of the Anti-Crime Unit?

17 A    We addressed violent conditions around the precinct.

18 Q    What does that mean?

19 A    Say, major burglaries, robberies, shootings.

20 Q    As part of your job with the Anti-Crime unit, did you

21 conduct patrols?

22 A    Yes, sir.

23 Q    As a member of the Anti-Crime Unit, did you wear a

24 uniform when you were on patrol?

25 A    No, sir.

1  Q    What did you wear instead?

2  A    Plain clothes.

3  Q    Would you wear anything to identify yourself as a police

4  officer?

5  A    Yes, my shield.

6  Q    Did you usually conduct these patrols in a vehicle or on

7  foot?

8  A    In a vehicle.

9  Q    What kind of car would you patrol in?

10 A    An unmarked vehicle, four-door Sedan.

11 Q    I want to direct your attention to October 30th going

12 into October 31st, 2015.

13        Were you working as a member of the Anti-Crime Unit

14 that day?

15 A    Yes.

16 Q    What was your shift?

17 A    7:30 p.m. to 04:05 a.m.

18 Q    When you say 7:30 p.m., was that on October 30th?

19 A    Yes.

20 Q    And 04:05 a.m., was that October 31st?

21 A    Yes.

22 Q    Were you on patrol that night?

23 A    Yes.

24 Q    Who were you on patrol with?

25 A    Police Officer Golat.

1    Q    What's Officer Golat's first name?

2    A    Daniel.

3    Q    Were you and Officer Golat in plain clothes that night?

4    A    Yes.

5    Q    Were you patrolling in an unmarked car?

6    A    Yes.

7    Q    Who was driving the car?

8    A    I was.

9    Q    Where was Officer Golat in the car?

10   A    Front passenger seat.

11   Q    What neighborhood were you patrolling?

12   A    Port Richmond area.

13   Q    When you were a member of the Anti-Crime Unit did you

14   usually patrol that neighborhood?

15   A    Yes.

16   Q    Generally low speaking, what's the level of crime in that

17   neighborhood?

18   A    High.

19            THE COURT:  I'm sorry, what?

20            THE WITNESS:  High.

21            THE COURT:  Do you want to define what you mean by

22   that?  Oh, you are saying high.

23            THE WITNESS:  Yes.

24            THE COURT:  I thought you said hot.

25            THE WITNESS:  High.

1    THE COURT:  Okay.

2    MR. HARRIS:  If the Court would like,

3  Officer Barreiro can elaborate.

4    THE COURT:  Okay.

5  A    We get shootings over there, stabbings, a lot of people

6  get robbed over there.  Do a lot of robberies and stuff like

7  that?

8  Q    Where were you and Officer Golat at somewhere around

9  between 3:00 and 3:30 in the morning that night?

10  A    We were in around Harrison Avenue, driving down

11  Harrison Avenue.

12  Q    I'm showing you what has been marked for identification

13  as Government's Exhibit 1.

14    Do you recognize it?

15  A    Yes, sir.

16  Q    What is it?

17  A    That's the Port Richmond area, that's Harrison Avenue and

18  Treadwell, the area I was patrolling that night.

19  Q    Are you familiar with this area?

20  A    Yes, sir.

21  Q    Does this Exhibit -- I'm sorry.

22    Is this Exhibit a map?

23  A    Yes, it's a picture of a map level with streets.

24  Q    Does this map depicted in Government's Exhibit 1, fairly

25  and accurately depict the streets in the area where you were

1  patrolling on October 31st 2015?

2  A    Yes.

3         MR. HARRIS:  The Government moves for Government's

4  Exhibit 1 to be admitted in evidence.

5         THE COURT:  Received.

6         (Government's Exhibit 1 was received in evidence.)

7  Q    Looking at Government's Exhibit 1, does this map show

8  Harrison Avenue where you were patrolling?

9  A    Yes, sir.

10 Q    Officer Barreiro, using the screen in front of you, can

11 you draw an arrow showing the direction you were driving on

12 Harrison Avenue that night?

13 A    Yes.

14        MR. HARRIS:  Let the record reflect that the witness

15 is drawing a leftward facing arrow along Harrison Avenue in

16 Government's Exhibit 1.

17        THE COURT:  Okay.

18 Q    While you were driving down Harrison Avenue what, if

19 anything, did you notice?

20 A    We observed a vehicle parked in front of a house, 144

21 Harrison.

22        THE COURT:  What is the address?

23        THE WITNESS:  144 Harrison.

24        THE COURT:  Okay.

25 Q    You said you saw a vehicle.  Was the vehicle parked or

1    was it on?

2              MR. BROWN:  Objection, Your Honor.

3              THE COURT:  Overruled.

4    A    The vehicle was on.  It was the lights were on,

5    headlights were on, the lights were on.

6    Q    What else did you notice at that time?

7    A    Once approach towards there, I also observe a male with

8    an open container on his hand.

9              THE COURT:  Where?

10             THE WITNESS:  On the sidewalk with an open container

11   on his hand.

12             THE COURT:  So, you saw a male on the sidewalk with

13   an open container in his hand?

14             THE WITNESS:  Yes, ma'am.

15             THE COURT:  What do you mean by open container?

16             THE WITNESS:  A glass bottle of alcohol.

17   Q    Now, you said you saw him on the sidewalk.  Where was he

18   in relation to the car?

19   A    Sideways distance, I don't know.  Like, from here to the

20   end of the table.

21   Q    Were they standing in front of different houses or the

22   same house?

23   A    Same house.

24   Q    Was there anyone with the male in front of the house?

25   A    Yes?

1  Q    Who was that, or who did it appear to be?

2  A    A female.

3         THE COURT:  So, there were a male and female, both

4  outside, both on the sidewalk?

5         THE WITNESS:  Yes.

6         THE COURT:  Were they together?

7         THE WITNESS:  They were together, yeah.

8  Q    You mentioned that the male had an open container of

9  alcohol, a glass bottle.  Is it illegal in New York to drink

10  alcohol in public?

11  A    Yes.

12  Q    Now, when you first saw the man with the liquor bottle,

13  were you driving towards him or away from him?

14  A    Towards him.

15  Q    Did you have a clear view of the man with the liquor

16  bottle?

17  A    Yes.

18  Q    Were the lighting conditions adequate for you to see him?

19  A    Yes.

20  Q    What were the sources of light at that time?

21  A    My vehicle had the headlights on, the car in front had

22  the headlights on and right across there is approximately,

23  across the street there is a public light pole right on top.

24  Q    Did you later identify the man with the glass bottle?

25  A    Yes.

1   Q     And who was he?

2   A     Robert Alexander.

3   Q     Do you see Robert Alexander in the courtroom today?

4   A     Yes.

5   Q     Can you please identify Robert Alexander by describing an

6   article of clothing that he's wearing?

7   A     He's wearing dark brown shirt, brown shirt, dark brown.

8   I can't see, brown shirt.

9          MR. HARRIS:  Let the record reflect that the witness

10  has identified the defendant.

11         THE COURT:  Excuse me, where at the table?

12         THE WITNESS:  He's next to the female with the black

13  jacket with the glasses.

14         THE COURT:  All right.

15         The record will reflect the identification of the

16  defendant.

17         MR. BROWN:  No objection.

18  Q     Now, I'm going to show you a series of Exhibits.

19         I'm showing you what has been marked for

20  identification as Government's Exhibit 2.

21         Government's Exhibit 3.

22         Government's Exhibit 4.

23         Government's Exhibit 5.

24         Government's Exhibit 6.

25         Do you recognize those Exhibits?

1  A    Yes.

2  Q    What are they?

3  A    That's the location, 144 Harrison.

4  Q    And when you say that's the location, are those Exhibits

5  photographs of the location?

6  A    Yes.

7  Q    How do you know that Government's Exhibits 2, 3, 4, 5

8  and 6 depict the location 144 Harrison Avenue?

9  A    Because I patrol the area, I recognize the pictures.

10  Q    Other than the season and time of day, do these

11  photographs fairly and accurately reflect 144 Harrison as it

12  appeared on October 31st, 2015?

13  A    The house itself or the way the stuff next to the house,

14  no.

15  Q    Other than the stuff next to the house?

16  A    Yes.

17  Q    Do these photographs fairly and accurately depict 144

18  Harrison Avenue?

19  A    Yes.

20        MR. HARRIS:  The Government moves for Government's

21  Exhibits 2, 3, 4, 5 and 6 to be admitted into evidence.

22        MR. BROWN:  Brief voir dire, if I may?

23        THE COURT:  Okay.

24

25        (Continued on following page.)

1    VOIR DIRE

2    BY MR. BROWN:

3    Q    Can I have you take a look at Government's Exhibit 5.

4         You didn't take this photo, did you?

5    A    No, sir.

6    Q    And this photo was in the daytime; correct?

7    A    Yes, sir.

8    Q    You were on 144 Harrison at nighttime; correct?

9    A    Yes, sir.

10   Q    So, this doesn't fairly and accurately depict how 144

11   Harrison looked at nighttime, does it?

12   A    Not at nighttime.

13   Q    And this car that's in the photo, does that fairly and

14   accurately represent the same time on October 31st, 2015?

15   A    No.

16   Q    The items of property, were they the same on

17   October 31st, 2015?

18   A    Repeat the question.

19   Q    So, there's items in this photo.  I'm not pointing to

20   them, but you see there's a barrel in the picture, a chair.

21        Are these items in the same position they were on

22   October 31st, 2015?

23   A    I don't remember if they were same position, but it looks

24   similar to the scenario they had that day.  I don't know if

25   that's the same exact position.

1      MR. BROWN:  So, my objection would be based on the

2 things I just raised with respect to the time of photo and

3 that it doesn't fairly and accurately represent October 31st

4 2015 at night.

5      THE COURT:  Why wouldn't be it better for the

6 Government to have photos at night?

7      MR. HARRIS:  Your Honor, I think that this photo

8 will accurately show the layout of the backyard, which I think

9 is a key issue.

10      THE COURT:  It will be admitted for the purpose that

11 it's a picture of the house and it's a layout of the property.

12      I take it you are not suggesting the layout of the

13 property has been changed, but I take your point that it is

14 not a nighttime photo and it has limited evidentiary weight.

15      So, I will take that as an objection, to the weight

16 given to it, but I will receive them into evidence.

17      MR. BROWN:  Thank you.

18      (Government's Exhibits 2, 3, 4, 5 and 6 were

19 received in evidence.)

20 DIRECT EXAMINATION (Continuing)

21 BY MR. HARRIS:

22 Q    Now, if we can look at Government's Exhibit 2.

23      Can you circle the area where you saw the defendant

24 with a liquor bottle.

25      MR. HARRIS:  Let the record reflect that the witness

1   has circled the front left corner of the front yard in front

2   of 144 Harrison Avenue and the driveway of 144 Harrison

3   Avenue.

4           THE COURT:  All right, the record will so reflect.

5           That is the corner of the house, of the front yard

6   of the house.

7           THE WITNESS:  Yeah, between the driveway and the

8   front yard of the house.

9   Q    When you first saw the defendant with a liquor bottle in

10  his hand, did he have anything else in his hands?

11  A    No.

12  Q    Now, you said earlier that there was a car sitting in

13  front of the house at 144 Harrison Avenue with the headlights

14  on.

15          Do you recall what kind of car it was?

16  A    It was a black, I think four doors, Honda Accord.

17  Q    Now, looking at Government's Exhibit 2, can you draw a

18  box where the car was sitting?

19  A    Somewhere around right there.  Like in front of the

20  driveway.

21          THE COURT:  So, it was blocking part of the

22  driveway, then?

23          THE WITNESS:  It's on the front of the driveway,

24  yes.

25          THE COURT:  But it was parked in the same line with

1   the cars that are parked on the street.

2           THE WITNESS:  Right.  Right.

3           THE COURT:  So, it would have been partially

4   blocking the driveway.

5           THE WITNESS:  No, it was blocking the driveway

6   hundred percent.

7           MR. HARRIS:  Let the record reflect that the

8   defendant has drawn a box in the street in front of the

9   driveway of 144 Harrison Avenue.

10          THE COURT:  The record will so reflect.

11  Q    Upon seeing the car and the two people standing in front

12  of 144 Harrison Avenue, what did you decide to do next?

13  A    I decide to stop the vehicle and get off my car.

14  Q    When you say stop the vehicle, do you mean your vehicle?

15  A    My car, yes.  RMP.

16  Q    Why did you do that?

17  A    To address the condition of the open container.

18  Q    When you got out of the vehicle, did you have your police

19  shield around your neck?

20  A    Yes.

21  Q    After you got out of the car, what happened?

22  A    As I stopped the car the vehicle was in front of the

23  driveway, start rolling out of like, trying to leave.  At that

24  point, I shine my light into the car.

25  Q    And why did you do that?

1   A    To see who's leaving, why they're trying to leave.

2   Q    And when you shined your flashlight in the car, did you

3   see any people in the car?

4   A    Yes.

5   Q    What people did you see?

6   A    I observed a female driving and a male in the passenger

7   front side.

8   Q    Did you later learn the identity of the female driver?

9   A    Yes.

10  Q    And who was that?

11  A    Megan Jeffries.

12  Q    Did you later learn the identity of the male sitting next

13  to her?

14  A    Yes.

15  Q    Who was that?

16  A    Jarrett Glover.

17  Q    Now, when you shined your flashlight into the car what,

18  if anything, did he see the Ms. Jeffries and Mr. Glover doing?

19            THE COURT:  Can I just clarify something.

20            THE WITNESS:  Yes.

21            THE COURT:  Are you pulled up parallel to them in

22  your car?

23            THE WITNESS:  Right.  I'm pulling out like this,

24  right next to each other, to the car.

25            THE COURT:  Okay, so you are --

1      THE WITNESS:  Faced opposite.

2      THE COURT:  Your passenger side, would have been the

3 officer in your passenger side?

4      THE WITNESS:  No, I'm going the direction towards

5 Nicholas, going this way.

6      THE COURT:  So you are going in the opposite

7 direction.

8      THE WITNESS:  Right.  And then I went right here,

9 right there, and my car stopped right there, so.

10      THE COURT:  And you pulled across the yellow line.

11      THE WITNESS:  Right, yes.

12      THE COURT:  To pull up next to them.  So, you are

13 going in the opposite direction.

14      THE WITNESS:  Yes.

15      THE COURT:  So you are pulling up next to the driver

16 of this vehicle.

17      THE WITNESS:  Right.

18      THE COURT:  So, you as the driver, and the driver of

19 the vehicle, were right next to each other.

20      THE WITNESS:  Yes.

21      THE COURT:  Okay.

22      MR. HARRIS:  Your Honor, let the record reflect that

23 the witness has drawn two rightward facing arrows, one on the

24 near side of the street in the photograph, Government's

25 Exhibit 2, and one traversing from the near side of the street

1   to the far side of the street in Government's Exhibit 2.

2          THE COURT:  The record will reflect.

3   Q    Now, when you car started to roll forward and you shined

4   your flashlight in, did the car continue forward?

5   A    No.  I told:  Police.  And the car stopped.

6   Q    What, if anything, did you observe Ms. Jeffries and

7   Mr. Glover doing when you shined the flashlight into the car?

8   A    I observed the female driver, then I put my light towards

9   the passenger and observe him doing certain movements,

10  movements around the car trying to like, put something with

11  his right hand on his pants.

12         THE COURT:  Trying to put something in his pants?

13         THE WITNESS:  Yes.

14  Q    Sorry, just to clarify.  When you said the passenger, who

15  is that?

16  A    Mr. Glover.

17  Q    When you shined your flashlight on Mr. Glover what, if

18  anything, did you see him do?

19  A    He was moving, like I say, his right hand like this,

20  trying to put something in his pocket.  That's when I tell him

21  stop, stop moving, and he stopped, closed fist.  I saw like, a

22  small little pink Ziploc bag, like this, one hand closed.

23         MR. HARRIS:  Let the record reflect that the witness

24  is indicating pink Ziploc bag was in the right hand.

25         THE COURT:  Which hand?

1          THE WITNESS:  Right hand.

2          THE COURT:  So you saw him with the pink Ziploc bag

3     in his right hand; is that right?

4          THE WITNESS:  Right.  You go see like, the corner,

5     like you know the thing where you zip up the bag?

6          THE COURT:  Like the blue part?

7          THE WITNESS:  Well, it's all pink, but the string in

8     the top, you see it like that.

9     Q    What did you do in response to this observation?

10    A    Well, at that point I proceed to take out Ms. Jeffries

11    out of the vehicle, make sure she has no weapons anything that

12    she couldn't have.

13         I took her to the back of the car and then I inform

14    my partner to take out Mr. Glover out of the vehicle and put

15    him in the back of the car, also.

16    Q    Now, just to clarify, when you say your partner, is that

17    Officer Golat?

18    A    Yes.

19    Q    Why did you bring Ms. Jeffries and then Mr. Glover out of

20    the car?

21    A    To be sure they have no weapons, make sure there's

22    nothing that going to hurt me or anything else, you know, my

23    partner, no weapons in the car.

24         And for that, what he had in his hand, you know,

25    also was suspicious to me what he's hiding, what's the, what's

1  the demeanor for.

2  Q    Why did you believe it was suspicious?

3  A    Previous arrests that I have made in the case that, you

4  know, Ziploc bags and then everything, they usually use for

5  drugs and stuff like that.

6

7              (Continued on following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BY MR. HARRIS:

Q    You mentioned that you brought Ms. Jeffries to the back of the car and Officer Golat brought Mr. Glover to the back of the car.

During this time period, what was the defendant doing?

A    He was standing, you know, around the same place.

Q    And did he still have the liquor bottle in his hand?

A    Yes.

Q    Was he saying anything?

A    Not to me.  To I don't know if Officer Golat.  My attention was more now to the people in the back.

Q    What happened after you and Officer Golat brought Mr. Glover and Ms. Jeffries to the back of -- withdrawn.

You said that you brought Mr. Glover and Ms. Jeffries to the back of the car.  Just to clarify, is the car you're referring your RMP or the car that Ms. Jeffries was driving?

A    The car that Ms. Jeffries was driving.

Q    After you and Officer Golat brought Mr. Glover and Jeffries to the back of the car, their car, what happened?

A    Well, I was patting down Mr. Glover to make sure he has no weapons or anything like that.

But his demeanor was one hand on the car closed fist and the other hand was on the car open, open, open.  That's

1  indicating there's two things:  He's either going to punch me

2  or he has something in the hand.  So, I proceed to turn him

3  around and tell him:  What do you have in your hand?

4        That's when he opened his hand and I saw the pink

5  Ziploc bag.

6  Q    Just to clarify, which hand did he have in a closed fist?

7  A    Right hand.

8  Q    Is that the same hand that you observed him earlier

9  holding what appeared to be a pink Ziploc bag?

10 A    Yes.

11 Q    You mentioned that he had put both his hands on the

12 car -- withdrawn.

13       THE COURT:  He was told to do that by the police,

14 put his hands --

15       THE WITNESS:  On the car, right.

16       THE COURT:  So, he's got his hands on the back of

17 the car?

18       THE WITNESS:  Right, trunk of the car.

19       THE COURT:  One hand is flat, the other hand is --

20       THE WITNESS:  Closed fist.

21       THE COURT:  -- on the back of the car.

22 Q    Now, you said that when he opened his right hand, you saw

23 this pink Ziploc bag.

24       What did the bag appear to contain?

25 A    White powder, appeared to be cocaine.

1   Q     And you said that it appeared to be cocaine.

2         Is that based on your training and experience?

3   A     Yes.

4   Q     What did you do in response to seeing the Ziploc bag in

5   Mr. Glover's hand?

6   A     At that moment, I asked him if there's anything else

7   shouldn't be in the car?  Anything else you have?

8   Q     What did he say?

9   A     He said yes.

10  Q     Did he say anything more?

11  A     Yes.  He said there's more in the black bookbag in the

12  back of the car.

13        THE COURT:  There's more what?

14        THE WITNESS:  In that black bookbag in the back of

15  the car.

16        THE COURT:  In a black book?

17        THE WITNESS:  Bookbag.

18        THE COURT:  Bookbag.

19  Q     Upon hearing this, what did you and Officer Golat do?

20  A     I informed Officer Golat -- he, I guess, heard too -- to

21  go get the bag, there's more in there.  Officer Golat

22  proceeded to go and get the bag.

23  Q     You said Officer Golat went to go get the bookbag.

24        Where did Officer Golat go to get the bookbag?

25  A     Rear seat of the car, passenger seat in the back.

1  Q    When Officer Golat went into the backseat of the car --

2  and, again, just to clarify, is that Ms. Jeffries' car?

3  A    Yes.

4  Q    When Officer Golat went into the backseat of Ms.

5  Jeffries' car, what, if anything, did the defendant do?

6  A    As Golat's inside, he said:  I'm just going to put this

7  in the back.

8           Then he walked towards the back.

9           THE COURT:  And when he said I'm going to put this

10  in the back, he was referring to what?

11           THE WITNESS:  The glass bottle of open alcohol.

12           THE COURT:  Was the bottle covered in anything or

13  was it in a brown bag?

14           THE WITNESS:  No, it's just the whole bottle by

15  itself; glass, clear.

16           THE COURT:  There's no brown bag or anything.

17           THE WITNESS:  No, not no bag, nothing, no nothing.

18           THE COURT:  Okay.

19  Q    What did the defendant do after he said that?

20  A    He proceed to walk towards to the back of the house.

21  Then the way -- after the grass, he leaned, picked up a bag,

22  and then walked towards the back of the house.

23  Q    You said that when the defendant was doing this, you were

24  in the process of recovering a bookbag from the back of the

25  car.

1     What drew your attention to the defendant at this

2 time?

3 A    His statement:  I'm going to put this in the back.

4          And, you know...

5          THE COURT:  Wait a minute.  Who was the one who went

6 to get the bag out of the car?

7          THE WITNESS:  Golat, Officer Golat.

8 Q    Continue.

9 A    As Golat's inside the car, he stated that.  So, my

10 attention, I looked this way:  Why he putting the bottle away

11 if we already saw him with the bottle?

12          That's when I saw him walking.  At the same time,

13 I'm looking at Golat, I'm looking at my, you know, two people

14 that I have stopped.  That's when I saw him walk towards the

15 back, leaning, and going to the back.

16 Q    Now I want to direct your attention to Government Exhibit

17 3.

18          Looking at Government Exhibit 3, can you please

19 circle the area where the defendant was standing before he

20 began walking to the back at 144 Harrison Avenue?

21 A    Somewhere around here.

22          MR. HARRIS:  Let the record reflect that the witness

23 has made a circle at the end of the driveway of 144 Harrison

24 Avenue adjacent to the front left corner of the front yard.

25          THE COURT:  The record will reflect that

1   description.

2   Q    Looking again at Government Exhibit 3, can you circle the

3   area where the defendant had leaned down and picked up a bag

4   from the ground?

5   A    Somewhere around here.  It's, like, a concrete.

6           MR. HARRIS:  Let the record reflect that the witness

7   has made a circle on the side of the house at 144 Harrison

8   Avenue adjacent to a red brick area on the side of the house

9   in front of two orange cones.

10          THE COURT:  All right.  The record will so reflect.

11          Were those orange cones there that day, do you

12  remember?

13          THE WITNESS:  No, none of that stuff was there that

14  day.

15          THE COURT:  So, it was a clear area that day?

16          THE WITNESS:  Yes.  Those items were not there.

17          THE COURT:  All right.

18  Q    What were the sources of light that allowed you to see

19  the defendant taking out this bag?

20  A    The light pole that was right across; there was also a

21  car, Maxima, over here, a white Maxima, with the lights on;

22  and my flashlights, my light itself.

23          THE COURT:  Wait a minute.  Where was the car?

24          THE WITNESS:  There was a car right here in the

25  driveway.

1          THE COURT:  There was a car in the driveway?

2          THE WITNESS:  Yes, also.

3          THE COURT:  Pointing in the same direction the car

4     in the driveway is --

5          THE WITNESS:  No, like that.

6          THE COURT:  Pointing in the other direction.

7          THE WITNESS:  Yeah.  The taillights were on.

8          THE COURT:  The taillights were on?

9          THE WITNESS:  Right.  Like the car was on.

10         MR. HARRIS:  Let the record reflect that the witness

11    has drawn an arrow on the driveway of 144 Harrison Avenue

12    directed towards the rear of the house.

13    Q    Now, you mentioned certain sources of light, including

14    the streetlight across the street, the flashlight, and lights

15    from a Maxima car.

16         The headlights on Ms. Jeffries' car, were they on or

17    off at this time?

18    A    Honestly, I don't remember.

19    Q    Now, you said earlier that you saw the defendant pick up

20    a bag.

21         What did the defendant do after he picked up this

22    bag?

23    A    After he picked up the bag, I just saw him walking

24    towards the back.

25    Q    Looking at Government Exhibit 3, can you draw an arrow

1  reflecting the path that you saw the defendant take after he

2  picked up the bag?

3  A    Yes.

4          MR. HARRIS:  Let the record reflect the witness has

5  drawn an arrow along the space between the house at 144

6  Harrison Avenue and the concrete driveway.

7          THE COURT:  All right.

8  Q    Did you follow the defendant?

9  A    No.

10 Q    Why not?

11 A    Because I have the two other people stopped.

12 Q    What did you do instead?

13 A    Once my partner, you know, came out, finished with this,

14 I told him to call for backup.

15 Q    Why did you tell Officer Golat to do that?

16 A    Safety reasons.  I didn't feel comfortable with what was

17 going on.

18 Q    Why not?

19 A    We were only two of us; there were Jeffries, Mr. Glover,

20 Mr. Alexander, and then the other female next to him too, you

21 know, earlier.

22 Q    Did you observe Officer Golat call for backup?

23 A    Yes.

24 Q    Did another police officer eventually arrive at the

25 house?

1    A     Yes.

2    Q     How long after Officer Golat called for backup did the

3    other police officer arrive?

4    A     I don't know, two, three minutes.

5          It felt like eternity.

6    Q     While you were waiting for backup to arrive, did the

7    defendant reappear from the rear of the house?

8    A     Yes, he was here already back by the time I told Golat to

9    get backup.

10         THE COURT:  He had already come back?

11         THE WITNESS:  Yes.

12         THE COURT:  Where was he standing?

13         THE WITNESS:  Same place, around here.  This whole

14   time he was standing in this area.

15         THE COURT:  So, he came back and stood at the same

16   place he was standing in before.

17         THE WITNESS:  Right, the same area, same area.

18         MR. HARRIS:  Let the record reflect the witness has

19   drawn a circle in front of part of the driveway at 144

20   Harrison Avenue.

21   Q     When the defendant returned, did he have the bottle, the

22   liquor bottle, in his hand?

23   A     No.

24   Q     Did he have the bag in his hand?

25   A     No.

1  Q    Did you observe any other changes about the defendant at

2  that time?

3  A    Yes.

4  Q    What were they?

5  A    The front of his shirt, sweater, he had dry leaves all

6  over the whole front.

7  Q    You said that the defendant picked up a bag from the side

8  of the house on 144 Harrison Avenue and walked to the back and

9  then he came back.

10       How long was he gone for?

11 A    Not long.  Approximately, I don't know, less than a

12 minute.  Not long, it was not long.

13 Q    After another police officer arrived, what did you do?

14 A    I informed Officer Malarkey to stay with the two subjects

15 I had stopped in the back of the Honda Accord.

16 Q    When you say "two subjects," are you referring to Ms.

17 Jeffries and Mr. Glover?

18 A    Yes, sir.

19       And I proceed to go to the back of the 144 Harrison.

20 Q    Why did you go to the back of 144 Harrison Avenue?

21 A    To see -- to look for the items, for the glass bottle and

22 the bag that he put away.

23 Q    Why did you want to find those two items?

24 A    Because I need the bottle.  To some extent, the whole

25 point of him bringing it, I feel like he's hiding something.

1  My suspicion level is high:  I already saw you with the

2  bottle.  Why are we going to the back for?  What's the whole

3  point about it?

4  Q    Looking again at Government Exhibit 3, can you draw an

5  arrow depicting the path that you took to the back of 144

6  Harrison Avenue?

7  A    Yes.

8          MR. HARRIS:  Let the record reflect the witness has

9  drawn an arrow along the space between the house at 144

10  Harrison Avenue and the driveway at 144 Harrison Avenue.

11          THE COURT:  Was that area at the time clear or did

12  it have objects in it, at the time you walked through?

13          THE WITNESS:  Clear, it was clear.

14  Q    Now, when you walked along this path to the back of 144

15  Harrison Avenue, did you walk along the concrete walkway?

16  A    Yes.

17  Q    I'm going to zoom in on a section of Government Exhibit

18  3.

19          Looking at this zoomed-in section of Government

20  Exhibit 3, can you circle the concrete walkway that you took

21  to the back of 144 Harrison Avenue?

22  A    You can hardly see it, but somewhere here.

23          MR. HARRIS:  Let the record reflect that the witness

24  has drawn a line on the right-hand side -- middle to the

25  right-hand side of the screen adjacent to a red bucket.

1  Q    Now, when you proceeded down the concrete walkway at 144

2  Harrison Avenue, were there any fences or other barriers

3  obstructing your path?

4  A    No.

5  Q    Did you observe any no trespassing signs or anything of

6  that nature?

7  A    No.

8  Q    The driveway and adjoining concrete walkway, were they

9  enclosed in any way?

10  A    No.

11  Q    Were they accessible from the street?

12  A    Yes.

13  Q    What happened after you walked down the concrete walkway

14  at 144 Harrison Avenue?

15  A    I got to the back of the house.  My flashlight, I turned

16  towards the right.  The back wall of the house to the right

17  side, I found the bottle -- the glass of alcohol that

18  Mr. Robert had in his hand.

19  Q    What were the sources of light that allowed you to see

20  the liquor bottle?

21  A    Flashlight.

22  Q    Did you recognize the liquor bottle on the ground to be

23  the same liquor bottle you saw the defendant holding a few

24  minutes earlier?

25  A    Yes.

1  Q    I want to direct your attention to Government Exhibit 5.

2  Looking at Government Exhibit 5, what part of 144 Harrison

3  Avenue does this show?

4  A    It shows the side view and the backyard.

5  Q    Of 144 --

6  A    Yes.

7  Q    Can you circle the general area where you saw the liquor

8  bottle?

9  A    I can't circle it because it's back here, like, behind

10 this wall here.

11 Q    Can you circle the wall that you're referring to?

12 A    This wall right here.

13          THE COURT:  It's behind that wall?

14          THE WITNESS:  Yes.  Once you take the turn, right

15 there, behind the wall.

16 Q    How far along that wall is it from the turn?

17 A    Once you make the turn, right there.

18 Q    Now, looking at Government Exhibit 5, is there a set of

19 stairs leading to the back of the house in the vicinity of

20 where you found the liquor bottle?

21 A    Yes.

22 Q    Can you please mark the stairs with an "X"?

23          MR. HARRIS:  Let the record reflect that the witness

24 has drawn an X in front of a set of stairs on the right-hand

25 side of Government Exhibit 5.

1     THE COURT:  The record will so reflect.

2 Q    Looking again at Government Exhibit 5, is there a

3 concrete walkway leading to the stairs?

4 A    Yes.

5 Q    Can you please circle the concrete walkway.

6 A    Right here.

7     MR. HARRIS:  Let the record reflect the witness has

8 drawn a circle on the -- adjacent to the left of the X marked

9 earlier.

10     THE COURT:  Which was on the steps.

11     MR. HARRIS:  Correct.

12     THE COURT:  The record will so reflect.

13 Q    You said at that time you saw the liquor bottle.

14     What about the bag you were referring to?

15 A    No, I didn't see it at that time.

16 Q    What did you do next?

17 A    At that time, I proceed to turn around and go back to the

18 front of the house.

19 Q    What did you do when you reached the front of the house?

20 A    Went to Mr. Alexander, I asked:  Do you have anything you

21 shouldn't have on you?  Do you have anything else on you?

22     Just patting him down to make sure, you know --

23     THE COURT:  I'm sorry, I --

24     THE WITNESS:  Once I got to him --

25     THE COURT:  No.  When you were back there the first

1    time, you did see the bottle?

2         THE WITNESS:  I saw the bottle.

3         THE COURT:  Did you pick it up?

4         THE WITNESS:  No, I left it there.

5         THE COURT:  So, then you come back to talk to

6    Mr. Alexander?

7         THE WITNESS:  I went right back, yeah.

8    Q    Why did you pat him down?

9    A    Because I didn't see the bag right next to the box, so I

10   thought maybe he put it on him or something.

11   Q    Did you find anything during the patdown?

12   A    No.

13   Q    After the patdown, what did you do next?

14   A    I went back into the backyard.

15   Q    Why did you do that?

16   A    Because I'm looking for that bag now.

17   Q    When you got to the back of 144 Harrison Avenue, what did

18   you do?

19   A    I went back to where the bottle was.  And then my

20   flashlight, I did a radius circle check of the area to see if

21   I see, you know, the bag.

22   Q    And what did you see?

23   A    I saw a black bag on top of a chair.

24   Q    And did the bag that you saw at that time, did it appear

25   to be the same bag that you saw the defendant pick up earlier?

1   A    Yes.

2   Q    What were the sources of light that allowed you to see

3   the bag?

4   A    My flashlight.

5            THE COURT:  Where were you standing when you were

6   showing your flashlight?

7            THE WITNESS:  Right here.  First I went over here

8   where the bottle its, then I stepped over here and went like a

9   circle.

10           MR. HARRIS:  Let the record reflect that the witness

11  has drawn a circle immediately to the left of the drum.

12  Q    Now, where was the drawstring bag in relation to the

13  driveway?

14  A    It was here.

15           MR. HARRIS:  Let the record reflect that the witness

16  has drawn a circle at the right corner of the shed which is at

17  the end of the driveway at 144 Harrison Avenue.

18  Q    Now, where was the bag -- sorry, withdrawn.

19           Was the bag on the ground?

20  A    No.  It was on top of a chair.

21  Q    What kind of chair?

22  A    Similar to that chair.  I don't know if it's the same

23  one, but similar to that chair.

24  Q    Can you mark an "X" on the chair that you're referring

25  to?

1  A    Right here -- sorry, an "X."

2         MR. HARRIS:  Let the record reflect that the witness

3  has marked a circle and an "X" over a chair in front of a shed

4  at the end of a driveway at 144 Harrison Avenue.

5         THE COURT:  Just to be accurate, you're not sure it

6  was that chair; but if it was that chair, that chair would

7  have been in a different location.

8         THE WITNESS:  Right.  The chair was approximately in

9  this location here, more towards the corner, not by the door.

10        THE COURT:  More to the corner of the shed.

11        THE WITNESS:  Right.  I don't know exactly here or

12 here, but I feel like it was more this way.

13 Q    I'll direct your attention to Government Exhibit 6.

14        What is depicted in this photograph, Government

15 Exhibit 6?

16 A    It's a picture of the shed and where the chair was and

17 everything.

18 Q    Can you mark an "X" in this photograph where you saw the

19 bag sitting on top of a chair?

20 A    Somewhere around here.

21        MR. HARRIS:  Let the record reflect that the witness

22 has circled the front right corner of the shed at the end of

23 the driveway at 144 Harrison Avenue.

24        THE COURT:  The record will so reflect.

25 Q    After you saw the bag sitting on the chair, what did you

1    do?

2    A    I proceed to walk, you know, fast walk towards the front

3    of the house to advise my partner that I'm going to place him

4    under arrest.

5    Q    Before walking to the front of the house, what do you do?

6    A    Once I went towards the bag, once I got close to the bag,

7    I saw what appears to be, like, the butt end of a gun.  The

8    bag is a string bag, so it's, like, semi-open, so it appears

9    to be the butt of a gun.  I got closer and look in, and

10   there was two guns inside.

11   Q    After you saw that the bag contained two guns, what did

12   you do?

13   A    That's when I proceed to walk, fast walk --

14        THE COURT:  Let me just make that clear:  Did you

15   see that the bag had two guns?

16        THE WITNESS:  Yes.

17        THE COURT:  I'm not sure I got this right.  Was the

18   bag partially opened that allowed you to see the butt end --

19        THE WITNESS:  The drawstring of the bag when you

20   close it, it don't close completely.  Like, one of the guns

21   had the butt like this, so that's like, you know, a wave on

22   it.  When I look, I was:  Oh, man, it's a gun.

23        So, that's when I went more in.

24        THE COURT:  And then there were two guns.

25        THE WITNESS:  There were two guns inside.

1  Q    After seeing that the bag contained two guns, what did

2  you do?

3  A    I walked up the front of the house to my partner, walking

4  fast.

5  Q    Did you secure the two guns at that time?

6  A    I left in the same place where I found them.

7  Q    Why didn't you secure them at that time.

8  A    Because I had to go to tell my partner what I got, to try

9  to cuff Mr. Robert Alexander.

10 Q    Once you reached the front of 144 Harrison Avenue, what

11 did you do?

12 A    I made a signal to my partner we're going to arrest him,

13 by crossing the hands, meaning we will arrest him.  I told him

14 92, which means arrest.  And I went to grab the right side of

15 Mr. Robert Alexander.

16 Q    You said the right side.  What part of Mr. Alexander did

17 you grab?

18 A    Somewhere between the arm, the shoulder area here.

19 Q    What did you observe Officer Golat do at that time?

20 A    He was holding the left side.

21 Q    When you and Officer Golat grabbed Mr. Alexander, what

22 were you trying to do?

23 A    Trying to place him under arrest.

24 Q    What did the defendant do?

25 A    He picked up his hands and then he went down again like

1  that, you know, to get off on us, get away from us.

2       MR. HARRIS:  Let the record reflect that the witness

3  has raised his hands above his head and then hold them down to

4  his sides.

5  Q    After the defendant did that motion with his hands, what

6  did he do?

7  A    He ran down Harrison Avenue.

8  Q    What did you and Officer Golat do?

9  A    Followed after him.

10 Q    Is it fair to say that you were chasing him?

11 A    Chasing him, yes.

12       THE COURT:  On foot?

13       THE WITNESS:  On foot, yes.

14 Q    Looking back at Government Exhibit 1, can you please

15 describe how the chase proceeded?

16 A    On Harrison Avenue, he made a left turn on Treadwell,

17 came around made a left turn on Slaight.  Now, on Slaight,

18 there's a complex there with a little street.  He made a right

19 turn over there.  And then we ended up stopping him, like, I

20 think 17 Slaight Street, a little grassy area in front of the

21 house.

22       MR. HARRIS:  Let the record reflect that the witness

23 has drawn a rightward-facing arrow on Harrison Avenue, an

24 upward-facing arrow on Treadwell Avenue, a leftward-facing

25 arrow on Slaight Street, and then upward-facing arrow between

1    two buildings in the middle of Slaight Street, followed by a

2    circle at the top of the exhibit.

3              THE COURT:  Record will so reflect.

4    Q    During the case, did you ever lose sight of the

5    defendant?

6    A    No.

7    Q    Did you and Officer Golat eventually catch the defendant?

8    A    Yes.

9    Q    Where was that?

10   A    In this area here, in front of the grassy area here.

11   Q    After you caught the defendant, what did you do?

12   A    Placed him on the RMP and go back --

13             THE COURT:  I'm sorry, placed him on what?

14             THE WITNESS:  On the car, the RMP.  There was a

15   vehicle that got there.

16             THE COURT:  You mean another vehicle?

17             THE WITNESS:  Yes -- no, no, no.  We cuff -- me,

18   Golat, and the RMP that stopped there too and was there also,

19   all three of us picked him up and placed him in the RMP that

20   got there.

21             THE COURT:  How did that other person get there?

22             THE WITNESS:  That was Officer Malarkey that was

23   there -- remember the backup?  That was him.

24             THE COURT:  What happened to Glover and Jeffries?

25             THE WITNESS:  They stood on Harrison.

1    Q    To your knowledge, did any of the officers stay with

2    Mr. Glover and Ms. Jeffries?

3    A    I don't know, I don't think so, because Malarkey, by the

4    time I saw him, he was with us.

5    Q    Did you stop and communicate with Officer Malarkey about

6    whether anyone should stay with those two defendants?

7              MR. BROWN:  Objection.

8              THE COURT:  Overruled.

9              You mean before he left?

10             MR. HARRIS:  Correct, your Honor.

11             THE COURT:  Before he started chasing him, is that

12   the question?

13             MR. HARRIS:  Yes.

14             THE WITNESS:  No, I didn't.  I just ran.

15             THE COURT:  Malarkey came in his vehicle?

16             THE WITNESS:  Right.

17             At the point when we turning to Slaight, I just hear

18   the tires going to Slaight and that's when I saw Malarkey.

19   Malarkey went ahead of us, crossing in front of us in the car.

20   Q    You said that you placed the defendant in Officer

21   Malarkey's vehicle.

22             What did you do after that?

23   A    Went back to 144 Harrison.

24   Q    And after you returned to 144 Harrison Avenue, what did

25   you do after that?

1   A    I went back of the house and grab, you know, the bottle,

2   staying right next to where I found the weapons, the guns.

3   Q    In addition to getting the bottle, did you obtain

4   anything else in the bag?

5   A    On the bag and the bottle and the two guns, the black bag

6   with guns.

7   Q    When you went to the back of 144 Harrison Avenue, did you

8   take the same route you took earlier?

9   A    Through the side, to the back of the house, yes, through

10  the side.

11  Q    And you said you recovered the liquor bottle.  Did you

12  recover it in the same location where you saw it earlier?

13  A    Yes.

14  Q    You said you recovered the bag containing the two guns.

15       Did you recover the bag with the two guns in the

16  same location that you saw them earlier?

17  A    Yes, they were both in the same location, yes.

18  Q    I'm showing you what has been marked for identification

19  as Government Exhibit 7, 8, 9, and 10.

20       Government Exhibit 7, Government Exhibit 8,

21  Government Exhibit 9, Government Exhibit 10, do you recognize

22  these exhibits?

23  A    Yes.

24            (Continued on next page.)

25

1  BY MR. HARRIS:

2  Q    And what are they?

3  A    The glass bottle is the bottle that Mr. Robert Alexander

4  had in his hand and I found in the back of the house and you

5  know --

6            THE COURT:  I think you are going to have to

7  identify them by number.

8            THE WITNESS:  By number?

9            THE COURT:  Yes.

10 Q    Showing you what has been marked as Government's Exhibit

11 7.

12 A    That is the glass bottle that I observed Mr. Robert

13 Alexander holding and also the one I found in the back of the

14 house.

15 Q    Government's Exhibit 8?

16 A    That was a bag where I observed him picking it up from

17 the side and getting it from the back of the house with the

18 guns inside.

19            THE COURT:  Just to be clear, these are photographs

20 of those items?

21            THE WITNESS:  Yes, everything is photographs.

22 Q    Government's Exhibit 9?

23 A    That's a pictures also of one of the weapons that was

24 inside the bag.

25 Q    Government's Exhibit 10?

1  A    That's the other weapon that was inside the bag.

2  Q    Did you take these photographs?

3  A    Yes.

4  Q    When did you take these photographs?

5  A    During the arrest in the precinct.

6  Q    Is that on October 31, 2015?

7  A    Yes.

8  Q    Does Government's Exhibit 7 fairly and accurately depict

9  the liquor bottle that you recovered from 144 Harrison Avenue

10 as it appeared on October 31, 2015?

11 A    Yes.

12 Q    Does Government's Exhibit 8 fairly and accurately depict

13 the bag that you recovered from 144 Harrison Avenue as it

14 appeared on October 31, 2015?

15 A    Yes.

16 Q    And do Government Exhibits 9 and 10 fairly and accurately

17 depict the two firearms that you recovered from 144 Harrison

18 Avenue as they appeared on October 31, 2015?

19 A    Yes.

20      MR. HARRIS:  The government moves for Government's

21 Exhibits 7, 8, 9 and 10 to be the received in evidence.

22      THE COURT:  They will be received.

23      (So marked.)

24 Q    Sometime thereafter or after that you recovered the items

25 from the back of 144 Harrison Avenue, was the defendant, to

1  your knowledge, transported back to a police precinct?

2  A    Yes.

3  Q    Did you personally transport the defendant?

4  A    No.

5  Q    Do you know which police precinct the defendant was

6  transported to?

7  A    121 precinct.

8  Q    Did you later travel to the 121 precinct?

9  A    Yes.

10 Q    What did you do with the defendant after you arrived at

11 the 12 precinct?

12 A    I got his pedigree information and started processing the

13 arrest.

14 Q    After you got his pedigree information where was he

15 placed?

16 A    In one of the holding cells.

17 Q    At that time was he offered anything to eat or drink?

18 A    He was offered water and we had in the precinct

19 Entemann's dropped off like little Entemann's apple things,

20 apple pies.  He was offered that.  I don't remember if he ate

21 or not though.

22 Q    After you placed him in a holding cell, what did you do?

23 A    I went to process my collar and make a the notifications

24 that I have to do.

25          THE COURT:  Process your what?

1      THE WITNESS:  My arrest.

2      THE COURT:  You said collar, is the word you used?

3      THE WITNESS:  Yes, that's a collar.

4  Q    What does it mean to process an arrest?

5  A    Put it on line, making the notifications, voucher,

6  fingerprints, the whole process.

7  Q    Did you later participate in an interview of the

8  defendant?

9  A    Yes.

10 Q    Who conducted that interview?

11 A    Detective Patterson.

12 Q    And when did that interview take place?

13 A    Around like 11:30, between 11:00 and 11:30 around.

14 Q    Is that 11:30 a.m. or p.m.?

15 A    A.m.

16 Q    And on what date?

17 A    The 31st.

18 Q    Is that the same date that the defendant was arrested?

19 A    Yes.

20 Q    Why didn't you interview the defendant immediately?

21 A    Because procedures for the department that the squad does

22 the enhancing of the case.  So I had to wait for the squad to

23 tell me they are ready, the detective squad is ready to do the

24 interview.

25 Q    When did the detective squad tell you they were ready to

1   interview the defendant?

2   A    Like I said, around 11:00, 11:30.

3   Q    Are you permitted to interview the defendant without a

4   member of the detective squad?

5   A    Not in these type of cases.

6   Q    Before the interview did you at any point ask the

7   defendant if he wanted to talk?

8   A    No.

9   Q    Why not?

10  A    Because from previous experience I know detectives have

11  to do the investigation.  They have to do the Miranda.  They

12  have to do everything.  So I leave it for them to do the

13  whole...

14  Q    At any point did you see any NYPD officers ask the

15  defendant if he wanted to talk before the interview?

16  A    No.

17  Q    At any point did you tell the defendant that he was not

18  going to court unless he spoke to you?

19  A    No.

20  Q    Now, before the interview, was the defendant given an

21  opportunity to go to the bathroom?

22  A    Yes.

23  Q    Before the interview, was he offered anything to eat or

24  drink?

25  A    Yes.

1  Q    Was the defendant handcuffed during the interview?

2  A    No.

3  Q    Can you describe the tone of the interview?

4  A    Friendly.

5  Q    Are you familiar with the Miranda warnings?

6  A    Yes.

7  Q    Was the defendant given his Miranda warnings?

8  A    Yes.

9  Q    Did the defendant state that he understood his Miranda

10 warnings?

11 A    Yes.

12 Q    Sorry.  His Miranda rights?

13 A    Yes.

14 Q    Did the defendant agree to waive those rights and agree

15 to speak with you and Detective Patterson?

16 A    His exact word were:  Yes, to a certain extent.

17        THE COURT:  Yes, to a certain extent?

18        THE WITNESS:  Yes.

19 Q    At any point during the interview did the defendant say

20 that he did not want to answer questions?

21 A    No.

22 Q    At any point during the interview did the defendant say

23 that he wanted to remain silent?

24 A    No.

25 Q    At any point during the interview did the defendant ask

1  to speak with an attorney?

2  A    No.

3  Q    During the interview did you or Detective Patterson ever

4  physically threaten the defendant?

5  A    No.

6  Q    Was the interview of the defendant recorded on video?

7  A    Yes.

8  Q    I'm showing what has been marked as Government's Exhibit

9  11.

10        MR. HARRIS:  Your Honor, may an I approach?

11        THE COURT:  Yes.

12  Q    Do you recognize this exhibit?

13  A    Yes.

14  Q    What is it?

15  A    It's a copy of a CD of the video that a day it was taken.

16  Q    When you say a video, are you referring to the video

17  interview of the defendant?

18  A    Yes.

19  Q    How do you know that this CD contains the video recording

20  of the defendant's interview?

21  A    I signed it and dated it.  I put not my signature -- I

22  put my initials and the date.

23  Q    What did you do before initialing?

24  A    I observed the video.

25  Q    Does the video file contained on Government's Exhibit 11

1  fairly and accurately depict the interview of the defendant on

2  October 31, 2015?

3  A    Yes.

4        MR. HARRIS:  The government moves for Government's

5  Exhibit 11 to be admitted into evidence.

6        THE COURT:  Eleven will be received.

7        (So marked.)

8        MR. HARRIS:  With the permission of the court, I

9  would like to play Government's Exhibit 11.

10        THE COURT:  Okay.

11        (Tape plays.)

12        (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Audio ends.)

2    BY MR. HARRIS:

3    Q    Officer Barreiro, after the interview of the defendant

4    concluded, what happened next?

5    A    Mr. Robert Alexander was put back in the holding cells.

6    Q    To your knowledge, was the defendant transported to court

7    later that day?

8    A    Yes.

9          MR. HARRIS:  May I just have one moment, Your Honor?

10         THE COURT:  Yes.

11         (Pause in the proceedings.)

12         MR. HARRIS:  No further questions, Your Honor.

13         THE COURT:  All right.

14         Counsel.

15   CROSS-EXAMINATION

16   BY MR. BROWN:

17   Q    Good morning, Officer Barreiro.

18   A    Good morning, sir, how are you doing.

19   Q    So you said you've been a police officer four-and-a-half

20   years.

21         As of this day?

22   A    Approximately, I don't know exactly, you know.

23   Q    So, as of October 31st, 2015, that was about four years

24   at that time?

25   A    I don't know exactly the dates.  I mean, I know I started

1   in 7/5/2011, whatever four months -- four years-and-a-half.

2   It's going to be five years in July.

3   Q    At that time, you were an Anti-Crime officer, though for

4   the 121st Precinct?

5   A    Yes.

6   Q    And that had been your post for how many years?

7   A    If I remember, around two years, I don't know exactly.

8   Approximately.

9   Q    And before Anti-Crime, what was your post?

10  A    Conditions.

11  Q    Okay.

12        THE COURT:  What was your post?

13        THE WITNESS:  Conditions.

14        THE COURT:  Conditions?

15        THE WITNESS:  Yes.

16        THE COURT:  What are Conditions?

17        THE WITNESS:  They do the bars and stuff like that

18  in the precinct, and you have like for liquor license, stuff

19  like that.

20        THE COURT:  All right.

21  Q    Conditions officers generally write summonses and patrol

22  in uniform; correct?

23  A    Correct.

24  Q    Whereas traffic might make traffic stops; correct?

25  A    What's...

1  Q    The 121 traffic, that unit might do more traffic patrol

2  and handle more traffic violations, right?

3  A    Right.

4  Q    But you were Anti-Crime?

5  A    Correct.

6  Q    Anti-Crime is a pathway to becoming detective; correct?

7  A    Yeah.

8  Q    Generally, as Anti-Crime, you make more arrests than

9  other units for serious felonies; correct?

10  A    Generally, yeah.

11  Q    Unlike your previous posting conditions you don't

12  generally handle quality of life conditions, correct?

13  A    Repeat, I don't understand.

14  Q    So as an Anti-Crime officer, you don't generally handle

15  conditions or quality of life investigations; correct?

16  A    We do sometimes, yes.

17  Q    Your primary function is for serious burglaries, weapons,

18  felonies?

19  A    Correct.

20  Q    That's Anti-Crime?

21  A    Correct.

22  Q    Whereas conditions officers might handle open container,

23  summonses for jumping a turnstile?

24  A    Correct.

25  Q    On October 31st you were a member of Anti-Crime as you

1    said.

2              You didn't have a summons book on you on

3    October 31st, 2015, did you?

4    A    No.

5    Q    So, on October 31st after 3:00 a.m. you told us that you

6    were on patrol; correct?

7    A    After what time?

8    Q    After around 3:00 a.m. you said you were on patrol?

9    A    Yes.

10   Q    At that time, you weren't responding to any tip from an

11   informant or anything?

12   A    No.

13   Q    You weren't responding to any radio run you had received

14   from dispatch?

15   A    No.

16   Q    And your shift was slated to end at 4:05 a.m.?

17   A    Yes.

18   Q    So, at a certain point in time you said you were driving

19   on Harrison Avenue?

20   A    Yes.

21   Q    At approximately what time was that?

22   A    Between 3:00 and 3:30, I don't know exactly the time.

23   Q    All right.  And Harrison runs east and west, as you told

24   us before?

25   A    Harrison goes from Port Richmond to Nicholas Avenue.

1    Q    All right, but you said you were driving?

2    A    I was driving towards Nicholas.

3    Q    Okay.  You told us before you were familiar with that

4    area from doing patrols?

5    A    Yes.

6    Q    Were you driving westbound on Harrison?

7    A    I forget the name of the streets now, I know the name of

8    the streets, but I don't know east, north or west.

9    Q    No problem.  I'm just going to show you what the

10   Government already moved in, just so it's clear to the Court.

11           You said you were driving from Treadwell to Nicholas

12   on Harrison?

13   A    I was on Harrison towards Nicholas, yes.

14   Q    And then you told us at a certain point in time you had

15   initial observation of Robert Alexander as you were on patrol?

16   A    Not my first observation, no.  My first observation was

17   the car, the headlights of the car.

18   Q    Okay.  So saw a car parked on the street?

19   A    Yes.

20   Q    You were the driver in the car you were driving in?

21   A    Yes.

22   Q    And the only other person in the car was Officer Golat?

23   A    Yes.

24   Q    He was in the passenger seat next to you?

25   A    Yes.

1  Q    So as the driver, the route you were driving on Harrison,

2  you were closer to the house at 144 Harrison than your

3  partner, correct?

4  A    Correct.

5  Q    The house was on your left-hand side of the car across

6  the street?

7  A    Correct.  Correct.

8  Q    All right.  And so you said the first thing you saw was a

9  car parked at 144 Harrison?

10 A    Correct.

11 Q    And then you also saw Mr. Alexander?

12 A    Yes.

13 Q    I'm just going show you Government's Exhibit 2 so we have

14 the photo.

15       So, on this photo can you again tell us where your

16 car was when you first saw across the street?

17 A    I was coming from over here before that.

18       When I saw what first?  What are we talking about

19 here first?

20 Q    So, you're driving on this side of the street that's

21 closest to the picture?

22 A    Right, I'm driving that side.

23 Q    And you're going in the direction that's to the right of

24 the picture --

25 A    Right.

1    Q    -- on Government's Exhibit 2.

2         When you first initially noticed the car that's

3    across the street at 144 Harrison, are you in the frame of

4    this picture?

5    A    No.

6    Q    You're further to the left of the picture that's

7    Government's Exhibit 2?

8    A    Well, at first I first noticed the car from like, before

9    the headlight.  I could see it from before.

10   Q    Okay.  And that car was a black Honda; correct?

11   A    Correct.

12   Q    And you said that this Honda was parked in front of 144

13   Harrison?

14   A    Parked in front like the driveway, yeah, in front.

15   Q    Specifically, if I'm looking at Government's Exhibit 2,

16   can you just mark it again where you said the car was?

17   A    Here.

18   Q    All right.

19            THE COURT:  So, that is in front of the driveway.

20            THE WITNESS:  Yeah, right here, the driveway, this

21   area.

22   Q    And you said the headlights of the car were on?

23   A    Yes.

24   Q    When you first noticed it, you couldn't see inside the

25   car; correct?

1   A    No.

2   Q    You didn't observe anything that the passengers inside

3   the car were doing?

4   A    No.  I can't remember, no.

5   Q    And then as you got closer you said that at a certain

6   point you noticed Mr. Alexander?

7   A    Yes.

8   Q    And you told us that Mr. Alexander was standing somewhere

9   another the front lawn here?

10  A    Somewhere over here, yeah.

11  Q    Okay.  Where I'm putting my finger.  But he was behind

12  the car from your view; correct?

13  A    Correct.  No, well, he was next to the car.  Not behind,

14  like on the side.  Right there.  I don't know if that's

15  behind.  For me it's like, back over here, it's like to the

16  left side of the car.

17  Q    So, if you're coming from the left of this photo and

18  you're in the drivers seat of the car --

19  A    It was on the left of that car.

20  Q    Is it fair to say that your view of Mr. Alexander where

21  he was standing was obstructed by the car that you said was in

22  front of this driveway?

23  A    Not really.  You could see.  It was not, I could see him.

24  Q    So, you could see exactly where Mr. Alexander was

25  standing as you were driving?

1   A    Yes I could see him with the female next to him.

2   Q    And the female next to him was standing in the same

3   position or where exactly?

4   A    Right next to each other.  I don't know, facing like next

5   to each other.

6   Q    Earlier you said the distance between the car and

7   Mr. Alexander was the distance from where you're at to the

8   table?  I just want to clarify which table you meant.

9   A    It's sideways like from here to there to the sidewalk, I

10  guess.  I don't know how long the sidewalk distance is.

11       THE COURT:  I'm sorry, the distance between which

12  car?  Do you want to clarify your question.

13       MR. BROWN:  Yes.

14  Q    My understanding, what you said on direct the distance

15  between Mr. Alexander where he was standing on the lawn and

16  the black Honda, not your car, was between you and the table

17  in the courtroom.  I'm just trying to clarify what --

18  A    Like the end of, you know this little container, like the

19  end, like the distance of the sidewalk.  See the table where

20  the blue containers are?

21       THE COURT:  What blue containers?

22       THE WITNESS:  The recycle containers at the bottom

23  over here.  You know where the keyboards is?

24       MR. HARRIS:  Your Honor, just let the record reflect

25  the witness is referring to the blue recycle bin adjacent to

1  the clerk's.

2          THE COURT:  The ones I can't see.

3          MR. BROWN:  Yes, Your Honor.

4          So, the table where the deputy sits at, it sounds

5  like he's referring to that.

6          THE COURT:  That's how far Mr. Alexander was from

7  the car?

8          MR. BROWN:

9  Q    From the black Honda?

10 A    Right, here to like the sidewalk distance.

11         THE COURT:  So that's like six or seven feet; is

12 that right?

13         THE WITNESS:  I don't, I don't, I don't know.  Like

14 that's the distance, I don't want to say yes.

15         MR. BROWN:  So, if I put up Government's Exhibit 2,

16 this might be easier, can you clear the green that you did

17 earlier.  Under the marking of the green.

18         THE COURT:  You want it cleared?

19         MR. BROWN:  Yes.  So, you can show us again.

20 Q    So, can you tell us just where Mr. Alexander was, can you

21 just put a small circle or wherever he was, just put a small

22 circle?

23 A    Somewhere around here, I can even do it like right here.

24 Q    And then again, just a small box, a box for where the car

25 was.

1    A    Somewhere like here.  Like in the front.

2    Q    Okay.  And so that distance again was the distance from

3    where you are at the witness stand to the end of this table in

4    the courtroom?

5    A    If you do it angle-wise, yes.

6              THE COURT:  To where the recycling is.

7              MR. BROWN:  Yeah.

8    Q    Yes, so he's on the corner of the lawn in terms of

9    distance from where you are at the witness stand to the

10   deputy's table in the court?

11   A    Right.  Like that.

12   Q    Okay.  On this street, 144 Harrison, you didn't observe

13   any signs blocking parking; correct?

14   A    I don't understand that question.

15   Q    Were there any signs on 144 Harrison that prohibited

16   parking?

17   A    No.

18   Q    And you said you didn't observe any exchange between

19   Mr. Alexander and the car, the black Honda?

20   A    Correct.

21   Q    You just saw Mr. Alexander standing on his lawn; correct?

22   A    I saw Mr. Alexander standing on the driveway, I don't

23   know, the driveway corner lawn thing with a bottle, yeah.

24   Q    You just saw Mr. Alexander standing where you put the

25   circle?

1   A    Okay.

2   Q    And you saw a black Honda with two passengers inside at

3   that time, when you first were driving up on 144 Harrison?

4   A    Saw the black Honda.  I don't know if it was two or one

5   passengers.  I saw a car.

6   Q    You couldn't see the passengers inside the black Honda?

7   A    I could see the driver.

8   Q    Okay.

9            So, as you approach, you then noticed Mr. Alexander;

10  correct?

11  A    As I approach the vehicle or out of the car?

12  Q    With the vehicle.  As you approach with the vehicle

13  you're driving?

14  A    Yes.

15  Q    On 144 Harrison, you notice Mr. Alexander across the

16  street?

17  A    Yes.

18  Q    Can you mark on this photo where your car was when you

19  stopped your vehicle?

20  A    When I stop my vehicle, my final stop.

21  Q    So at a certain point in time you stopped your vehicle?

22  A    Yes.

23  Q    You made a decision to get out of your vehicle?

24  A    Correct.

25  Q    This was after you saw Mr. Alexander; correct?

1  A    Correct.

2  Q    And you had already seen the black Honda at this point;

3  correct?

4  A    Correct.

5  Q    But you didn't know how many passengers were inside the

6  black Honda at this point when you decide to get out of your

7  vehicle?

8  A    Correct.

9  Q    Okay.  So, can you show us at this moment where you

10  decided to stop your vehicle, if it's in the picture frame

11  that's in front of you?

12  A    The car was stopped right here.

13  Q    That's where you stopped.

14  A    Right.

15  Q    Your -- okay.

16       At the moment you stopped your vehicle, you got out

17  of your vehicle, right?

18  A    Correct.

19  Q    And you stopped your vehicle here to block the black

20  Honda?

21  A    No, just to get out.

22  Q    Okay.  So, at the point you stopped your car, the black

23  Honda, you saw it attempted to pull away and leave the

24  location; correct?

25  A    Yeah, like rolling.  I call rolling, like roll, tried to

1  roll out.

2  Q    So, the drivers -- you're facing the car?

3  A    Yes.

4  Q    You get out of your car?

5  A    Yes.

6  Q    Your badge is visible?

7  A    Yes.

8  Q    But your in plain clothes?

9  A    Yes.

10  Q    You then raised your flashlight with your arm?

11  A    Put my flashlight toward the car yes.

12  Q    And you're walking towards the car or were you walking

13  towards 144 Harrison at this point?

14  A    When I got out the car, the car start moving.  My

15  attention focused to the car now.

16  Q    Okay.  And you pointed your flashlight at the black

17  Honda?

18  A    Correct.

19  Q    And your actions of pointing the flashlight made the

20  black Honda stop?

21  A    Yes.

22  Q    And it was at that point that the black Honda stopped

23  that you were able to see the female driver inside?

24  A    No, saw the female driver before.

25  Q    Okay.  I'm sorry, but you knew there was a driver before

1   but after you made the car stop with your flashlight, you were

2   able to look inside of the car at this moment?

3   A    Yes.

4   Q    And you had already seen the female driver; correct?  But

5   with your flashlight you were able to identify that there was

6   another person in the vehicle; correct?

7   A    Right.

8   Q    And that was there only one other person in the

9   vehicle; correct?

10  A    Correct.

11  Q    And he was in the passenger seat?

12  A    Correct.

13  Q    Okay.  And then with your flashlight you observed what he

14  was doing?

15  A    Correct.

16  Q    And you said that you were able to observe his hand?

17  A    Yes.

18  Q    Did you check both of his hands or just one?

19  A    When are we talking about?  I checked both his hands.

20  Q    You're pointing a flashlight now into the vehicle?

21  A    Okay.

22  Q    And you're looking at the passenger?

23  A    Okay.

24  Q    You said you've already seen there's only two people in

25  the car?

1  A    Okay.

2  Q    But then you said you noticed something in his hand?

3  A    Right.

4  Q    So, did you check both his hands at this point?

5  A    Well, I look at the hand that was doing the motion.  The

6  right hand was the hand with the motion, so that's where my --

7  when I tell him to stop.

8           THE COURT:  Everybody is still inside the car.

9           THE WITNESS:  All is inside the car.

10 Q    Okay.  And so, approximately how long did it take you to

11 get out of your car and observe what you saw in the hand of

12 that person, would you say?

13 A    Quick, I don't know, seconds.  I don't know, quick.

14 Q    Less than a minute, you would say?

15 A    Yeah.

16 Q    So, at this point the passenger was still further from

17 you in the car -- and the black Honda, I should say?

18 A    Passenger was in the same place, yes.

19 Q    Okay.  So, you are standing in front of the driver's door

20 in the black Honda at this point?

21 A    Yes.

22 Q    And then you opened the door to pull out the driver?

23 A    After, yeah, after to pull out the door to have the

24 driver come out the car, yes.

25 Q    And this is a female that you identified later as

1   Ms. Jeffries?

2   A    Correct.

3   Q    So, you brought her to the back of the vehicle?

4   A    Correct.

5   Q    Because she was the driver?

6   A    Right.

7   Q    You patted her down?

8   A    Right.  Make sure she has no weapons on her, anything

9   like that.

10  Q    So, at this point, can you put a dot where you're

11  standing, which I assume is in back of the screen, but I'm not

12  sure.

13        So, you brought her to the back of the vehicle.

14  A    Right.

15  Q    Is this where you were standing?

16  A    Right here.

17        MR. HARRIS:  Your Honor, if Defense Counsel could

18  freeze the photo because the photo's been jogged a little bit.

19        MR. BROWN:  My apologies.

20        MR. HARRIS:  And the markings have stayed the same.

21  I think it's creating inaccuracies where the markings are

22  located.

23

24        (Continued on following page.)

25

1   BY MR. BROWN:

2   Q    My apologies for that.  Just so I'm clear, is this a fair

3   representation, this second dot you've put on --

4   A    No, because everything happened more this way.

5   Q    When you say "more this way," you're saying --

6   A    If I'm looking, towards the left.

7           MR. HARRIS:  Your Honor, I think that the photo has

8   shifted to the left.  Perhaps we can have the witness redraw

9   the markings or shift the photo to the right.

10          THE COURT:  You want to redraw the markings?

11          MR. BROWN:  That's fine if he's saying it doesn't

12  accurately reflect.  I'm just trying to get where he was in

13  the back of the car.

14  Q    Well, it's already frozen that way, so can you redraw the

15  markings?

16  A    Right here, I was in the back of the car.

17  Q    So, at this point, you're in back of the car.

18  A    Yes.

19  Q    Can you put the dot again where you said Mr. Alexander

20  was?

21  A    Right around here.

22  Q    After you brought the female to the back of the car, you

23  asked your partner, Officer Golat, to take the male passenger

24  out of the car?

25  A    Yes.

1  Q    And then the male passenger came to the back of the car

2  where this other green circle is in back of the car, correct?

3  A    Correct.

4  Q    And then you searched that male passengers?

5  A    I frisked him to make sure he had no weapon.

6  Q    How long would you say approximately it took for you to

7  complete both searches of both passengers?

8  A    I don't know, a minute?  I don't know.

9  Q    So, the whole time you were searching the car, what were

10 Mr. Alexander and the female next to him doing?

11 A    They were around the same location.

12 Q    Were they talking at all?

13 A    Between each other?  I think so.

14 Q    And what was your partner doing while you were

15 frisking -- you identified him as Mr. Glover, correct?

16      What was your partner doing while you were frisking

17 Mr. Glover.

18 A    He was by the side of the car, the sideboard of the side

19 of the car.

20 Q    Was he talking to Mr. Alexander at that time?

21 A    I don't remember.  I think so.  I don't remember, to be

22 honest with you.

23 Q    So, after you frisked both individuals, you've said that

24 Mr. Alexander walked away or he walked to the back of his

25 house, I should say, or towards the back of his house.

1  A    After?  Right after?  No, not right after, no.

2  Q    How long did it take after you frisked the individuals in

3  the back of the car before Mr. Alexander turned and walked to

4  the back?

5  A    I mean, approximately a minute, minute and change.  I

6  don't know, but not right after.

7  Q    Okay.  So, after you frisked -- I'm sorry, you said

8  Officer Golat went in the car to search?

9  A    Yes.

10 Q    And he went to the rear passenger of the black Honda?

11 A    He went through the rear passenger of the black Honda,

12 yes.

13 Q    Approximately how long did it take for him to go inside

14 of the rear of the black Honda and do his search?

15 A    I don't know, less than a minute?  I don't know.  Quick.

16 Q    And after Officer Golat did a search of the rear of the

17 black Honda, that's when you're saying -- well, what happened

18 next, I should say, just so I'm clear?

19 A    What happened next?  That's when -- as he doing that,

20 that's when I observed Mr. Alexander telling me:  I'm just

21 going to put this in the back.

22        And he started walking the path.

23 Q    When you say "this," you're referring to the bottle that

24 you said you saw earlier?

25 A    Right.

1  Q    When Mr. Alexander walked to the back of his house, how

2  long was it before you were unable to see him from your view?

3  A    Honestly, once I look at him, he lean, it came back my

4  attention, so it was quick.

5  Q    So, less than a minute, you'd say, he disappeared from

6  your view?

7  A    Yes.

8  Q    Less than 30 seconds?

9  A    I don't know if less than 30 seconds, but less than a

10 minute.

11 Q    And you didn't know where he was going exactly.

12 A    Just to the back.  I don't know, just to the back.

13 Q    And just so I'm clear, on this picture you said that as

14 he was going to the back, you said he picked something up on

15 the side of his house?

16 A    Yes.

17 Q    Can you mark on this with an "X" where exactly on the

18 side you saw him pick it up?

19 A    I can't do exactly, but it's around here.  The picture

20 has cones and stuff.  It's like a concrete -- cement-concrete

21 area, where the cement meets the concrete.

22 Q    How quickly after you saw him pick up something did he

23 disappear from your view?

24 A    When I saw him pick it up, I saw him walking, and my

25 attention went back.  So, right quick after that.

1  Q     So, you just said that your "attention went back."

2         Your attention went back to the people that you had

3  just frisked?

4  A     My partner and people, yes.  My scenario, what I call a

5  scenario, my scenario where I'm standing right there.

6  Q     Okay.  What I'm trying to get it, was it that your

7  attention changed or were you unable to see as he kept walking

8  further back in the house?

9  A     My attention changed because I would have to like -- I

10  went like this to the side, and then I went back to the

11  scenario here because I didn't want to not pay attention to

12  the guy I have in the front with the people.

13  Q     Just so I'm clear, where Mr. Alexander went in the back

14  of the house was not visible from your position in back of the

15  Honda, correct?

16  A     If I shined the light, yes, it would be so.

17  Q     Without the use of a flashlight at nighttime on

18  October 31, where Mr. Alexander went in the back of the house

19  was not visible from your location, correct, in back of the

20  Honda?

21  A     Not clear, no.

22         THE COURT:  I'm not clear.  I meant to ask you this

23  question earlier, and I'm sorry that it was not clear to me.

24         You said you could see him when he picked up

25  whatever item it was.  In part, your source of light was your

1  flashlight, you had said on direct.

2          Is that right or not?

3          THE WITNESS:  No.  My flashlight, I had my

4  flashlight on me.  When I turn, my body moves with my

5  flashlight.  So, as I'm looking attention to him, my

6  flashlight is there.  But when I turn it back, I have no light

7  on it.

8          THE COURT:  When you first turned your attention to

9  him and saw him pick up the item, was your flashlight shining

10 on him at that point in time?

11         THE WITNESS:  My flashlight is to the side.  I don't

12 know if it's exactly shine on him, but my flashlight -- I wear

13 my flashlight, like, it's down because it's bright and I don't

14 want to put in people's face.  If I move like this, it shines

15 to the side, like a hundred thousand lumens.  So, it shines in

16 a big circle.

17         You could see here clear.  Like, you can see that

18 clear.  Once you go towards the back, you have to keep shining

19 that, I can't see after that.

20         THE COURT:  But it did illuminate the area where you

21 were --

22         THE WITNESS:  Right.  Like, this area was

23 illuminated.  Like I said, there was a car here too, the white

24 Maxima.

25         THE COURT:  Okay.

1  Q    I just need to clarify this, because you said that you

2  used your flashlight to point it with your hand into the black

3  Honda, which made it stop, correct?

4  A    Yes.

5  Q    So, are you saying that there's a place on your person

6  that you can attach a flashlight and that happened at some

7  point?

8  A    No.  I can put my flashlight in my pocket, just...

9  Q    So, you just told the Court that you turned and your

10 flashlight turned with your body.

11 A    Yes.  I signal it like this with my hand.

12 Q    Before you frisked the individuals in the back of the

13 Honda, did you put your flashlight into your pocket?

14 A    Yes, in the back pocket.

15 Q    And, so, again, the area behind the house where

16 Mr. Alexander went would not be visible without your

17 flashlight pointed at it.

18 A    Yes, that particular source of light, correct.

19 Q    And at this point in time when you're behind the black

20 Honda, you're not pointing your flashlight at Mr. Alexander.

21 A    No.

22 Q    Because your attention was on the people you were

23 frisking.

24 A    After we're done with the frisk, when my partner went to

25 the back, I took out my flashlight again and hold it in my

1 heart.  When he go to the back, my body turn with the

2 flashlight.  That's when I look, I saw him, and I went back to

3 my position.

4 Q    So I'm clear, after you frisked the people in the black

5 Honda, your flashlight is not in your pocket.  You take your

6 flashlight --

7 A    Right.  I only put my flashlight on my pocket when I'm

8 doing something with my hands.  Soon as my hands are free, I

9 need my flashlight.

10 Q    After you frisked the people in back of the black Honda,

11 did you put cuffs on them?

12 A    Only on the male.

13 Q    So, the male was secure at this point but the female

14 driver was not?

15 A    No.

16 Q    And then you took the flashlight out of your pocket after

17 the male was secured, after your partner went in the rear of

18 the black Honda?

19 A    Within that time.

20 Q    Within that time.

21 A    Within that time.  Everything happened so quick.  So,

22 once I found the bag, I turn around, cuff him, tell my partner

23 there's more in the bag, and that's when the flashlight and

24 everything, you know...

25 Q    So, with your flashlight you turned to the area where

1  Mr. Alexander and the woman were on the lawn?

2  A    Basically, my body is turning with the flashlight in the

3  hand.

4  Q    Back to the people that were in the back of that black

5  Honda.

6  A    Yes.

7  Q    I'm going to put up -- at this point, you're in back of

8  the black Honda.

9        MR. BROWN:  I'm going to put up what's been marked

10  Defense Exhibit C, which I've shown to the government.  And

11  I'm going to show that to the witness if I can.

12        Do I need to unfreeze this?  Okay.

13        Can you clear the screen?

14        MR. HARRIS:  Lower left-hand corner of the screen,

15  it will clear it.

16        MR. BROWN:  Thank you.

17  Q    Office Barreiro, do you recognize what's in this photo?

18  A    The side of 144 Harrison.

19  Q    Does this photo fairly and accurately represent what a

20  view would have looked like from your position behind the

21  black Honda which was parked in the driveway on October 31,

22  2015?

23  A    No, because there was a car here parked, the Maxima with

24  the lights on.

25  Q    You said the lights of the Maxima, the taillights, were

1  on in this part?

2  A    Right.

3  Q    Okay.  But other than the fact that there was another car

4  here, does this photo fairly and accurately represent what the

5  view --

6  A    No, because it's dark over here.  The Maxima was here.

7  There's more lighting over here.

8         MR. BROWN:  So, then, your Honor, I would move to

9  admit this with the same consideration of the weight being

10  given that there was a Maxima in the bottom right-hand --

11         THE COURT:  All right, it's received.

12         (Defendant's Exhibit C so marked.)

13  Q    With respect to this photo, this is a view from the

14  street looking to the back of 144 Harrison at night.

15  A    Yes, sir, you told me.  It's the view, like, if you

16  looking that way, yes.

17  Q    This is the perspective of the view that you had, without

18  the car being present, looking to where Mr. Alexander went?

19  A    Yes.

20  Q    And you were standing somewhere which would be the bottom

21  right-hand corner of this photo.

22  A    Somewhere, yes.

23  Q    So, I'm going to take you back to the story, I'm sorry.

24  So, you're with the two people behind the car.  After

25  Mr. Alexander goes down the back of this house that's shown in

1   this photo, you said that he returned after a period of time.

2   A    Right.

3   Q    You didn't speak with Mr. Alexander when he came back.

4   A    No.

5   Q    And you didn't speak to him before he walked down this

6   pathway.

7   A    I heard him, that's about it.  I remember him speaking.

8   Q    I understand.

9        You never told him to freeze before he went down the

10  pathway?

11  A    No.

12  Q    You didn't place him under arrest or frisk him before he

13  went down the pathway?

14  A    Place him under arrest?

15  Q    Yes.  You didn't take any of those actions before he went

16  down the pathway.

17  A    No.

18  Q    And when he returned, you also didn't tell him to freeze.

19  A    At some point, he was trying to go back in the house.  I

20  told him he couldn't go back in.

21  Q    You told Mr. Alexander he couldn't go back inside his

22  house?

23  A    I didn't know it was his house.  He was walking across

24  the lawn in the front.  I said:  You have to stay here.  You

25  can't leave yet.

1  Q    So, at this point, you and your partner called for
2  another unit?
3  A    Yes.
4  Q    And when you called for that unit, you told them that
5  this was a nonemergency case?
6  A    I don't remember exactly how the radio signal came out.
7  I just told my partner to call, I don't know how it was put
8  over the air.
9  Q    So, you didn't call, your partner called the radio.
10 A    Yes.
11 Q    Did you tell your partner to call for any type of
12 emergency assistance?
13 A    For safety, yes.
14       THE COURT:  At what point in time?
15 Q    At what point in time?
16 A    After he came back.
17 Q    After Mr. Alexander came back?
18 A    Yes.
19 Q    So, how long did it take for the additional unit to get
20 to 144 Harrison?
21 A    I don't know, two -- approximately two, three minutes.
22 Felt like eternity.
23 Q    And during this two to three minutes, you were still in
24 the back of the black Honda?
25 A    Yes.

1    Q    Mr. Alexander was still on his lawn somewhere?

2    A    He was pacing between there, you know, like the driveway,

3    the area, just pacing like that, walking.

4    Q    And the woman that he was with, where was she, the one on

5    the lawn?

6    A    Around the same area.  They were in close proximity.

7    Q    Did you tell her she couldn't leave or move?

8    A    No.

9    Q    And during this time, you had the male passenger secured

10   at the back of the black Honda and you still were standing

11   with the female driver at the back of the black Honda?

12   A    Correct.

13   Q    And Officer Golat was doing what at this time?

14   A    If I remember correctly, he was standing around or next

15   to Mr. Robert Alexander.

16   Q    Did you observe him speaking to Mr. Alexander at that

17   time?

18   A    I don't remember.  I think so, but I'm not a hundred

19   percent sure.

20   Q    So, two to three minutes later, you said that an

21   additional unit arrived.  Who was that unit?

22   A    Police Officer Malarkey.

23   Q    Was Malarkey alone or with anyone else?

24   A    Alone.

25   Q    Did he get out of the car?

1   A     Yes.

2   Q     And what did he do?

3   A     At some point, I told him to stay with the two people I

4   have in the back of the Honda Accord, to basically take my

5   position where I was standing.

6   Q     So, Officer Malarkey took your position in back of the

7   black Honda?

8   A     Right.

9   Q     At this point, did you interact with Mr. Alexander?

10  A     I tell my partner I'm going to the back.

11  Q     You spoke to your partner, Officer Golat.

12        You didn't say anything else to Mr. Alexander?

13  A     Not that I remember.

14  Q     Essentially, at this point you walked past Mr. Alexander?

15  A     Correct.

16  Q     And you walk past the female that was on the lawn?

17  A     Correct.

18  Q     And you proceed to go to the back of the house?

19  A     Correct.

20  Q     And you took a path that's depicted in this photo?

21  A     The path that to on the side of the house, between the

22  cars and the wall.

23  Q     Gotcha, which is depicted in this photo, correct?

24  A     Okay.

25  Q     I'm asking you.

1   A     Well, it's dark, but, yeah, between there, the car and

2   the wall.

3   Q     Did you use your flashlight to go down this path?

4   A     Yeah.

5   Q     And the flashlight, without it you couldn't have seen

6   down the path, correct?

7   A     I could have seen it, but I feel safety, you know, better

8   with my flashlight.

9   Q     So, before you took the path -- let me just ask you this:

10  Approximately how long was Officer Malarkey there before you

11  walked down the path?

12  A     Less than a minute because I think he went first -- I

13  don't know exactly.  He went to talk to Officer Golat, then he

14  came to me.  So, less than a minute, approximately.

15  Q     Did you tell Officer Malarkey to come take your position

16  behind the black Honda?

17  A     Yes, I told Malarkey to stay here.

18  Q     Did you tell Officer Golat or Officer Malarkey what you

19  were intending to do when you walked down the path?

20  A     I told them I'm going to go to the back to get what he

21  put in the back, yes.

22  Q     Did you say those same things to Officer Malarkey?

23  A     I don't remember if I said it just aloud, not

24  specifically to Officer Golat or not.  I say:  I'm going to

25  the back.  I'm going to get what's in the back.

1  Q    So, as you walk down the path to the back of the house,

2  approximately how long did it take before you found the bag --

3  not the bag, the bottle, I'm sorry.

4  A    Once I went to the back, as soon as I make that turn to

5  the right, I saw the bottle on the floor.

6  Q    When you say the turn to the right, just so I'm clear,

7  you're referring to the southern -- sorry, you're referring to

8  the back corner of the house?

9  A    Back right corner of the house, yes.

10 Q    And the bag was to the right of that back corner?

11 A    What bag?

12 Q    Sorry, I keep saying bag when I mean bottle.

13       The bottle was to that right of that corner of the

14 house?

15 A    Yes, the bottle.

16 Q    And that bottle wouldn't have been visible day or night

17 from the front street.

18 A    No.

19 Q    Because it was blocked from the house.

20 A    Yes, from my point of view, I could not see it.  If you

21 could maybe see from the side you could probably see it, but

22 when I'm walking down the path, the straight line, I could not

23 see it.

24 Q    And you flashed your flashlight throughout the whole

25 backyard area in back of the house, correct?

1    A    When?

2    Q    After you found the bottle.

3    A    No.

4    Q    You did not?

5    A    No, I just -- it's called perimeter search.  So, what I

6    did, I just look around quick like this.  Like I said, my

7    flashlight, it's a big circle it creates.  I look around quick

8    like this.  I didn't see anything besides that.

9    Q    After you saw the bottle, you didn't take a photograph of

10   this bottle?

11   A    No.

12   Q    You didn't try to recover it as evidence or anything like

13   that?

14   A    No.

15   Q    You proceeded to walk back to the front of the house?

16   A    Correct.

17   Q    And when you walked back to the front of the house, you

18   went to Mr. Alexander.

19   A    Yes.

20   Q    And how long would you say it took you to do this

21   complete walking to the back of the house and coming back

22   after you found the bottle?

23   A    Quick, man.  Less than a minute.  It was quick.

24   Q    And this whole time Mr. Alexander stayed where you told

25   him to stay, correct?

1   A    Correct.

2   Q    When you got back to Mr. Alexander, you said you patted

3   him down?

4   A    Yes.

5   Q    You said he had no weapons on him?

6   A    He had nothing, no weapons, yeah.

7   Q    At this point, you didn't write any type of summons for

8   open container.

9   A    No.

10  Q    You didn't place him at cuffs?

11  A    Not at that point yet, no.

12  Q    You did question him, though, at this point, correct?

13  A    I asked if he had anything he shouldn't have, any

14  weapons, yes.

15  Q    You also asked him where was the bag?

16  A    Correct.

17  Q    And he responded no, that he didn't have anything that he

18  shouldn't have on him, correct?

19  A    I don't remember exactly the words.

20  Q    So, after you questioned him, you decided that you were

21  going to search the back of the house again?

22  A    I went back towards the back of the house, yes.

23  Q    You didn't ask Mr. Alexander's permission before you went

24  and searched again, did you?

25  A    No.

1    Q    And when you were in the front, you didn't communicate

2    anything to Officer Golat or Officer Malarkey at that point.

3    A    After I came back from the first time?

4    Q    After you patted Mr. Alexander down when you returned

5    from the bottle, you didn't say anything to Officer Golat, did

6    you?

7    A    Yeah, I said I'm going back to the back.  I don't

8    remember exactly.

9    Q    You didn't tell him to arrest Mr. Alexander?

10   A    No.

11   Q    You didn't tell him to give an open container summons to

12   Mr. Alexander?

13   A    Not at the time yet, no.

14   Q    But at this time, he was still -- where was he standing?

15   Was he with Officer Malarkey behind the black Honda or was

16   he --

17   A    He was with Officer Golat.

18   Q    Officer Golat and Officer Malarkey were both behind the

19   black Honda?

20   A    No.

21   Q    So, I'm asking when you came back from retrieving the

22   bottle and you patted down Mr. Alexander, where was Officer

23   Golat during that time?

24   A    Front of the driveway, like, front driveway area.

25   Q    Was he securing either the woman or the man that were

1    behind the black Honda?

2    A    No.

3    Q    And the woman who was on the lawn earlier with

4    Mr. Alexander, where was she during this time?

5    A    I don't remember exact location, but she was always

6    around the area, approximate area.  I don't remember exactly,

7    like, here or there, but she was always in the scenario of the

8    picture.

9    Q    But you didn't tell her anything.

10          You didn't communicate with her at all?

11   A    No.

12   Q    You didn't search her?

13   A    No.

14   Q    You didn't pat her down?

15   A    No.

16   Q    You didn't tell her to stop?

17   A    No.

18   Q    Okay.  So, you go back behind the house, and this time

19   your intent is to look for the bag.

20   A    Correct.

21   Q    And you're using your flashlight to do this search,

22   correct?

23   A    Correct.

24   Q    And you don't know where this bag is?

25   A    Not at the moment, no.

1  Q    Because you didn't see where it was placed down.

2  A    No.

3  Q    And you saw it for -- initially, when you said you

4  observed it, it was quick when you saw Mr. Alexander pick up

5  the bag, correct?

6  A    Right, saw him picking up the bag, yes.

7  Q    It was less than five seconds?

8  A    I don't know, quick.  I don't know, five, ten seconds.

9  Not really, I don't know the time.

10 Q    It was less than ten seconds?

11 A    One, two, three, four, five, six -- yeah, approximately.

12 Q    So, you get back to the back of the house this time.

13      Did you do another perimeter search with your

14 flashlight?

15 A    The second time, yes.

16 Q    And how long did this perimeter search take?

17 A    It was quick, man; again, less than a minute.

18 Q    So, it took less than a minute?

19 A    Approximately, yes.

20 Q    Would you say it took more than 30 seconds but less than

21 a minute to do the search?

22 A    Approximately.  I don't know exact, to be honest with

23 you.

24 Q    Approximately less than a minute but more than 30

25 seconds?

1   A    I don't know, to be honest with you.

2   Q    And during the whole time you did this perimeter search,

3   you needed the aid of your flashlight to see.

4   A    I feel more comfortable with my flashlight, yes, to see.

5         If I need it?  I don't know.  That's just the way I

6   work.

7   Q    I understand what you're saying about more comfortable.

8         What I'm asking you is with the naked eye, could you

9   have seen anything?

10  A    I don't know that.  Probably.  I don't know, to be honest

11  with you.

12  Q    So, you don't know whether or not you could have seen

13  anything in the back without your flashlight.

14  A    No.  To be honest with you, no, I don't know.

15  Q    But the flashlight is what enabled you to do your search.

16  A    Correct.

17  Q    And it's what you chose to do your search.

18  A    Yes.

19  Q    Until you got close to the bag, you had no idea what was

20  inside, correct?

21  A    Correct.

22  Q    And it was with your flashlight that you were able to

23  have some sense of what you thought was inside, correct?

24  A    Correct.

25  Q    You had to physically -- did you have to physically hold

1    the bag to inspect what was inside?

2    A    No.

3    Q    You were just able to use your flashlight up close to

4    figure out what was inside?

5    A    When I put my flashlight, I saw the butt end of what

6    appeared to be a weapon.  That's when I leaned forward and I

7    look more inside, and I was able to see the other weapon.

8    Q    So, I'm going to show you another picture, which has been

9    marked as Defense Exhibit D.  I'll try to freeze this

10   correctly this time.

11         Do you recognize what's in this photo?

12   A    Yes.

13   Q    What do you recognize it to be?

14   A    It's a picture of the bag and the two weapons that were

15   inside the bag.

16   Q    Does this fairly and accurately represent the picture of

17   the bag and the two firearms that you recovered on October 31,

18   2015?

19   A    Yes.

20   Q    With the exception that this is a lighted photo and you

21   didn't -- it's not dark, correct?

22   A    Correct.

23         MR. BROWN:  So, I'd move that this be admitted as

24   Defense Exhibit D, just so I can ask him about it.

25         MR. HARRIS:  No objection, your Honor.

1          THE COURT:  All right.  It will be received.

2          (Defendant's Exhibit D so marked.)

3    Q    So, you said that you saw this bag on top of a chair?

4    A    Yes.

5    Q    And you said that the butt of one of the guns was

6    sticking out?

7    A    Yes.  Well, not that -- I called it the butt, but, like,

8    the back, this end like this.  Not sticking out, it's, like,

9    open.

10   Q    You can mark it.

11         Can you tell us what part of the gun you saw

12   sticking out?

13   A    This area like this.  You could see this area.  This is

14   the area I saw.

15   Q    So, with your flashlight you only saw that end part --

16   A    Yeah, this area, like, this here.

17         THE COURT:  So, it was that gun spot that you saw?

18         THE WITNESS:  I'm sorry?

19         THE COURT:  It was this gun that has --

20         THE WITNESS:  Yes, the gun in the top.  This is the

21   gun that was on the bottom.

22         THE COURT:  The butt that you saw, was it --

23         THE WITNESS:  This one, this one.

24         THE COURT:  -- the gun that appears to have yellow

25   on it.

1          THE WITNESS:  This one right here, yes, this gun.

2          MR. BROWN:  For the record, he's pointing to the gun

3    that in the picture appears is further to -- it appears to be

4    the left, on my side.  I'm just making sure it's the same.

5          And he put a mark at the tail end of the gun --

6          THE COURT:  I think it's on the right.

7          THE WITNESS:  It's my right.

8          MR. BROWN:  I'm sorry, the right of the photo.

9    Sorry.

10         And he put a green mark at the butt of the gun, as

11   he said.  It's a small mark.

12

13         (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

1  BY MR. BROWN:

2  Q    And so after you saw the butt of the gun did you go and

3  open the bag?

4  A    To confirm it was a gun, yes.

5  Q    How did you open the bag, what parts did you touch?

6  A    I don't remember.  I think the top to be honest with you.

7  I think it went like that.  I don't remember exactly.

8  Q    You needed to open the bag to confirm that it was a gun,

9  correct?

10  A    That it's a complete gun, yes.

11  Q    Did you also need your flashlight to confirm it was a gun

12  or could you have felt it with your hand?

13  A    I could have felt it if it was a gun.

14  Q    Did you take the gun all the way out of the bag?

15  A    No.

16  Q    What did you do next with the bag and the gun?

17  A    After I saw them, I walked to the front.

18  Q    Did you put the bag down on the chair?

19  A    I never picked up the bag out of the chair.  The bag is

20  on chair.  I went to the chair.  I looked and then I went to

21  the front.

22  Q    When you say look, you are saying that you opened the

23  draw string part and you looked inside?

24  A    Right.

25  Q    So that you can see what was inside?

1    A    So I could confirm what I thought it was.

2    Q    All right.  You didn't take any picture of the bag or the

3    gun when you were in the back?

4    A    No.

5    Q    At that point you decided to come back to the front of

6    the house?

7    A    Yes.

8    Q    And you didn't signal to Officer Golat or Officer

9    Malarkey that there was a firearm?

10   A    Not at that point, no.

11   Q    You didn't say anything to Officer Malarkey at all?

12   A    I went, I crossed my hands sideways, which means he was

13   under arrest and put the cuffs on.

14   Q    When you say you crossed your arm sideways, you did that

15   for Officer Golat or Officer Malarkey or both?

16   A    I going to Officer Golat.  So it was Officer Golat.

17   Q    Officer Golat, did he respond to that?

18   A    Yes.  That's when he went and grabbed him on the side of

19   the hand, the left side.

20   Q    What did Officer Malarkey do at that time?

21   A    He was still in the same place where he was before with

22   the two other persons.

23   Q    At that point you said there was a foot chase, right?

24   A    Correct.

25   Q    And this is Government's Exhibit 1.  You told us this

1  foot chase took you from Harrison to Treadwell and Treadwell

2  to Slaight, all the way to 17 Slaight?

3  A    I think the number of the house was 17 Slaight.  I think

4  it's a little street.  I think it's 17 Slaight right there.

5  Q    It was you and Golat who did this chase, correct?

6  A    We started doing the chase, me and Golat, yes.

7  Q    You didn't see initially Officer Malarkey run with you?

8  A    He didn't run.  He went in the car.

9  Q    You know that because eventually he caught up to you in a

10 car, correct?

11 A    Right.

12 Q    You don't know what was happening back at 144 Harrison

13 while you were doing this chase?

14 A    No.

15 Q    And there was no police officers there, to your

16 knowledge, while you were doing this chase if Officer Malarkey

17 was in a car?

18 A    Not to my knowledge.

19 Q    How long did this chase take?

20 A    I don't know.  However long it takes to run.  I don't

21 know approximately how long.

22 Q    Would you say it took less than five minutes or more than

23 five minutes?

24 A    I think less.  I don't know.

25 Q    You think it took more than a minute other less than a

1   minute?

2   A    I don't know.  I think maybe more.  I really don't know.

3   Q    Between a minute and five minutes you would say?

4   A    Maybe less.  I don't know.  I don't know how long it

5   takes to run that.

6   Q    Can you give an approximation of how long it took on

7   October 31 for you to get from 144 Harrison to where you

8   caught up with Mr. Alexander at 17 Slaight?

9        MR. HARRIS:  Objection, your Honor.  I think this

10  has been asked and answered.

11       THE COURT:  Yes.  Sustained.

12       MR. BROWN:  Okay.

13  Q    So at a certain point you did catch up to Mr. Alexander

14  at 17 Slaight, correct?

15  A    Correct.

16  Q    And you placed Mr. Alexander under arrest, correct?

17  A    Okay, yes.

18  Q    At that time you did not give him Miranda rights?

19  A    No, sir.

20  Q    And after you arrested Mr. Alexander you didn't ask him

21  about the bag that you had just found?

22  A    No, sir.  He was placed in the RMP.

23       THE COURT:  He was what?

24       THE WITNESS:  He was placed in the RMP.

25       THE COURT:  In the car you mean?

1    THE WITNESS:  Yes, in the car.

2  Q    As soon as you placed him in handcuffs you are saying you

3  placed him with Officer Malarkey in the car?

4  A    Yes.

5  Q    He was in that car alone?

6  A    Me and Officer Golat went in the car.

7  Q    All three of you got in the car?

8  A    Yes.

9  Q    You rode back to 144 Harrison together?

10  A    Yes.

11  Q    Nobody in the car talked to Mr. Alexander about what

12  happened?

13  A    I don't remember.  I think so.  But I don't remember.  I

14  can't tell you what exactly, the words.

15  Q    You didn't tell Officer Malarkey what you just arrested

16  this person for?

17  A    I don't remember.  I remember telling Golat when we were

18  running.

19  Q    Only you and Officer Golat were running?

20  A    Right.

21  Q    Officer Malarkey didn't run with you?

22  A    Correct.  I guess he wanted to put it over the air, the

23  reason why we were running.

24  Q    Did you communicate with Officer Malarkey while you were

25  running?

1  A    He put over the air why we're running.

2  Q    Officer Malarkey put over the air --

3  A    No.  No.  I'm running next to Officer Golat.  He's saying

4  what's going on.

5  A    CPW, it's a gun.  It's a weapon.  He puts it over the air

6  because I guess somebody asked where you are running and he

7  put CPW.  I don't know if Malarkey had that or not.  I don't

8  know.

9  Q    You are in the RMP with Officer Malarkey, Officer Golat

10 and Mr. Alexander.  You didn't talk to Officer Malarkey about

11 why you arrested Mr. Alexander?

12 A    I don't know.

13 Q    That's fine.  Then you went back with Mr. Alexander to

14 144 Harrison?

15 A    Correct.

16 Q    And were there other police officers there at this time?

17 A    Yes.

18 Q    Who was there?

19 A    There was my sergeant, another guy from crime, a bunch of

20 other units.

21 Q    Approximately how many officers would you say were there?

22 A    More than five, more.

23 Q    So when you get back to 144 Harrison you got out of the

24 car?

25 A    Yes.

1   Q    And then you did another search?  I'm sorry.  Not another

2   search.  You went to the back of the house?

3   A    Yes.

4   Q    With Officer Golat?

5   A    I don't remember if Officer Golat went with me.  I know I

6   went.

7   Q    Mr. Alexander at this time was in whose custody?

8   A    The last I knew about it, he was in back of Officer

9   Malarkey's car.

10  Q    And you don't know if Officer Malarkey spoke to him while

11  he was in the car or not?

12  A    No.

13  Q    Approximately how long was he in Officer Malarkey's car?

14  A    Five or ten minutes -- I don't know -- to take him to the

15  precinct.  I don't know.

16  Q    When you finished going back to 144 Harrison, after you

17  had returned with Robert Alexander in the back of the car, how

18  long were you in the backyard retrieving -- I'm sorry.  Let me

19  back up?

20       You get back to 144 Harrison.  Mr. Alexander is in

21  the back seat of Officer Malarkey's car.

22  A    Okay.

23  Q    You then proceed to go to the back of the 44 Harrison

24  again, correct?

25  A    Correct.

1    Q    How long were you back there?

2    A    Well, at that point, you know, I'm talking to my

3    supervisor.  We have to call ESU.  We have to secure

4    everything.

5    Q    Can you give me an approximation of how long you were

6    back there?

7    A    We were there more than ten minutes while we were waiting

8    for ESU and stuff.

9    Q    While you were back there for more than ten minutes --

10   okay.  After the ten minutes you came back to the front of 144

11   Harrison, correct?

12   A    I don't understand the question.  What do you mean I came

13   back?

14   Q    At some point after you did ESU and all of that, you left

15   the backyard and came to the front is what I am asking?

16   A    After ESU is done and it's safe for me to grab the

17   weapons and bring it to the precinct, yes, I came back.

18   Q    When you came back to the front after that ten minutes

19   was Mr. Alexander still in the car with Officer Malarkey?

20   A    I don't remember.

21   Q    He was gone?

22   A    I don't know.  To be honest with you, I don't remember

23   exactly if he was gone or he was there.

24   Q    You didn't transport Mr. Alexander to the precinct?

25   A    No.

1   Q    You have no idea if anybody spoke to him while he was

2   going to the precinct?

3   A    No.

4   Q    Went to the to the 120 precinct?

5   A    No, 121.

6   Q    You went to the 121 precinct?

7   A    Yes.

8   Q    Was Mr. Alexander at the 121 precinct when you got there?

9   A    Yes.

10  Q    And he was in a holding cell?

11  A    Correct.

12  Q    And you didn't talk to him initially when you got to the

13  121 precinct?

14  A    When I got there, I had to get his pedigree.

15  Q    Aside from asking his pedigree, did you ask him about the

16  back?

17  A    No.  He just asked me what am I here for.  I said we'll

18  talk about it.  You're here for the guns and that's it.

19  Q    You told him he was here for the guns, that's the CPW?

20  A    Yes.

21  Q    You also didn't give him Miranda while he was at the

22  holding cell?

23  A    No.

24  Q    But you were the arresting officer for Mr. Alexander that

25  night with the other two in the back of the black Honda?

1   A    Yes.

2   Q    One of throws people was Meghan Jeffries?

3   A    Yes.

4   Q    You gave her Miranda that night?

5   A    Yes.

6   Q    You took a post-Mirandized statement in writing which she

7   signed?

8   A    Right.

9   Q    You didn't do that for Mr. Alexander?

10  A    Correct.

11  Q    Mr. Alexander was there for six hours before you put him

12  in a video confessional?

13  A    From the time of arrest, 11:00, 11:30, yes.

14  Q    And during that full six hours you were doing other

15  things during that six hours, right?

16  A    Processing the arrest and stuff, yes.

17  Q    At some point you did Miranda with Ms. Jeffries?

18  A    Correct.

19  Q    At any point in that time you don't know who else spoke

20  to Robert Alexander?

21  A    Correct.

22  Q    Okay so around 11:30 in the morning is when the video

23  statement started with Mr. Alexander, correct?

24  A    Correct.

25  Q    And you were in that room with the detective?

1   A     Correct.

2   Q     Essentially that detective is your boss, correct?

3   A     No, he's not my boss.

4   Q     He's a higher rank?

5   A     He's a detective.  I'm a police officer.  He's a

6   detective.

7   Q     Is he a higher rank?

8   A     He's an investigatory rank.  He's not a higher rank.  I

9   don't believe so.

10  Q     But he's an investigatory rank which means his purpose is

11  investigation?

12  A     Correct.

13  Q     He's trying to get information, right?

14  A     Trying to investigate.

15  Q     Totally fine?

16        So at a certain point during that interview the

17  detective asked you where you found the bag.

18  A     The detective asked me where I found the bag?

19  Q     Yes.

20  A     I had to explain the scenario.

21  Q     I understand.  We just watched the interview.  At a

22  certain point in that interview --

23  A     On the interview itself?

24  Q     Yes.

25  A     Yes.

1   Q    And you answered him?

2   A    Yes.

3   Q    At no point did you ever answer the bag was on a chair?

4   A    Okay.  I don't remember exactly if it was on the chair or

5   not.  I remember saying it was by the shed.  I don't remember

6   exactly.

7            MR. BROWN:  I'll play what's been marked I believe

8   Defendant's Exhibit A 1 through 3.  All this is clips from

9   Government's Exhibit 11.

10           THE COURT:  What exhibit number is this?

11           MR. BROWN:  Defendant's Exhibit A 1 through 3.

12           THE COURT:  It will be received.

13           MR. BROWN:  These are short clips.

14           THE COURT:  From the larger exhibit?

15           MR. BROWN:  Of the larger exhibit that is

16  Government's Exhibit 11.

17           THE COURT:  That's already been played?

18           MR. BROWN:  That's already been played.

19           (So marked.)

20  Q    I'm going to play for you now what is clip A one.

21           (Tape plays.)

22           (Tape stops.)

23  Q    So this is the first time the detective asked you where

24  the bag was?

25  A    Yes.

1    Q    You didn't mention it being on top of the chair the first

2    time he asked you there?

3    A    Specifically, no.

4    Q    You specifically responded to the question, The bag was

5    in the backyard and you said yes?

6    A    Yes.

7    Q    He asked you two more times.  At no point when he asked

8    you did you ever say the bag was on top of a chair?

9    A    Okay.  I don't remember.

10            MR. BROWN:  We'll play the second clip.

11            (Tape plays.)

12            (Tape stops.)

13            THE COURT:  Is this from the same video?

14            MR. HARRIS:  Your Honor, I can speak to that.  When

15    these interviews are conducted, the recordings are conducted

16    from three different locations.  They are conducted

17    simultaneously.  So it's the same interview from different --

18            THE COURT:  It's the same interview but it's a

19    different tape of that interview?

20            MS. GELERNT:  Government's Exhibit 11 I believe

21    includes all three views from all three of the cameras.

22            MR. HARRIS:  That's correct.  I maximized one of the

23    three views.

24            MR. BROWN:  There's three different streams.  They

25    chose one stream to play.  This stream is on that video.

1    THE COURT:  I didn't understand that.  I'm sorry.

2  Do you want to replay that part?

3    MR. BROWN:  That's fine.  The first one or we can do

4  the second one.

5    THE COURT:  I heard the first one.

6    MR. BROWN:  We'll play the second one then.

7    (Tape plays.)

8    (Tape stops.)

9  Q   Okay.  So this is the second time the detective is trying

10  to figure out where the bag was.  Again you don't tell him

11  that it's on top of a chair the second time he tries to

12  inquire?

13  A   Correct.

14  Q   Then he asked you again, where was the bag and again you

15  don't say it's on top of a chair; is that correct?

16  A   Can you play it?

17    MR. BROWN:  Play the third one.

18    (Tape plays.)

19    (Tape stops.)

20  Q   So once again the detective is trying to figure out where

21  the bag was and you don't tell him it's on top of a chair?

22  A   Correct.

23  Q   In fact you tell him it's four feet away from where the

24  bottle was?

25  A   Roughly four feet, yes.

1      THE COURT:  Can you play that again?

2      MR. BROWN:  Yes.

3      (Tape plays.)

4      (Tape stops.)

5      THE COURT:  Four feet.  What's the second word that

6  you say?

7      THE WITNESS:  If that.

8      THE COURT:  If that?

9      THE WITNESS:  Yes, four feet, if that.

10      THE COURT:  Okay.

11      MR. BROWN:  We could take that down.

12  Q    So I'm going to ask you:  You worked at the NYPD you said

13  for four years, correct?

14  A    Four and a half.

15  Q    Four and a half.  I'm sorry.  On October 31 you were

16  aware the NYPD has a media presence?

17  A    Yes.

18  Q    It's called the Public Service Information Office?

19  A    Yes.

20  Q    They have a website?

21  A    Yes.

22  Q    And certain cases get written about for the NYPD website,

23  correct?

24  A    Correct.

25  Q    This case was written about by the NYPD?

1    A    Yes.

2    Q    The officer at the public information division contacted

3    you about this arrest?

4    A    Correct.

5    Q    And asked you questions?

6    A    Correct.

7    Q    And you gave them answers?

8    A    Correct.

9    Q    And then they published a news article about this arrest?

10   A    Correct.

11   Q    Let me just be clear:  You told the public information

12   division that you saw Robert Alexander throw a bag into the

13   grass?

14   A    No.

15   Q    You didn't tell them that?

16   A    No.

17   Q    They published after talking to you:  "As the officers

18   approached the suspect they observed him throw a bag into the

19   grass near the location?

20   A    I did not tell them that.

21   Q    Just so I'm clear:  You never mentioned anything to the

22   public information office about a bag being on a chair?

23   A    I don't remember exactly the way the conversation went.

24   He called me in the morning.

25            THE COURT:  He was what?

1        THE WITNESS:  He called me in the morning, like

2   around 9:00, 10:00, after the arrest.  He called the front

3   desk.  I answered.  He told me, Quickly, can you tell me what

4   happened?  I will call you right back and that's it.

5        THE COURT:  Who was the individual?  Do you know his

6   name?

7        THE WITNESS:  No.  It was somebody from the PIC.

8   Q    It was someone from the NYPD Public Information Office?

9   A    Right.

10  Q    Just like the detective's purpose is investigatory, the

11  Public Information Office is to put out correct facts, right?

12  A    To put facts out, yes.

13  Q    They don't normally put out news stories and try to

14  present the facts, correct?

15  A    Correct.

16  Q    They try to give an accurate account of the what

17  happened?

18  A    Correct.

19  Q    You know that from being a police officer?

20  A    Yes.

21  Q    At no point did you tell a member of the Public

22  Information Office that you saw this bag on a chair?

23  A    I can't tell you I remember the whole conversation the

24  way it went.

25  Q    After this arrest you wrote an arrest report?

1    A    Correct.

2    Q    And in the arrest report you put that this bag was

3    dropped?

4    A    I have to remember -- I don't remember exactly what I

5    wrote on the arrest report.

6    Q    If I were to show you your complaint report or arrest

7    report, would that refresh your recollection?

8    A    Yes.

9    Q    So this is your complaint report, the on-line copy?

10   A    Can you make it bigger, please?

11   Q    So does this refresh your recollection?

12   A    Yes.

13   Q    You never mentioned the chair in your arrest report?

14   A    No.

15   Q    Just so I'm clear:  Did you do a handwritten copy of this

16   arrest report?  Do you have to do a handwritten copy?

17   A    I didn't do a handwritten copy.

18   Q    But you never said in your arrest report that there was a

19   chair?

20   A    Not in that on-line, no.

21   Q    You said that the bag was dropped?

22   A    Correct.

23   Q    And then after that you spoke to a member of the federal

24   Probation Department, Officer Carter, correct, about this

25   arrest?

1  A    I don't remember, to be honest with you, who I spoke to.

2  Officer who?

3  Q    Officer Carter, a member of the department of probation,

4  federal probation, you spoke to him, correct, about this

5  arrest?

6  A    I don't remember me speaking to him.  I don't remember.

7  I spoke to so many people after that.

8  Q    This is the last thing.

9        You were a conditions officer before you were open

10  container?  You were a conditions officer before you were

11  anti-crime.

12  A    Yes.

13  Q    As a conditions officer you wrote summonses for open

14  containers before?

15  A    Yes.

16  Q    You are familiar with the summons?

17  A    Correct.

18  Q    On the summons you have to have an address for a person

19  that's given a summons, correct?

20  A    Correct.

21  Q    You also have to have an address that's an occurrence

22  location which is where the occurrence happened, correct?

23  A    Correct.

24  Q    So in your years of being a conditions officer all the

25  summonses you wrote, you never wrote a summons for someone for

1  open container where the address of the incident matched the

2  address of the person who got a summons?

3  A    Have I?

4  Q    Yes.

5  A    I think so.  I have, yes.

6  Q    Okay.  You've given people a summons for drinking on

7  their property?

8  A    Either me or my partner that is in the car, yes.  The

9  locations have nothing to do with the crime that is being

10  committed, if it's in front of the house or next door.

11  Q    You have given people summonses before for open container

12  on their property?

13  A    I don't remember exactly if I have.  Yes, it doesn't

14  matter.  If that's their address or outside, it doesn't

15  matter.

16  Q    And you were a member of anti-crime on October 31.  A

17  part of your job -- I'm sorry.  A part of your job was to run

18  people's information in your precinct, correct?

19  A    Yes, to run people's information and patterns and stuff

20  in the precinct.

21  Q    Prior to October 31, you were -- you had run

22  Mr. Alexander's information?

23  A    Not myself.  I don't remember me running it.

24        MR. BROWN:  Your Honor at this point --

25        THE COURT:  Is the question whether he had known of

1  Mr. Alexander before that day.

2          MR. BROWN:  Yes.

3          THE WITNESS:  I have known him.  I have not

4  physically myself run his name, no.

5          THE COURT:  You knew who he was?

6          THE WITNESS:  Him, his whole family, the address of

7  the house, everything.

8  Q    All right.

9          MR. BROWN:  Your Honor, at this point I would ask to

10  inquire about what we talked about.

11          THE COURT:  I have reviewed the document.  To the

12  extent it has any relevance -- and I don't believe that it

13  does -- it would clearly be outweighed by the waste of time in

14  going into a completely different transaction.  This officer's

15  actions at the search were not the subject of being

16  questioned.  I think it's just at this point distracting and a

17  waste of time within the meaning of 403.

18          MR. BROWN:  I just have a few more follow-up

19  questions and I'll be done.

20  BY MR. BROWN:

21  Q    Speaking about what we were just talking about, open

22  container has to be done in a public place, right?

23  A    Yes.

24  Q    And if I just take you back to what we talked about

25  before with respect to when you first saw the bag:  On the

1  chair as you said what you saw -- what you observed sticking

2  out from the bag was an object that appeared to be sticking

3  out of it, correct?

4  A    Right.

5  Q    It was a small piece that was just about how long would

6  you say, an inch long, longer?

7  A    It looks like the butt of a gun, the butt end of a gun.

8         THE COURT:  When you saw it, at the moment you saw

9  it --

10        THE WITNESS:  The bottom part.

11        THE COURT:  The butt of a gun?

12        THE WITNESS:  Right.

13 Q    How long was the piece of the object that you saw?

14 A    Like this, somewhere around approximately this size.

15        THE COURT:  You're showing like three inches.

16        THE WITNESS:  Right, the back of the hand.

17        MR. BROWN:  The witness is using his fingers to

18 approximate what the court would say is?

19        THE COURT:  Three inches?

20        MR. BROWN:  Yes.

21        THE COURT:  I'm bad on measurements, counsel.  Don't

22 count on me.

23        MR. BROWN:  No problem.

24 Q    That object was dark in color?

25 A    Yes.

1   Q    Without your flashlight you wouldn't have known what it

2   was?

3   A    Yes.

4   Q    You didn't know if it was a tool at that time when you

5   saw just the inch of it, or three inches more or less?

6   A    I know it was not a tool.

7   Q    You didn't know what it was until you opened the draw

8   string?

9   A    I know it was a gun.  I didn't now what type of gun,

10  would it be air pistol or any type of gun.  The

11  characteristics were of a gun, the way the butt end looked.

12  Q    At that moment when you saw just the three inches of the

13  object?

14  A    It's the three inches and the side; you just look at the

15  three inches.

16  Q    At that moment the next thing you did was to go to the

17  bag and peer inside?

18  A    Once I went in there and I saw the whole thing and I went

19  inside to confirm it, yes.

20  Q    After you saw that three inch part of the object, you did

21  not turn around and give the 92 symbol to Officer Golat?

22  A    No.

23  Q    You turned to the bag and peered inside, correct?

24  A    Correct.

25           MR. BROWN:  I have no further questions at this

1    time.

2            THE COURT:  Does the government have anything

3    further?

4            MR. HARRIS:  Just one moment, your Honor.

5            THE COURT:  Okay.

6            (Pause.)

7            MR. HARRIS:  Just a few questions, your Honor.

8            THE COURT:  Okay.

9    REDIRECT EXAMINATION

10   BY MR. HARRIS:

11   Q    Officer Barreiro, I'm going to touch on a few different

12   topics.

13   A    Yes.

14   Q    Defense counsel just discussed with you earlier the fact

15   that you interviewed Meghan Jeffries when you arrived?

16   A    Correct.

17   Q    But you did not interview the defendant at that time?

18   A    Correct.

19   Q    Did you interview Meghan Jeffries with Detective

20   Patterson?

21   A    No.

22   Q    Why didn't you do that?

23   A    Because depending on the type of case it is -- it's

24   called enhanced case, depending on the type of arrest.

25   There's certain ones we can do as an anti-crime cop.  There's

1   certain ones the detective has to do.

2   Q    The case that was Meghan Jeffries was arrested for did

3   not require the enhancement unit to be present for?

4   A    Correct.

5   Q    Is it fair to say that the type of crime that Robert

6   Alexander was arrested for required the enhancement unit to be

7   present for?

8   A    Correct.

9   Q    Defense counsel asked you a few moments ago about some

10  statements that you made during the video interview; do you

11  remember that?

12  A    Yes.

13  Q    During those clips you talked about the relationship or

14  the distance between the bottle and the bag.  Do you recall

15  that?

16  A    Correct.

17  Q    When you observed the bottle and observed the bag, did

18  you have a tape measure with you?

19  A    No.

20  Q    Did you measure the distance in any way?

21  A    No.

22  Q    Is it fair to say that any statements you made about the

23  distance are an estimate?

24  A    Yes, approximate estimate, yes.

25  Q    Defense counsel also asked whether you mentioned that the

1  bag was on a chair.  Do you recall that?

2  A    Yes.

3  Q    Do you recall if you mentioned that the bag was on a

4  shed?

5  A    Yes.

6  Q    In front of a shed?

7  A    Yes.

8  Q    You were also asked a few questions about a NYPD press

9  release.  Do you recall those questions?

10 A    Yes.

11 Q    Correct?

12 Q    Did you write the article that defense counsel was

13 referring to?

14 A    No.

15 Q    Did the NYPD Public Information Office send you a draft

16 of the article before it was published?

17 A    No.

18 Q    And do you recall reading the article after it was

19 published?

20 A    Yes.

21 Q    What was your reaction?

22 A    That it was wrong.

23        MR. HARRIS:  No further questions, your Honor.

24        THE COURT:  All right.  Is there anything further?

25        MR. BROWN:  No, your Honor.

1      THE COURT:  Thank you.  You can step down.

2          We'll take a luncheon recess now.  The government

3  has one additional witness?

4      MR. HARRIS:  Correct, your Honor.

5      THE COURT:  That's Officer Golat?

6      MR. HARRIS:  Yes, your Honor.

7      THE COURT:  I take it that the material that I

8  reviewed with respect to this witness, the CCRB, is similar to

9  the only one that applies to Officer Golat?

10         MR. HARRIS:  Let me confirm that.

11         Your Honor, as I disclosed in my letter, there are

12  three CCRB cases related to Officer Golat.  The one in which

13  you reviewed the material --

14         THE COURT:  This is the one that dealt with the

15  search and the memo book on the search?

16         MR. HARRIS:  Correct.

17         There was another incident from December 2014.  No

18  investigation was conducted of Officer Golat.  He was cited

19  for failure to make a memo book entry.  There was also a third

20  incident in which Officer Golat was investigated for the stop

21  of a vehicle and the allegations against Officer Golat and the

22  other officers were deemed unsubstantiated.  Officer Golat was

23  cited for failure to make a memo book entry.

24         THE COURT:  Okay.

25         MR. HARRIS:  I'm happy to disclose the material

1    related to that third incident.

2            THE COURT:  Why don't you give the court a copy of

3    that.

4            MR. HARRIS:  I apologize, your Honor.  This one is a

5    little longer.

6            THE COURT:  Thank you.

7            All right.  You have a witness, too, counsel?

8            MR. BROWN:  Yes, your Honor.  I turned over a

9    witness list.  I'm note sure if the court got it.  This

10   witness should be short, it's my understanding.

11           MR. HARRIS:  Your Honor, to be clear, for the

12   record, defense counsel made a Rule 16.1 disclosure.  It

13   consisted of an e-mail containing the witness's name, date of

14   birth and I assume her employment.  I want to confirm for the

15   record there are no other statements or mineralizations of any

16   kind in the anticipated testimony at this point.

17           (Continued on next page.)

18

19

20

21

22

23

24

25

1  (Continuing)

2          MR. BROWN:  There's not.  I sent that E-mail out of

3  caution, I didn't know if for the witness list we'd have to

4  turn that over to the Government.

5          She sent it back by E-mail so I gave it to the

6  Government, I didn't know of anything else.

7          THE COURT:  All right.

8          MR. BROWN:  That relates to our testimony.

9          MR. HARRIS:  The only other issue, Your Honor, I

10 apologize, it is unclear to me the relevance of the witness's

11 testimony.  I don't believe there is any indication that she

12 was present.

13         THE COURT:  Who is the with witness?

14         MR. BROWN:  The witness is Charnae Alexander.  She

15 is the sister of my client.  She actually lives at the

16 location and can speak to some of the things that the

17 Government asked about of Officer Barreiro with respect to the

18 property.

19         She is literally being called for that purpose.

20         THE COURT:  To discuss the layout of the property?

21         MR. BROWN:  Layout, the Government asked about

22 fences and things like that.  If they intend to make any

23 arguments using those things, then I think she should be

24 allowed to be called to give the Court information the layout,

25 what's open to the public, things that might come up later in

1   the argument, which I only understand from the Government's

2   opposition.

3           THE COURT:  She is a tenant there?  She lives there?

4           MR. BROWN:  Yes.

5           THE COURT:  Okay.  I will have to see.

6           MR. HARRIS:  Thank you, Your Honor.

7           THE COURT:  2:00 o'clock.

8

9           (Continued on following page with AFTERNOON

10  SESSION.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              AFTERNOON SESSION

2              (In open court.)

3              (Judge CAROL B. AMON enters the courtroom.)

4              (Defendant enters the courtroom.)

5              THE COURT:  Are we ready to proceed?

6              MR. HARRIS:  Yes, we are, Your Honor.

7              THE COURT:  All right.

8              I have reviewed the CCRB investigative

9    recommendation with respect to Officer Golat and I have the

10   same reaction I did to the other one; I don't think it is

11   truly relevant to any credibility issues or facts that would

12   make it similar to the case before the Court.  So, on 403

13   grounds, I would preclude cross-examination about that

14   incident.

15             MR. HARRIS:  Your Honor, may we call our next

16   witness?

17             THE COURT:  Sure.

18             MR. HARRIS:  The Government calls officer Daniel

19   Golat.

20             (Witness enters and takes stand.)

21             THE COURTROOM DEPUTY:  Please, raise your right

22   hand.

23

24             (Continued on following page.)

25

1    **D A N I E L     G O L A T**,

2             called by The Government, having been

3             first duly sworn, was examined and testified

4             as follows:

5             THE COURTROOM DEPUTY:  You may be seated.

6             THE WITNESS:  Thank you.

7             THE COURTROOM DEPUTY:  Please, state and spell your

8    name for the record.

9             THE WITNESS:  Officer Golat -- G-O-L-A-T.  NYPD.

10            THE COURT:  You may proceed.

11            MR. HARRIS:  Yes, Your Honor.

12   DIRECT EXAMINATION

13   BY MR. HARRIS:

14   Q    Good afternoon, Officer Golat.

15   A    Good afternoon.

16   Q    Where do you work?

17   A    The NYPD.

18   Q    What was your job title?

19   A    I work as an investigator with the Staten Island Warrant

20   Squad.

21   Q    How long have you been a member of the Staten Island

22   Warrant Squad?

23   A    Three months.

24   Q    Where were you assigned before the Staten Island Warrant

25   Squad?

1    A     121 Precinct.

2    Q     How long were you assigned to the 121 Precinct?

3    A     Two-and-a-half years.

4    Q     And what was your assignment at the 121 Precinct?

5    A     I did patrol conditions and Anti-Crime.

6    Q     What was your last assignment with the 121 Precinct?

7    A     Anti-Crime.

8    Q     What did you do as a member of the Anti-Crime Unit?

9    A     We tracked violent felons as well as tried to make

10   arrests and apprehensions on violent felony crimes.

11   Q     As part of your job with the Anti-Crime Unit, did you

12   conduct patrols?

13   A     Yes.

14   Q     I want to direct your attention to October 31st, 2015.

15         Were you working as a member of the Anti-Crime Unit

16   that day?

17   A     Yes.

18   Q     What was your shift?

19   A     7:30 at night to 4:05 in the morning.

20   Q     When you say 7:30 at night, was that on October 30th,

21   2015?

22   A     Yes.

23   Q     And you said it ended at 4:05 in the morning, was that on

24   October 31st, 2015?

25   A     Yes.

1   Q    Were you on patrol that night?

2   A    Yes.

3   Q    Who were you on patrol with?

4   A    Officer Barreiro.

5   Q    Were you and Officer Barreiro in plain clothes that

6   night?

7   A    Yes.

8   Q    Were you patrolling in a marked or unmarked car?

9   A    Unmarked.

10  Q    Who was driving the car?

11  A    Officer Barreiro.

12  Q    Where were you seated in the car?

13  A    I was in the front passenger seat.

14  Q    What neighborhood were you patrolling?

15  A    Port Richmond.

16  Q    Where were you and Officer Barreiro at somewhere between

17  3:00 and 3:30 in the morning that night?

18  A    Port Richmond, close to the corner of the Harrison and

19  Treadwell.

20  Q    And when you say you were close to the corner of the

21  Harrison and Treadwell, were you on Harrison Avenue or

22  Treadwell Avenue?

23  A    We were on Harrison Avenue.

24  Q    I am showing you what's been entered into evidence as

25  Government's Exhibit 1.

1       What is it?

2  A    That's a map of the area where me and my partner were

3  that night.

4  Q    Does Government's Exhibit 1 show the area on Harrison

5  Avenue that you were patrolling?

6  A    Yes.

7  Q    Can you please draw an arrow, using the screen in front

8  of you, in the direction that you were driving on patrol on

9  Harrison Avenue that night?

10 A    Yes, I can.

11       MR. HARRIS:  Let the record reflect that the witness

12 has drawn a leftward-facing arrow along Harrison Avenue.

13       THE COURT:  The record will so reflect.

14 Q    While you were driving down Harrison Avenue what, if

15 anything, caught your attention?

16 A    I observed a vehicle that was the engine was idling.  I

17 also observed a male on the front of a residence with an open

18 container of alcohol.

19 Q    Okay.  Let me break that down.  You said you saw a

20 vehicle with the engine idling.

21       Were the headlights on that vehicle on?

22 A    I can't recall.

23 Q    You said you observed a male sitting in front of a house

24 with an open container of alcohol?

25 A    That's right, he was standing in front of the house.

1  Q    What kind of container of alcohol?

2  A    It was a bottle of vodka.

3  Q    Was there anyone standing with the male?

4  A    Yes.

5  Q    And was that a male or a female?

6  A    That was a female.

7  Q    You mentioned that the male had a bottle of -- did you

8  say vodka?

9  A    Yes.

10 Q    A bottle of vodka in his hand.

11       Is it illegal in New York to drink alcohol in

12 public?

13 A    Yes.

14 Q    Now, this man with the bottle of vodka, did you later

15 identify him?

16 A    Yes.

17 Q    Who was he?

18 A    Robert Alexander.

19 Q    Do you see Robert Alexander in the courtroom today?

20 A    Yes.

21 Q    Can you please identify Robert Alexander by describing an

22 article of clothing that he is wearing.

23 A    Yes.  He's over there with the, looks like a gray shirt

24 and glasses.

25            MR. HARRIS:  Let the record reflect that the witness

1    has identified the defendant.

2         THE COURT:  The record will so reflect.

3    Q    When you first saw the defendant holding a vodka bottle,

4    did he have anything in his hands besides the bottle?

5    A    No.

6    Q    What did you do next?

7    A    At that point as we pulled up to the location, the

8    vehicle that was engine idling tried to pull away, so we

9    hopped out of the car both to address Mr. Alexander with his

10   alcohol bottle as well as the vehicle.

11   Q    Why did you decide to get out of the car at that point?

12   A    Well, as we pulled up, like I said, the car started --

13   looked like it was about to pull away.  Also, for the open

14   container stop as well.

15   Q    Now, when you got out of the car you said that the car

16   that was standing that was idling in front was idling in front

17   of a house.

18        Do you know what the address of that house was?

19   A    Yes.

20   Q    What is it?

21   A    144 Harrison Avenue.

22   Q    When you got out of the car, what happened?

23   A    We identified ourselves as police officers, so at that

24   point the car stopped and we approached the vehicle.

25   Q    How did you identify yourselves as police officers?

1  A    We had our shields visible and we said police.

2  Q    When the car stopped, what happened?

3  A    My partner and I approached the car.  There was a lot of

4  movement as we approached.  And my partner told me to get

5  everyone out of the car.

6  Q    When you say there was a lot of movement, what do you

7  mean?

8  A    Hand movement, things like that.

9  Q    And how many people did you observe inside the vehicle?

10  A    Two.

11  Q    And can you specify who they were and where they were

12  sitting?

13  A    Yes, there was a front passenger was a female and -- I'm

14  sorry.  The driver was a female and the front passenger was a

15  male.

16  Q    Did you later learn the identity of woman that was

17  driving the car?

18  A    Yes.

19  Q    And who is she?

20  A    Meghan Jeffries.

21  Q    Did you later learn the identity of the man that was

22  sitting next to her?

23  A    Yes.

24  Q    And who was he?

25  A    Jarrett Glover.

1  Q    So, you mentioned that your partner Officer Barreiro told

2  you to bring everyone out of the car.

3            What did you do in response?

4  A    At that point I waited.  He brought the female out first

5  and then I brought the male front passenger out of the car and

6  brought him to the back.

7  Q    While you were doing this, what was the defendant doing?

8  A    He was on the lawn, he was trying to make conversation,

9  he was saying this is my house, those are my cousins.  I'm

10 just out here drinking.  Things of that sort.

11 Q    Did he still have the vodka bottle in his hand?

12 A    At that time, yes.

13 Q    Now, you said you and Officer Barreiro brought Jarrett

14 Glover and Meghan Jeffries to the back.  Was it their car?

15 A    Yes.

16 Q    What happened after you did that?

17 A    We put his hands against the car and did --

18 Q    I'm sorry, when you say his hand?

19 A    I'm sorry, Mr. Glover's hands against the car and at that

20 point, his right hand was still balled up and my partner asked

21 him to open his hand.  He opened his hand and there was a bag

22 of cocaine in his right hand.

23 Q    You said there was a bag of cocaine.  What was its

24 appearance?

25 A    It was a white powdery substance in a Ziploc.

1    Q    And what happened after you observed the Ziploc bag with

2    the white powdery substance?

3    A    We put Mr. Glover in cuffs at that point.  We asked him

4    is there any more cocaine in car or on his person and he

5    responded that there was more inside a backpack.

6    Q    After Mr. Glover said there was more cocaine in a

7    backpack, did he -- I'm sorry?

8         MR. HARRIS:  Withdrawn.

9    Q    Did he specify where the backpack was located?

10   A    Yes.

11   Q    Where did he say it was located?

12   A    It was in the back seat of the vehicle he was in.

13   Q    After Mr. Glover told you about the backpack in the rear

14   seat of the vehicle, what did you do?

15   A    At that point I went to the back and I grabbed the bag.

16   Q    While you were recovering the bag from the back seat of

17   the car, were you facing the defendant?

18   A    No.

19   Q    And after you retrieved the backpack from the back seat

20   of the vehicle what, if anything, did you notice about the

21   defendant?

22   A    He had his back toward me, he was walking to the rear of

23   144 Harrison.

24   Q    What drew your attention to the defendant at that time?

25   A    Well, I was making, you know, quick facial contact with

1    my partner and at that point my partner looked and, you know,

2    I went to see what he was looking at, so I turned around.

3    Q    When you saw the defendant walking to the back of

4    144 Harrison Avenue, was he facing you?

5    A    No.

6    Q    I'm showing you what's been entered no evidence as

7    Government's Exhibit 3.

8         What is it?

9    A    That's the front of the residence.

10   Q    When you say the residence is that 144 Harrison Avenue?

11   A    Yes.

12   Q    Is that the address that you saw the defendant standing

13   in front of on October 31st, 2015 with the vodka bottle?

14   A    Yes.

15   Q    Now, looking at Government's Exhibit 3, can you please

16   circle where the defendant was standing before you went into

17   the back seat of the car?

18   A    Yes.

19        MR. HARRIS:  Let the record reflect that the witness

20   has drawn a circle on the front left corner of the lawn, the

21   front yard.

22   Q    Now, looking again at Government's Exhibit 3, can you

23   please circle, please make a circle where you next saw the

24   defendant?

25   A    Yes.

1       MR. HARRIS:  Let the record reflect that the witness

2   has drawn a circle on the alley between the house at 144

3   Harrison Avenue and the driveway around a red bucket.

4   Q    Could you see either of the defendant's hands at that

5   time?

6   A    No.

7   Q    What were the sources of light that allowed you to see

8   the defendant at that time?

9   A    It was actually pretty well-lit.  Clear night.  There was

10  a street light that was on across the street and we had our

11  flashlights as well.

12  Q    Did you follow the defendant?

13  A    No.

14  Q    Why not?

15  A    Well, I already had one person under arrest for

16  possession of cocaine, so our focus was on that at that point.

17  Q    After the defendant went to the back of 144 Harrison

18  Avenue, did you see him again?

19  A    Yes.

20  Q    And how long after?

21  A    Fifteen seconds.

22  Q    And what were the circumstances in which you saw him

23  again?

24  A    He came back to the location and at that point he had no

25  more vodka bottle, so at that point we called for backup.

1  Q    Did he have anything else unusual about his appearance at

2  that time?

3  A    Yeah, he looked like he had leaves on his shirt and a

4  leaf in his hair.

5  Q    You said that you called for backup.  Why did you do

6  that?

7  A    Well, we had four people we were dealing with.  There was

8  only two of us.  Tactically, we don't like to approach that

9  that way.  We like to have even numbers.  So we called for a

10 backup car, non-emergency at that point.

11 Q    And why was it non-emergency?

12 A    We don't want anyone getting hurt going over there,

13 getting into any kind of car accident.  We weren't fighting

14 with anyone, no one was giving us a problem at that point.  It

15 was strictly a numbers thing.

16 Q    Okay.  What are the kinds of situations that would

17 require an emergency backup?

18 A    For fighting with someone, physically.  Maybe resisting

19 arrest situation.  Gunfight, something like that.

20 Q    Did another police officer arrive on scene eventually?

21 A    Yes.

22 Q    And who was that officer?

23 A    Officer Brian Malarkey.

24 Q    After Officer Malarkey arrived on scene, what happened?

25 A    I asked him for a C summons for Mr. Alexander and at that

1  point my partner went to the back of the location and I

2  approached Mr. Alexander while he watched Mr. Glover and

3  Ms. Jeffries.

4  Q    You said your partner went to the back of the location.

5  Is that Officer Barreiro?

6  A    Yes.

7  Q    While Officer Barreiro was in the back of 144 Harrison

8  Avenue, did you have a conversation with the defendant?

9  A    Yes.

10  Q    And what was the substance of that conversation?

11  A    It was small-talk.  I asked him why he went back there

12  and he came back, you know.  He had no bottle.  He said it was

13  out of respect for us, the NYPD.  And he seemed a little

14  nervous at that point.

15  Q    Looking at Government's Exhibit 3, can you please circle

16  the area where you and the defendant were standing during this

17  conversation.

18  A    Yes.

19        MR. HARRIS:  Let the record reflect the witness has

20  drawn a circle on the front lawn on the left-hand side, on the

21  left-hand side of 144 Harrison on Government's Exhibit 3.

22  Q    Was the defendant in handcuffs at this point?

23  A    No.

24  Q    You mentioned that Officer Barreiro walked to the back of

25  144 Harrison Avenue.  Looking at Government's Exhibit 3, can

1  you draw an arrow reflecting the path that Officer Barreiro

2  took?

3  A    Yes.

4         MR. HARRIS:  Let the record reflect that the witness

5  has drawn an arrow from the front lawn of 144 Harrison Avenue

6  down the space between the house and the driveway, toward the

7  rear of the residence.

8         THE COURT:  The record will so reflect.

9  Q    What happened after that?

10  A    After about ten seconds my partner re-emerged and asked

11  Mr. Alexander if he had any weapons on him, anything like

12  that.  At that point we gave him a frisk for weapons.

13  Q    What was the result of that frisk?

14  A    It was negative at that time.

15  Q    What happened after you frisked the defendant for

16  weapons?

17  A    My partner said I'll be right back and he went back to

18  the rear of the location again.

19  Q    And you mentioned that Officer Barreiro went to the rear

20  of the location two times.

21         The first time, how long was he down the rear of the

22  location?

23  A    About ten seconds, 15 seconds, maximum.

24  Q    And you mentioned that he went down to the back of

25  144 Harrison Avenue a second time?

1    A    Yes.

2    Q    What happened after he went to the back?

3    A    He re-emerged and at that point he raised his hands up

4    and went like this, signaling for me to handcuff

5    Mr. Alexander.

6         MR. HARRIS:  Let the record reflect in a the witness

7    has crossed his wrists.

8         THE COURT:  The record will so reflect.

9    Q    How long was Officer Barreiro back in the rear of

10   144 Harrison Avenue a second time?

11   A    Again, another ten to 15 seconds, very short amount of

12   time.

13   Q    After Officer Barreiro signalled to you to arrest the

14   defendant, what happened?

15   A    I went to grab his left wrist and Officer Barreiro went

16   to grab his right.  At that time he crossed his arms, swung

17   them at us and ran up Harrison Avenue.

18        MR. HARRIS:  Let the record reflect that the witness

19   raised his arms to his chest and then brought them down to his

20   sides.

21        THE COURT:  The record will so reflect.

22   Q    After the witness pulled his hands away from you, what

23   did he do?

24   A    He ran.

25   Q    And which way did he run?

1  A    Up Harrison, towards Treadwell.

2  Q    What did you and Officer Barreiro do then?

3  A    We chased him on foot.

4  Q    Looking back at Government's Exhibit 1.

5         Can you please detail how the chase proceeded.

6  A    Sure.  Started from approximately over here and up this

7  way, made a left on Treadwell and a left on Slaight and then

8  into a complex around right here, 17 Slaight Street.

9         MR. HARRIS:  Let the record reflect that the witness

10  has drawn a line from Harrison Avenue taking a left on

11  Treadwell Avenue then a left on Slaight Street and then a

12  right into a parking lot between two buildings in the middle

13  of Slaight Street.

14         THE COURT:  The record will so reflect.

15  Q    Did you and Officer Barreiro eventually apprehend the

16  defendant?

17  A    Yes.

18  Q    Where?

19  A    In front of 17 Slaight Street.

20  Q    After you caught the defendant, did you place him in

21  handcuffs?

22  A    Yes.

23  Q    What did you do next?

24  A    At that point we put him in the vehicle that was with us,

25  that was Officer Malarkey, he followed us while driving and we

1    went back to 144 Harrison.

2    Q    When you returned to 144 Harrison Avenue, what did you

3    do?

4    A    We went to the backyard at that point.

5    Q    When you say we, who was that?

6    A    Myself, Officer Barreiro, my Sergeant who was also on

7    scene at that point after we called for a foot chase.

8    Q    When you proceeded to the back of 144 Harrison Avenue,

9    were there any fences or other barriers obstructing your path?

10   A    I can't recall.

11   Q    Did you observe any no trespassing signs or anything of

12   that nature?

13   A    No.

14   Q    Were the driveway and the adjoining concrete -- I'm

15   sorry.

16            How did you proceed to the rear of 144 Harrison?

17   A    We went up the driveway on the sidewalk.

18   Q    Was the driveway enclosed in any way?

19   A    No.

20   Q    Was it accessible from the street?

21   A    Yes.

22   Q    What did you find in the back of 144 Harrison Avenue?

23   A    We found both the vodka bottle that the defendant was

24   drinking -- was holding rather -- open.  And two firearms

25   inside a string bag.

1  Q    Where did you find the vodka bottle?

2  A    Vodka bottle was on the cement near steps leading into

3  the house.

4  Q    And where did you find the bag containing the two

5  firearms?

6  A    It was on top of a chair in close proximity to the

7  bottle.

8  Q    I'm showing you what's been entered into evidence as

9  Government's Exhibit 5.

10         What is it?

11  A    It's the rear of 144 Harrison Avenue.

12  Q    Looking at Government's Exhibit 5, can you draw an X

13  where you found the bag containing the firearms?

14  A    Yes.

15         MR. HARRIS:  Let the record reflect that the witness

16  has drawn an X over on the right-hand side of a shed at the

17  rear of 144 Harrison Avenue driveway, in front of a chair.

18         THE COURT:  The record will so reflect.

19  Q    Looking at Government's Exhibit 35, can you please circle

20  the general area where you found the liquor bottle?

21  A    Yes.

22         MR. HARRIS:  Let the record reflect that the witness

23  has drawn a circle on a piece of grass adjoining a concrete

24  walkway leading to a set of stairs in the rear of 144 Harrison

25  Avenue.

1          THE COURT:  The record will so reflect.

2   Q    Looking at Government's Exhibit 6.

3          What does this photo depict?

4   A    That's also the rear of 144 Harrison, the shed.

5

6          (Continued on following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  BY MR. HARRIS:

2  Q    Can you please mark an X where you observed the bag

3  containing two firearms on this exhibit?

4  A    Yes.

5        MR. HARRIS:  Let the record reflect that the witness

6  has marked an "X" on the plastic chair standing in front of

7  the shed at the rear of 144 Harrison Avenue.

8  Q    Where was the bag and two firearms situated with respect

9  to the shed?

10  A    It was right against the shed.

11  Q    Was it on the ground?

12  A    The bag?  No.  It was on the chair.

13  Q    Does the chair depicted in Government Exhibit 6 appear to

14  be the same plastic chair that the bag was found on?

15  A    Yes.

16  Q    I'm showing you what's been entered into evidence as

17  Government Exhibit 7.

18        What is it?

19  A    It's the vodka bottle that the defendant was drinking or

20  was holding.

21  Q    I'm showing you what's been entered into evidence as

22  Government Exhibit 8.

23        What is it?

24  A    That's the string bag that was on the chair with the two

25  firearms in it.

1  Q    And just to clarify, Government Exhibit 7 and 8 that we

2  were just talking about, is that the actual liquor bottle and

3  bag or are those photographs of those items?

4  A    Photographs of the actual bag and the bottle, yes.

5  Q    Showing you what's been marked as Government Exhibit 9,

6  what is this a photograph of?

7  A    It's one of the firearms that was inside the string bag.

8  Q    Now I'm showing you what's been marked as Government

9  Exhibit 10.

10         What is this a photograph of?

11  A    That's the other firearm that was in the string bag.

12  Q    Who recovered the physical evidence?

13  A    Officer Barreiro.

14  Q    And what happened after the physical evidence was

15  recovered?

16  A    We went back to the precinct to process his arrest.

17  Q    Did you have any further interaction with the defendant

18  after that?

19  A    No.

20         MR. HARRIS:  May I have one moment, your Honor?

21         THE COURT:  Yes.

22  Q    Just one last question:  Did you transport the defendant

23  to the 121 Precinct?

24  A    No.

25         MR. HARRIS:  No further questions, your Honor.

1              THE COURT:  Thank you.

2    CROSS-EXAMINATION

3    BY MR. BROWN:

4    Q    Good afternoon, Officer Golat.

5    A    Good afternoon.

6    Q    On October 31, 2015, you were an anticrime officer?

7    A    Yes.

8    Q    And you had been in that post for three and a half years

9    at that point?

10   A    I'm sorry, two and a half.

11   Q    Two and a half?

12   A    That post specifically, a little over a year and a half.

13   I was in the 121 for two and a half years.

14   Q    Okay.  So, that post was one and a half years.

15   A    Yes.

16   Q    And as a member of anticrime, your job was to make

17   arrests for serious felonies?

18   A    Yes.

19   Q    In fact, you, yourself, were credited last year with

20   making 78 felony arrests at a ceremony, correct?

21   A    That's false.  That was my total number of arrests for

22   the year.

23   Q    Oh, it wasn't just specifically felony arrests, is what

24   you're saying.

25   A    Correct.

1  Q     But you did get credited with making 78 arrests that

2  year.

3  A     Yes.

4  Q     And for that, you were celebrated, correct?

5  A     Yes.

6  Q     Every arrest you make, you don't necessarily testify in

7  the grand jury, correct?

8  A     No.

9  Q     And for all of those arrests, you don't necessarily

10  testify in court, correct?

11  A     No.

12  Q     For that year, how many of those arrests did you testify

13  in court?

14  A     I can't give you an actual number.

15  Q     Less than five?

16  A     For grand jury or just --

17  Q     In trial or in court.

18  A     In trial?  Less than five.

19  Q     And how many of those did you testify in the grand jury?

20  A     Around ten, I would say; maybe more, ten to fifteen.

21  Q     As an anticrime officer, you generally aren't responsible

22  for writing summonses, correct?

23  A     No.

24  Q     In fact, you didn't have a summons book on you

25  October 31, 2015.

1    A    No, I did not.

2    Q    Now, on October 31, 2015, you were on a patrol some time

3    after 3 a.m.?

4    A    Yes.

5    Q    And you were only in the car with Officer Barreiro?

6    A    Yes.

7    Q    At that time, you weren't responding to any type of tip

8    or radio run.

9    A    No.

10   Q    And your shift was about to end at 4:05?

11   A    Yes.

12   Q    And you were in the passenger seat of the car that

13   Officer Barreiro was driving?

14   A    Yes, front passenger seat.

15   Q    In your initial observation from the car, all you

16   observed was Robert Alexander on the lawn of 144 Harrison,

17   right?

18   A    No, that's not true.  I observed he was with a female on

19   the lawn and there was a car that was there.

20   Q    Okay.

21   A    Two passengers.

22   Q    But you recognized Robert Alexander as the man that was

23   the man on the lawn?

24   A    Yes.

25   Q    You did not recognize the female that was next to him?

1  A     No.

2  Q     And you did not know who the people inside the car were

3  at that time?

4  A     No.

5  Q     And you didn't notice anything in the car that would make

6  you take police action?

7  A     From my vehicle as I was driving?  No.

8  Q     You didn't take any police action with respect to the

9  people in the vehicle, the black Honda, until your partner

10  told you to, correct?

11  A     Correct.

12  Q     And he told you to pull a man out of the passenger side

13  of the vehicle?

14  A     Yes.

15  Q     Now, when you got out of your car and walked towards 144

16  Harrison, were you working towards Mr. Alexander or were you

17  walking towards the black Honda?

18  A     At that time, the black Honda.  It did try to pull away,

19  so that was where our attention was focussed.

20  Q     And as you were walking towards the Honda that pulled

21  away, you didn't see anything in terms of parking signs on

22  that street for no parking, correct?

23  A     No.

24  Q     And nothing drew your attention to the Honda until your

25  partner told you to pull the guy out of the passenger, right?

1   A    What drew my attention to the Honda was the fact that it

2   looked like it tried to pull away as we approached.

3   Q    You were in plainclothes at that time?

4   A    Yes, I was.

5   Q    Where was your badge on your person?

6   A    It was around my neck.

7   Q    So, as you got towards 144 Harrison, you went to the

8   passenger side of the black Honda?

9   A    Yes.

10  Q    That would put you closer to Robert Alexander than your

11  partner, correct?

12  A    Correct.

13  Q    How close were you to Mr. Alexander?

14  A    A few feet, five feet, maybe.

15  Q    As you were pulling the man out of the black Honda

16  passenger side, what was Mr. Alexander doing?

17  A    At that point, he was saying to me:  That's my cousin.

18  This is where I live.  This is my house.

19       That sort of thing.

20  Q    Then at your partner's request, you gave that man to

21  Officer Barreiro at the back of the black Honda?

22  A    Yes.  I made sure he had no weapons on him right away in

23  his waistband area, and we brought him to the back.

24  Q    What was the female doing that was next to Mr. Alexander

25  while you were doing this at the passenger side of the black

1   Honda?

2   A    To the best of my knowledge, she was just standing there.

3   Q    How long did it take from the time you got out of your

4   car, the RMP, from the passenger side to get across the street

5   to 144 Harrison, get to the door of the black Honda passenger

6   side?

7   A    Five seconds, six seconds.

8   Q    So, in five seconds you opened your door, walked across

9   the street, and opened the passenger car?

10  A    Not opened the passenger door, just approached the car.

11  Q    Okay.  So, you reached the passenger door in five

12  seconds.

13  A    Uh-huh.

14  Q    So, you didn't even go for Mr. Alexander, you just went

15  straight for the passenger door of the car.

16  A    Not at that time.  Like I said, our focus was the car

17  that was trying to get away, that we perceived was trying to

18  get away.

19  Q    But you didn't see anything inside the car before it

20  tried to get away, quote/unquote?

21  A    No.

22  Q    After you gave the man that was in the passenger side of

23  the black Honda to your partner, what were you doing at that

24  time?

25  A    At that point, I brought him to the back and I was with

1   my partner at the back.

2   Q    You were in the back of the car, the black Honda?

3   A    Yes.

4   Q    Did you put handcuffs on anyone?

5   A    I don't recall who cuffed Mr. Glover.

6   Q    How long were you in the back of the car, the black

7   Honda?

8   A    Overall or just that?  You got to be -- I'm sorry, you

9   got to be more specific.  Maybe you could repeat it.

10  Q    Okay.  So, you went to the back of the black Honda, and

11  then you said that she patted down Mr. Glover, who you

12  identified.

13  A    Yes.

14  Q    And you were there with your partner.

15  A    Yes.

16  Q    You don't remember who put cuffs on Mr. Glover, but cuffs

17  were put on Mr. Glover at that time?

18  A    Yes.

19  Q    How long did that process take of taking him out of the

20  car and putting cuffs on Mr. Glover?

21  A    Thirty seconds, approximately.

22  Q    After cuffs were on Mr. Glover, what was the next thing

23  you did?

24  A    At that point, we called for -- like I said, my partner

25  was -- I looked at him and I saw Mr. Alexander walking to the

1  back, and we called for another unit.

2  Q    Were there cuffs on Ms. Jeffries at this point, the

3  woman?

4  A    No.

5  Q    She was with your partner, Officer Barreiro?

6  A    Yes.

7  Q    And then you said you called for backup?

8  A    Right.

9  Q    You put over the radio, you called for an absolutely

10 nonemergency vehicle?

11 A    Yes.

12 Q    And you said you did that because you had four people

13 there?

14 A    Yes.

15 Q    Two of those people were -- one was Meghan Jeffries, who

16 was with Officer Barreiro, right?

17 A    Yes.

18 Q    One of those people was the female who was just standing

19 on the lawn, correct?

20 A    Yes.

21 Q    And the other person was Robert Alexander, who was on the

22 lawn?

23 A    Yes.

24 Q    And at that point, you had just seen him holding a vodka

25 bottle.

1   A    Yes.

2   Q    And only Mr. Glover was in cuffs at this point.

3   A    Yes.

4   Q    I'm sorry, let me get the timing of that right.

5        When exactly did you call for backup?

6   A    I can't recall what time it was.

7   Q    And how long did it take for the additional unit to

8   arrive?

9   A    Few minutes.

10  Q    Say, less than five?  More than five?

11  A    Less than five minutes.

12  Q    More than one minute?

13  A    Yes.

14  Q    One to five minutes?

15  A    Yes.

16  Q    Okay.  At a certain point in time, you went and searched

17  the back of the car.

18  A    Yes.

19  Q    And you went into the rear passenger door of the black

20  Honda?

21  A    Yes.

22  Q    And you specifically were going for a backpack that was

23  in the car?

24  A    Yes.

25  Q    And the reason why you went for that backpack was b

1  because Officer Barreiro told you to look in there?

2  A    No.  At that point, Officer Barreiro recovered cocaine

3  from Mr. Glover's hand.  We asked him if he had any more; he

4  said it was inside that backpack.

5  Q    So, you went inside the rear of the car?

6  A    Yes.

7  Q    And you did find cocaine inside of the backpack?

8  A    I got the backpack and I opened it, then I brought it to

9  the back of the car.  That's where we recovered the cocaine,

10  Officer Barreiro recovered the cocaine.

11  Q    So, the only cocaine in the car was in the backpack, to

12  your knowledge, which you recovered, correct?

13  A    No.  There was also a bag in Mr. Glover's hand as well.

14  Q    Okay.  So, the only cocaine in the car --

15  A    Inside the car, yes.

16  Q    -- was either in Mr. Glover's hand or it was inside of a

17  backpack that you had to open, correct?

18  A    Yes.

19  Q    You guys never found any cocaine on Ms. Jeffries, right?

20  A    No.

21  Q    And at that point, you still continued to hold her behind

22  the black Honda.

23  A    Yes.

24  Q    You said that while were you in the car searching for the

25  wag, this is when Mr. Alexander went to the back of his house?

1  A    Yes.

2  Q    And your attention wasn't on him at that time?

3  A    No, it was not.

4  Q    You didn't see him as he walked to the back?

5  A    No.

6  Q    But you had a sense that he was going to the back of his

7  house.

8  A    I saw him as he was walking towards the back.  I got that

9  sense from my partner's face, he was looking over there.

10 Obviously, I'm going to, you know, turn around.

11 Q    You didn't tell Mr. Alexander to stop as he went to the

12 back of the house.

13 A    No.

14 Q    And you didn't tell him he couldn't go inside of his

15 house.

16 A    No.

17 Q    And the female that was on the lawn with Mr. Alexander,

18 at this point in time do you know what she was doing?

19 A    No, I don't.

20 Q    When you get out of the rear passenger side of the black

21 Honda, what do you do then?

22 A    That's when I call for additional units.

23 Q    And you said it took between one and five minutes for the

24 additional units to get there.

25 A    Yes.

1  Q   And that unit, who was that?

2  A   Officer Malarkey.

3  Q   Was Malarkey in uniform?

4  A   Yes, he was.

5  Q   Was he by himself?

6  A   Yes, he was.

7  Q   He is from the 121 traffic, right?

8  A   Yes.

9  Q   And you said that you asked him about ABC summons?

10 A   No, a criminal court summons.

11 Q   A criminal court summons.

12     Did Officer Malarkey give you a criminal court

13 summons?

14 A   Yes.

15 Q   Did you write out a criminal court summons?

16 A   No.

17 Q   What happened at that point, after you -- you said you

18 physically got a criminal court summons --

19 A   Yes, I had it in my hand.

20 Q   So, what happened at that point?

21 A   At that point, that's when my partner went to the back

22 for the first time.

23 Q   After you get the summons, your partner goes to the back

24 for the first time.

25     You said he was there 15 to 30 seconds?

1  A    Less than that.  Ten seconds.

2  Q    And while he's back there, you don't know why he's back

3  there.

4  A    Well, it was to retrieve the vodka bottle.  We can't

5  write the summons without it.

6  Q    When you say you can't write the summons without it...

7  A    We need to know the brand, the size of the bottle.

8  Q    So, are you saying that police procedure requires you to

9  write the brand of vodka for your summons?

10 A    I'm saying that that's what I would always do writing a

11 summons.

12 Q    So, you inferred or your partner told you that he was

13 going to collect the bottle to write a summons?

14 A    I'm sorry?

15 Q    Did Officer Barreiro tell you he was going to get the

16 bottle or did you just infer that?

17 A    No, he didn't tell me.

18 Q    At that point, you thought he was going to get the

19 bottle?

20 A    Yes.

21 Q    When he comes back the first time, Officer Barreiro

22 doesn't say anything to you, right?

23 A    No.

24 Q    At that point, he patted down Mr. Alexander?

25 A    Yes.

1  Q    And Mr. Alexander is standing where in relation to you

2  when he comes back the second time?

3  A    Right next to me.

4  Q    He's right next to you.

5       So, then Officer Barreiro leaves again to go to the

6  back of the house?

7  A    Yes.

8  Q    Before he leaves, did he communicate anything to you?

9  A    He told me to hold them, that's it.

10  Q    Did he tell you he found a bottle?

11  A    No.

12  Q    He just went and you didn't ask him any questions?

13  A    No.

14  Q    So, he just goes back to the back of the house again.

15  A    Yes.

16  Q    And this time you said again he was there 15 or 30

17  seconds?

18  A    10 seconds, 10 to 15 seconds.

19  Q    10 to 15 seconds.  All right.

20       And when he goes to the back of the house both these

21  times, you can't see all the way down where your partner went,

22  correct?

23  A    No, not from where I was standing.

24  Q    Same as when Mr. Alexander went all the way down the

25  path, you could not see at that time all the way down to where

1  Mr. Alexander went if you looked from your position.

2  A    I could.  I was in a better position when I was near the

3  car.

4  Q    When you're near the car, you can see all the way down

5  the pathway to where Mr. Alexander went?

6  A    At a brief point, yes.

7  Q    How far was the position of where you were at the black

8  Honda to where you were where you could not see all the way

9  down the path?

10 A    It's a few feet, but it's just the angle that I was on.

11 I was closer to the house at that point.

12 Q    So, this is Government 2.  Can you --

13         THE COURT:  That's Defendant's Exhibit B.

14         MR. BROWN:  Defendant's B.

15 Q    Can you mark where you were the first time when you say

16 you were able to see all the way down the pathway?

17 A    "X," you said?

18 Q    That circle is fine.

19 A    Okay.

20 Q    Can you mark with an "X" where you were when you couldn't

21 see all the way down the path?

22 A    Closer on the lawn, though.  Sorry.

23         THE COURT:  Closer to what?

24         THE WITNESS:  Closer on the lawn.

25 Q    When you were closer on the lawn, you couldn't see as far

1  back as when you're on the street is what you're saying.

2  A    No.

3        THE COURT:  That is yes, that's what your saying?

4        THE WITNESS:  Yes, that's what I'm saying.

5  Q    Did you have a flashlight on you that night?

6  A    Yes, I did.

7  Q    Could you see without the flashlight down the path or did

8  you need the flashlight to see?

9  A    I don't recall.

10 Q    Did you use your flashlight that night?

11 A    Yes.

12 Q    Did you use your flashlight to see?

13 A    Yes.

14 Q    So, I'm going to take you back.  The second time when

15 Officer Barreiro was in the back, at some point you said he

16 re-emerged.

17 A    Yes.

18 Q    How close was he to you when he re-emerged?

19 A    Would you like me to mark it?

20 Q    You can mark it at the point where you say he re-emerged.

21 A    Right about here.

22        MR. BROWN:  I'll note for the record, the first

23 circle where Officer Golat can see is right above the middle

24 yellow double line.

25        THE WITNESS:  It should be closer to the sidewalk

1    over there.

2            MR. BROWN:  And the second X where you couldn't see

3    was marked on the lawn.  And the third X, where he could see

4    his partner re-emerge, was a little further into the lawn near

5    the corner of the lawn.

6            THE COURT:  Is that accurately described?

7            THE WITNESS:  Yes.

8    Q    When he re-emerged, that's when you said he gave you a

9    signal.

10   A    Yes.

11   Q    And it's from this position that you're marking here?

12   A    Yes.  All three of these should be pushed back towards

13   the house a little bit.  That's just my finger, sorry about

14   that.

15   Q    But it's on the area that is along the grassy areas of

16   the front lawn?

17   A    Correct, right near the driveway.

18   Q    He didn't say any words to you, he just gave you a signal

19   of the "X" that you marked before?

20   A    Yes.

21   Q    And you didn't know why he was telling you to make an

22   arrest at that point in time.

23   A    Not at that point, no.

24   Q    So, at this point in time or shortly after, you said that

25   you did a foot pursuit, right?

1   A      Yes.

2   Q      The foot pursuit was you and Officer Barreiro?

3   A      Yes, correct.

4   Q      Officer Malarkey, what did he do at this time?

5   A      He jumped in the car and followed us in the vehicle.

6   Q      Did you see him jump in the car and follow you?

7   A      No.  We were already gone a couple blocks.

8   Q      And you were the only three officers on the scene before

9   you did the foot pursuit, correct?

10  A      Yes.

11  Q      And you said that foot pursuit took you from 144 Harrison

12  to 17 Slaight?

13  A      17 Slaight Street, yes.

14  Q      How long did that take?

15  A      30 seconds, maybe a minute.

16  Q      And how far would you say is the distance between 144

17  Harrison that you traveled to 17 Slaight.

18  A      It's approximately three blocks.

19  Q      When you got to 17 Slaight Street -- I'm sorry.

20         When you got to the 17 Slaight Street, that's when

21  Mr. Alexander was placed in cuffs?

22  A      Yes.

23  Q      Who placed him in cuffs?

24  A      To my recollection, I did.

25  Q      And then at that time, what happened?

1        Where did you put Mr. Alexander next?

2   A    In Officer Malarkey's vehicle, in the backseat.

3   Q    There was another police vehicle there at that time?

4   A    No, not that I recall.

5   Q    Okay.

6        You didn't get into Officer Malarkey's vehicle, did

7   you?

8   A    Yes, I did.

9   Q    What vehicle did your partner get into?

10  A    He also got in that vehicle as well.

11  Q    And you both traveled back to 144 Harrison?

12  A    Yes.

13  Q    But you didn't travel back together, correct?

14  A    To my recollection, yes, we did.

15  Q    So, I'm just going to ask you briefly:  You testified in

16  the grand jury in this case before, right?

17  A    Yes.

18  Q    And you were sworn under oath and asked questions about

19  this matter?

20  A    Yes.

21  Q    I just want to make clear, please --

22       MR. BROWN:  For the government, I'm reading from

23  Page 8, Lines 14 through 19.

24  Q    Were you asked these questions and did you give these

25  answers in response to traveling back to 144 Harrison:

1          Question, What did you do at that point?

2          Answer, I placed him in the vehicle that responded

3     with us, which was also the traffic car.  At that point, I

4     went back to the location, 144 Harrison.  The occurrence

5     location.

6          Question, Did you go back to the location with your

7     partner?

8          Answer, He went in a separate car and we met up at

9     the...

10         And then you were cut off, I guess.

11         Were you asked those questions and did you give

12    those answers?

13    A    Yes, I did.

14    Q    So, you guys didn't go back to 144 Harrison together.

15    A    I'm testifying today to the best of my recollection.  As

16    of my recollection today, yes, we did.

17    Q    How long did it take you to get back to 144 Harrison?

18    A    30 seconds.

19    Q    And inside the car, did Officer Barreiro tell you why you

20    were arresting Robert Alexander?

21    A    I don't recall that, no.

22    Q    Did he tell Officer Malarkey why he was arresting Robert

23    Alexander?

24    A    I don't recall that either.

25    Q    Did you ask Mr. Alexander any questions inside the back

1  of the vehicle?

2  A    No.

3            THE COURT:  Let me clarify.

4            He was in the vehicle with you on the way back, the

5  defendant?

6            THE WITNESS:  Yes.

7            THE COURT:  Okay.

8  Q    And you said it took 30 seconds to get back to 144

9  Harrison.

10  A    Approximately.

11  Q    Once you got back to 144 Harrison, what did you do?

12  A    We both -- I went to the back of the location.

13  Q    Where was Mr. Alexander at this time?

14  A    Best of my knowledge, he was still in the traffic car.

15  Q    Was this with Officer Malarkey?

16  A    Yes.

17  Q    How long were you in the back of the location of 144

18  Harrison before you came back to the front?

19  A    Few minutes.

20  Q    Would you say more than five or less than five?

21  A    Less than five.

22  Q    More than one minute?

23  A    Yes.

24  Q    One to five minutes?

25  A    Yes.

1  Q    When you came back to the front, was Officer Malarkey's
2  car still in the front?
3  A    I don't recall.
4  Q    When you went back at 1494 Harrison, you went back with
5  your partner, correct?
6  A    Yes.
7  Q    This was the first time he showed you the bag that's in
8  this case?
9  A    Yes.
10 Q    Before that, you had never seen the bag?
11 A    No.
12 Q    And that was the first time he showed you the bottle
13 that's in this case, correct?
14 A    Well, I had seen the bottle in the defendant's hand, yes.
15 Q    And you saw the bottle was in back of the house?
16 A    Yes.
17 Q    So, the bottle is the same one you said you saw before,
18 but this bag, you have no idea where that came from.
19 A    Yes.
20 Q    After you got back to the front, you said you don't
21 recall if Officer Malarkey's car was still there.
22 A    Yes.
23 Q    Did you speak to Robert Alexander after you got back to
24 the front?
25 A    No.

1   Q    You didn't transport Robert Alexander to the precinct?

2   A    No, I did not.

3   Q    When you got back to the precinct, you went back in the

4   same car as Officer Barreiro?

5   A    I don't recall.

6   Q    Your shift that night ended at 4:55 a.m., correct?

7   A    That's 9:55.

8   Q    9:55?

9   A    Yes.

10  Q    So, after you left Robert Alexander in Officer Malarkey's

11  car to go back to 144 Harrison with your partner, you never

12  saw Robert Alexander; did you, sir?

13  A    Not to my recollection, no.

14  Q    You don't know if Officer Malarkey spoke to him?

15  A    No, I don't know.

16  Q    And you didn't see Robert Alexander in the holding cell

17  at the precinct?

18  A    No, not to my recollection.

19  Q    You went and did other police business, correct?

20  A    Yes.

21  Q    As a part of anticrime, a part of your job is to run

22  information about people in your precinct, right?

23  A    Yes.

24  Q    You knew who Robert Alexander was before that night,

25  right?

1   A    Yes.

2   Q    You knew his information.

3   A    I knew his name, yes.

4   Q    Okay.  But you knew that he lived at 144 Harrison as

5   well.

6   A    Yes.

7           MR. BROWN:  Can I have just one moment, your Honor?

8           (Pause in proceedings.)

9           MR. BROWN:  I have no further questions at this

10  time.

11          THE COURT:  Anything further?

12          MR. HARRIS:  No, your Honor.

13          THE COURT:  Thank you.  You can step down.

14          THE WITNESS:  Thank you, your Honor.

15          THE COURT:  Does the government have any further

16  witnesses?

17          MR. HARRIS:  No, we don't, your Honor.

18          THE COURT:  Does the defense?

19          MR. BROWN:  Yes, your Honor.

20          THE COURT:  You want to call your witness?

21          MR. BROWN:  Yes.  It's Charnae Alexander.

22

23          (Continued on next page.)

24

25

1        THE CLERK:  Please raise your right hand.

2   C H A R N A E      A L E X A N D E R,

3              having been duly sworn was examined and

4                   testified as follows:.

5        THE CLERK:  State your name and spell it, please.

6        THE WITNESS:  Charnae Alexander, C H A R N A E, A L

7   E X A N D ER.

8   DIRECT EXAMINATION

9   BY MR. BROWN :

10  Q    Good morning, Ms. Alexander.

11  A    Good afternoon.

12  Q    Good afternoon.  I'm sorry.  It's been a long day.

13       Where do you live.

14  A    144 Harrison, Staten Island, New York.

15  Q    How long have you lived there?

16  A    Over 20 years.

17  Q    At any point in time did Robert Alexander live with you?

18  A    Yes.

19  Q    Did he live with you on the date of October 31, 2015?

20  A    Yes.

21  Q    Are you familiar with the area surrounding your home?

22  A    Yes.

23  Q    I'm going to show you what's been marked as Defendant's

24  Exhibit I. Do you recognize this?

25  A    Yes.

1  Q    What do you recognize it to be?

2  A    A layout or a diagram of my property.

3  Q    Does that fairly and accurately represent the layout of

4  your property as it would have been on October 31?

5  A    Yes.

6  Q    2015.

7         MR. BROWN:  I would move to admit this as

8  Defendant's Exhibit I.

9         MR. HARRIS:  Brief voir dire, your Honor?

10        THE COURT:  Yes.

11 VOIR DIRE EXAMINATION

12 BY MR. HARRIS:

13 Q    Ms. Alexander, you didn't create in exhibit, did you?

14 A    I did not.

15 Q    You don't know whether these proportions are correct?

16 A    Not on the paper.  I didn't make it.

17 Q    You don't know whether these measurements are correct,

18 for example, the length of the house in comparison to the

19 length of the shed?

20 A    Not on the paper, no.

21        MR. HARRIS:  Your Honor, we would object.  I don't

22 think there's been sufficient foundation laid that this

23 exhibit has real value.  There's no verification that it's

24 accurate.

25        THE COURT:  Well, if you want to offer it simply as

1  an example of the layout, but it hasn't been validated as to a

2  to scale layout as to someone who has been there.  I'm not

3  going to accept it for that purpose.  Just as a general layout

4  I'll accept it.

5  DIRECT EXAMINATION (Cont'd)

6  BY MR. BROWN:

7  Q    This is the general layout of your home?

8  A    Yes, it is.

9  Q    And you recognize this as being your house that you live

10 in?

11 A    Yes.

12          THE COURT:  The orange part?

13 Q    The orange part?

14 A    Yes.

15 Q    On the diagram there's a part in the backyard here, the

16 shed, there's a shed in that position with respect to your

17 house?

18 A    Yes.

19 Q    And this green area that's on the diagram, does that

20 represent where there's grass outside of your home?

21 A    Yes, it does.

22 Q    These I guess are sort of they are not white, but cream

23 colored spaces.  Does that represent where there's concrete or

24 pavement going to your home?

25 A    Yes, there is.

1  Q    The gray area in the front, does that represent where the

2  street is in front of your home?

3  A    Yes.

4  Q    Okay?

5         If you know, do you know how long the distance is

6  from in front of the shed here all the way to the sidewalk up

7  here.

8  A    About 84 feet.

9  Q    Where is your mailbox or front door with respect to this

10  diagram?

11  A    You want me to point to it?

12  Q    Yes, please.

13  A    It would be on this diagram --

14  Q    You can actually mark it if you touch it.  Just mark it

15  with a X.  Right there, that dot, is your front door, that's

16  also your mailbox?

17  A    Yes.

18  Q    Where do visitors come to knock on the door?

19  A    The front door.

20  Q    Where do deliveries come for your residence?

21  A    The front door.

22  Q    I'm going to put my fingers over here on this side

23  pathway that goes to the back of your house.  Did you ever get

24  deliveries to the back of your house?

25  A    No.

1  Q    Is there any other door to your house on this diagram, if

2  you could mark where it's at if there is one?

3  A    It would be about here, like up.  I think I touched the

4  wrong spot.  Let me see.

5           MR. BROWN:  The witness made two dots.

6           THE COURT:  Is there a door?

7           THE WITNESS:  There is a door.

8           THE COURT:  Back there where you put the two dots?

9           THE WITNESS:  Hmm.

10  Q    If someone was looking from the street, would they be

11  able to see that door from the street?

12  A    No.

13  Q    Would they have any way of knowing there was a door

14  there?

15  A    No.

16  Q    Let me ask about this area of the pavement.  How would

17  you refer to that in terms of your house?

18  A    The driveway.

19  Q    And what you use your driveway for?

20  A    Cars, barbecues, relax.

21  Q    Where in terms of this diagram, if you could mark with a

22  X, would you generally hold what you referred to as barbecues?

23  A    About like right here, back here, maybe even back here.

24  Q    Okay.

25           THE COURT:  So you have marked three spots?

1       THE WITNESS:  I did.

2       THE COURT:  One in front of the shed, one in the

3    backyard?

4       THE WITNESS:  Yes.

5       THE COURT:  And one --

6       THE WITNESS:  Like a little bit up from the shed.

7       THE COURT:  Near the back?

8       Near the back door?

9       THE WITNESS:  Like across from the back door.  It's

10   not that far from the shed but it's two different spots.

11      THE COURT:  Okay.

12   BY MR. BROWN:

13   Q    I'm going to take this away now?

14        I'm going to show you Government's Exhibit 2.  You

15   recognize this picture, correct.

16   A    I do.

17   Q    What do you recognize it to be?  I'm sorry.

18   A    The front view of my house.

19   Q    In this picture I see a little log right here.  Do you

20   recognize that?

21   A    I do.

22   Q    What do you recognize that to be?

23   A    A log.

24   Q    Do you know how that log got to be there?

25   A    My family put it there.

1    Q    Do you know if that log was there on October 31, 2015?

2    A    It was.

3    Q    Why did your family put that log there?

4    A    Because there used to be a fence there and that was

5    taking the place of the fence.

6    Q    What happened to the fence?

7    A    It was taken down.

8    Q    Did your family ever put the fence back up?

9    A    No.

10   Q    Why not?

11   A    Didn't have the money.

12   Q    Okay.  In this picture you can see there's cars in the

13   driveway?

14   A    I do.

15   Q    Do you know if there were cars in the driveway on October

16   31, 2015, in the middle of the night?

17            MR. HARRIS:  Objection, your Honor.  I don't think

18   it's been established that the witness was present at the

19   location.

20            THE COURT:  I think you need to lay a foundation.

21            MR. BROWN:  Okay.

22   Q    Were you home on October 31, 2015, overnight, in the

23   middle of the night?

24   A    In the middle of the night, not at the time of the --

25   Q    Not between the hours of three and four a.m.?

1   A    Right.

2            THE COURT:  You were not there?

3            THE WITNESS:  Not there like when that was going on,

4   no.

5   Q    Do you know if there were cars in the driveway at that

6   time on October 31, 2015?

7            MR. HARRIS:  Objection, your Honor.

8            THE COURT:  I'll sustain the objection.

9            MR. BROWN:  No problem.

10  Q    Let me just ask you if you were standing in the front of

11  the sidewalk looking down this pathway to your house, in the

12  daytime, can you see all the way back to the shed?

13  A    Yes.

14  Q    Can you see the grassy area that is behind your house?

15  A    No.

16  Q    That was in this diagram.  Okay.  If you are standing on

17  the front sidewalk on the street here at nighttime can you see

18  all the way down to the shed in the nighttime?

19  A    No.

20  Q    Can you see the grassy area that's behind the house?

21  A    No.

22           MR. BROWN:  One second, your Honor.

23           (Pause.)

24  Q    Let me just ask you about the fence you said was in the

25  front where the log was.  Why was that fence taken down?

1   A    It was broken.

2   Q    Okay.  I'm just going to put back up this diagram,

3   Defendant's Exhibit I.  Is there any border along this side of

4   your house, the left side of your house on the diagram?

5   A    Yes, a fence.

6   Q    Is there any border on the back side of your house?

7   A    A fence.

8   Q    And is there any border on this side of our house between

9   you and the neighbors?

10  A    A fence.

11           MR. BROWN:  One moment, your Honor.

12           (Pause.)

13  Q    One more thing I wanted to touch on.  This is Defendant's

14  Exhibit B.  This grassy area in between the car and the house,

15  there's some items in that area?

16  A    Hmm.

17  Q    Are there generally items in that area of your house?

18  A    Not -- not those clothes, no.

19  Q    Do you use that area for storage or anything else?

20  A    Yes.  If you put the garbage out.

21           MR. BROWN:  Nothing further at this time.

22  CROSS-EXAMINATION

23  BY MR. HARRIS:

24  Q    Good afternoon, Ms. Alexander.

25  A    Good afternoon.

1   Q    My name is Ryan Harris.  I'm a Assistant United States

2   Attorney and I'm going to ask you some questions.  If you

3   don't understand any of the questions I ask, and you want me

4   to repeat the question, just let me know.  Okay.

5             You are the defendant's sister, correct.

6   A    I am.

7   Q    And you spoke with defense counsel at some length about

8   the address 144 Harrison Avenue, Staten Island?

9   A    Yes.

10  Q    Are you familiar with that address?

11  A    I am.

12  Q    And you in fact live at that address?

13  A    I do.

14  Q    How long have you lived there?

15  A    Over 20 years.

16  Q    How long did the defendant live there before he was

17  arrested?

18  A    You mean prior to him being incarcerated?

19  Q    If you can just give us some detail about the defendant's

20  -- how long the defendant lived there, what times.

21  A    He lived there before he was incarcerated and after he

22  came home.

23  Q    Did he ever live anywhere else?

24  A    With my mother, 178 Lockmead.

25  Q    It's just the two of you living at that house?

1  A    Hmm, yes.

2  Q    I'm going to show you what's been admitted as Defendant's

3  Exhibit I or 1?

4        MS. GELERNT:  I.

5  Q    Defendant's Exhibit I?

6        You spoke with defense counsel about this exhibit

7  and there's a concrete driveway which I'm marking leading to a

8  shed in the back; is that correct?

9  A    Yes.

10 Q    Is it correct also that there's a path way that parallels

11 the driveway leading to the back of the house?

12 A    Yes.

13 Q    That's also paved?

14 A    Yes.

15 Q    That leads to a door you mentioned earlier, which I'm

16 marking, on the back right corner of the orange block in

17 Defendant's Exhibit I, is that correct?

18 A    Yes.

19 Q    A set of stairs leads to that back entrance?

20 A    Yes.

21 Q    And a concrete pathway leads to that set of stairs?

22 A    Yes.  But you have to turn a little bit, not just walking

23 straight.

24 Q    You mentioned earlier that there was originally a fence

25 in front of 144 Harrison Avenue?

1   A    Correct.

2   Q    And the fence was removed because it was broken?

3   A    Yes.

4   Q    How long ago was it removed?

5   A    I'm not sure.

6   Q    Months?

7   A    Years.

8   Q    Did you remove that fence?

9   A    No.

10  Q    Who removed it?

11  A    My grandmother.  I'm not exactly sure.  I was a little

12  younger.

13          THE COURT:  Do you own the house?

14          THE WITNESS:  No, I don't.  It's my grandmother's

15  house.

16          THE COURT:  Your grandmother's?

17          THE WITNESS:  Yes.

18          THE COURT:  Who owns the house?

19          THE WITNESS:  It's the family's house.

20  BY MR. HARRIS:

21  Q    Let talk about the night the defendant was arrested,

22  October 30 going to October 31.  You were not present at 144

23  Harrison Avenue when the defendant was arrested, correct?

24  A    No.

25  Q    So you didn't personally witness anything that happened

1   that night?

2   A    I did not.

3           MR. HARRIS:  One moment, your Honor.

4           (Pause.)

5           MR. HARRIS:  No further questions, your Honor.

6           THE COURT:  Anything further?

7           MR. BROWN:  Nothing further, your Honor.

8           THE COURT:  All right.  Thank you.  You can step

9   down.

10          (Witness excused.)

11          THE COURT:  Do you have any further witnesses?

12          MR. BROWN:  No, your Honor.

13          THE COURT:  So the defense rests?

14          MR. BROWN:  Yes, your Honor.

15          THE COURT:  All right.  Do the parties want to argue

16  this?  Do you think there's any merit to putting in papers?

17          MR. HARRIS:  Your Honor, if the court would like

18  further written submissions I'm happy to prepare them.  I do

19  think the court can rule based on the submissions that were

20  previously made and on the testimony here today.

21          THE COURT:  Why don't you just put forth your

22  position and then I'll hear from you, counsel.

23          MR. HARRIS:  With respect to the defense motion to

24  suppress it has three parts.  The first is the suppression of

25  the physical evidence that was seized from the location.  As

1   the court heard both the officers testified that the bag

2   containing two firearms and was recovered from a plastic chair

3   standing in front of a shed at the end of the driveway and

4   that the liquor bottle was recovered from the grass adjacent

5   to a concrete walkway leading to the back end of the house.

6           THE COURT:  No.  I thought the first officer

7   testified it was behind the house on the grass.

8           MR. HARRIS:  Yes, your Honor, I think that's

9   correct.

10          THE COURT:  Are you assuming that testimony is

11  credited?  Isn't that in an area where the defendant would

12  have an expectation of privacy?

13          MR. HARRIS:  Your Honor, I would argue that he does

14  not.  That grass is still adjacent to the concrete walkway

15  leading to this back entrance to the house.  There is case law

16  on this point, for example, United States versus Hayes, 551,

17  F.3d, 138, Second Circuit 2008, in which an officer and a drug

18  sniffing dog walked to a the rear of the house toward a

19  detached garage.  The dog dove into a hedge row which was at

20  the rear of the detached garage and recovered a bag.  Despite

21  the fact that this is behind the garage the court nonetheless

22  held that this area was not fenced off from the street.  There

23  was no gate or any other obstacle blocking the driveway or the

24  hedge row area where this bag was recovered.  There was no

25  structure designed to conceal the area, therefore, the court

1   held there was no reasonable expectation of privacy in these

2   areas.

3          The government cited a wealth of case law on the

4   driveway issue.  There are additional cases that I mentioned,

5   United States vs. Hayes, that deal with items recovered from

6   grassy areas adjoining walkways and adjoining driveways.  The

7   government would submit that based on this case law and the

8   lack of obstructions to this driveway and concrete walkway,

9   the lack of no trespassing signs, the lack of a fence to

10  prohibit anyone from entering upon the driveway and concrete

11  walkway, there was no reasonable expectation of privacy tea in

12  these areas.

13         THE COURT:  Would that extend to the entire

14  backyard?

15         MR. HARRIS:  Your Honor, I'm not making that

16  assertion at this time.  I think that it would certainly

17  depend on the circumstances of where the item was located

18  within the backyard, whether the backyard -- there were

19  efforts made to obstruct any particular part of the backyard,

20  either a fence or other kind of enclosure.

21         THE COURT:  Well, in this case, as I understand the

22  first officer's testimony he had to come down to the shed area

23  and look to his right to see the bottle which was in the

24  backyard behind -- sort of where I've put the mark -- I'm

25  sorry.  That's wrong.  I'm not very good at touching this.

1    Sort of there, correct?

2         MR. HARRIS:  I think that's correct, your Honor.

3         THE COURT:  Assuming that it was not permissible to

4    go to that particular area and seize the bottle, how does that

5    affect the rest of your analysis, if at all, with respect to

6    the guns?

7         MR. HARRIS:  It does not, your Honor.  There is case

8    law -- and I don't know if I have it in front of me -- that if

9    an officer were to traverse an area where a person had a

10   reasonable expectation of privacy and then discovered and

11   recovered items in another area where there was no reasonable

12   expectation of privacy, that would not necessitate the

13   suppression of the physical evidence recovered.

14        THE COURT:  Which case is that?

15        MR. HARRIS:  I don't have it in front of me, your

16   Honor.  I'm happy to make a submission after today's hearing.

17        THE COURT:  Is the government seeking to offer any

18   statements?  It's not clear to me what statements are at issue

19   here.  You have the videotape of the defendant.  Is the

20   government seeking to put that videotape into evidence in the

21   case?

22        MR. HARRIS:  The government may seek to introduce

23   excerpts of that video at trial and wish to preserve that

24   option.  In addition, there were three on-scene statements

25   that were made.

1        THE COURT:  The what?

2        MR. HARRIS:  On-scene statements.

3        THE COURT:  What on-scene statements are you seeking

4 to admit?

5        MR. HARRIS:  The defendant said to Officer Golat in

6 sum and substance:  This is my house.  I'm just having a drink

7 on my front lawn.  That's my cousin.  Why are you guys giving

8 us a hard time?

9        A second statement that was made:  I'm just going to

10 put this in the back, to Officer Barreiro before he walked to

11 the rear of 144 Harrison Avenue.

12        And a third statement that was made, I was just

13 putting it away out of respect.

14        THE COURT:  That was Officer Golat though?

15        MR. HARRIS:  Correct.

16        THE COURT:  Okay.

17        Do you want to be heard?

18        MR. BROWN:  Your Honor, I can argue now, but I think

19 based on the testimony that was adduced here, this is

20 something that should be written on.

21        THE COURT:  Just give me a gist of what you think

22 the issues are.

23        MR. BROWN:  If I give you a gist, I'll just start

24 with respect to the physical evidence.  There's essentially

25 two things that are at play.  Is this an unreasonable subject

1   to the Fourth Amendment and then is there any well delineated

2   exception.  I think the crux of the issue that the government

3   raised in their motion and in opposition to my motion is they

4   are using these lines of the reasonable expectation of privacy

5   citations.

6          That starts with U.S. v. Oliver which deals with

7   specifically open fields.  Open fields is not the same thing

8   as curtilage.  Curtilage is protected by the Fourth Amendment.

9   Open fields are not.  The most recent case from the supreme

10  court that I would cite for you, Florida v. Jardines, 133

11  Supreme Court 1409, I think is most instructive on making out

12  the difference between open fields will get you reasonable

13  expectation of privacy versus curtilage.  There's a lot of

14  issues that came up in the testimony to clarify for the court

15  which I may not have been able to do for the court through

16  cross-examination.

17         THE COURT:  So you are saying that both the area in

18  front of the shed and the area slightly behind the house are

19  areas in which the defendant had a reasonable expectation of

20  privacy?

21         MR. BROWN:  I'm saying that the diagram that we put

22  into evidence is protected by the Fourth Amendment as

23  curtilage and what Florida v. Jardines points out, the

24  reasonable expectation of privacy is that comes from U.S. vs.

25  Katz and other cases is not a substitute.  I guess it is in

1   addition to Fourth Amendment protections.  But when you have

2   an area that's protected by the Fourth Amendment you don't

3   even reach reasonable expectation of privacy.

4          The only case that the government cited was U.S. v.

5   Hayes.  That was not a reasonable expectation of privacy case.

6   That case started with a 911 call.  It had consent.  It had

7   other exceptions and puts it outside the realm of this case.

8          THE COURT:  If someone doesn't have a reasonable

9   expectation of privacy in an area you don't need to get to any

10  of the exceptions?

11         MR. BROWN:  Your Honor, what I am trying to say is

12  if something is subject to the Fourth Amendment, it's

13  protected by that.

14         THE COURT:  That means if something is subject to

15  the Fourth Amendment, it means you have a reasonable

16  expectation of privacy in that area.  If you don't have a

17  reasonable expectation of privacy, then it's not protected by

18  the Fourth Amendment, correct?

19         MR. BROWN:  My understanding of the case law,

20  there's a traditional Fourth Amendment trespass property

21  entrance that we all understand.  As the case developed, the

22  Supreme Court developed the reasonable expectation of privacy

23  for those hard questions, for distances away from the home.

24  It's obvious to everyone, subject to the Fourth Amendment,

25  there also is a reasonable expectation of privacy.

1      What I am saying it's in addition to.  It's not a

2  substitute for a Fourth Amendment analysis.  That's why I'm

3  saying there's two lines of cases, open felids versus

4  curtilage and this whole area is protected by the Fourth

5  Amendment is what I am saying.

6      Just further, it's curtilage and by definition

7  there's a reasonable expectation of privacy.

8      MR. HARRIS:  Your Honor, if I could briefly speak to

9  that?

10      The case law the government cited in its brief makes

11  clear that the curtilage distinction has been substituted by

12  the reasonable expectation of privacy test.  Just to quote one

13  of the cases that the government cited, United States vs.

14  Smith, 783 F.2d, 648 and this is a case where the Sixth

15  Circuit concluded that the defendant did not have a reasonable

16  expectation of privacy in his driveway or an area around the

17  house where he was growing marijuana plants.

18      THE COURT:  Presumably that's not because he was

19  growing marijuana plants?

20      MR. HARRIS:  No.

21      THE COURT:  Just joking.

22      MR. HARRIS:  Sixth Circuit wrote:  When Stewart --

23  who was the law enforcement officer -- drove into the driveway

24  there were no obstructions indicating any attempt at limiting

25  access to the area around the house.  No effort had been made

1   to screen off or enclose the area where the marijuana plants

2   were growing.  The Sixth Circuit concluded that Helton -- who

3   is the defendant -- had no reasonable expectation of privacy

4   in the area where the large marijuana plants were observed.

5        The Sixth Circuit noted that "not every entry on

6   private property by police officers is a Fourth Amendment

7   violation, even if there was an encroachment upon the

8   curtilage."

9        THE COURT:  All right.

10        I take it both sides could do with an opportunity to

11   take the specific facts of this case and apply them to what

12   they believe the case law to be.

13        What is defendant's theory with respect to the

14   earlier statements that the government wants to offer?  This

15   is my house.  Where are you going?  I'm just going to put this

16   in the back out of respect.  Why are those statements not

17   admissible?

18        MR. BROWN:  Your Honor, I need to review the

19   testimony today which is different from what I had in 3500.

20   The officers told my client to stop before those statements.

21   In addition, if those statements were after there was an

22   existing probable cause for an open container, with my client

23   being on the lawn of his property, both officers here from

24   what I understood testified that they saw a bottle.  I think

25   they are trying to elicit those statements because they didn't

1  say anything on the stand about seeing him drinking.  So we

2  did request daily copy, but I think the moment at which they

3  told my client to stop and they are walking toward the

4  property --

5          THE COURT:  Told him to stop what?

6          MR. BROWN:  They told him he could not move.  He was

7  stopped, not free to leave.  Then those statements, if they

8  were in response to police activity, that's not based on

9  probable cause, they are subject to suppression.  And, so,

10  yes, I would put that in the submission.  Where the first

11  police activity starts with respect to Mr. Alexander without

12  probable cause, if any of the statements pre-Miranda were the

13  response to unlawful police activity, then I would move to

14  suppress it.

15          MR. HARRIS:  Your Honor, can I briefly be heard?

16          THE COURT:  Yes.

17          MR. HARRIS:  So the first two statements, as the

18  court heard during testimony, were spontaneous utterances.

19  They were not made in response to any police questioning and,

20  therefore, there's no reason to suppress them under the Fifth

21  Amendment.

22          The third statement which I was putting the bottle

23  out of the way out of respect was made in response to Officer

24  Golat's question.  However, it was not made while the

25  defendant was in custody and, therefore, it should not be

1    subject to suppression.  The courts have outlined many factors

2    to consider in determining whether someone is in custody and

3    here none of those factors are met.  The defendant was not in

4    handcuffs.  He was questioned on his own front yard.  And in

5    the recent case, United States vs. Newton, 46369 F3d., 659,

6    Second Circuit 2011, the court held interrogation in the area

7    surrounding one's own home is generally not deemed custodial.

8            This is not a 30 minute interrogation.  It lasted

9    only a few seconds.  The NYPD officers never drew their with

10   weapons or used physical restraints on the defendant.  The

11   totality of the circumstances here established pretty clearly

12   there was a noncustodial situation when the defendant made

13   this third statement.

14           THE COURT:  All right.

15           You want the opportunity the file papers?

16           MR. BROWN:  Yes, your Honor.  We did request daily

17   copy, as I said.

18           THE COURT:  So can you get your papers in in a week

19   from today and the government respond a week later?

20           MR. BROWN:  Your Honor, would it be okay if I asked

21   for two weeks instead of one week?

22           THE COURT:  I don't know what the speedy trial

23   implications are.

24           MS. GELERNT:  I think the motion would still be

25   pending.

1       THE COURT:  I think once you have a hearing, I think

2  you have 30 days to decide the case.

3       MR. HARRIS:  Your Honor, my understanding is that

4  once the hearing has been held and the motion has been fully

5  briefed, then time is excluded for 30 days pending the court's

6  decision.

7       (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  (Continuing)

2            THE COURT:  I don't know that.

3            MS. GELERNT:  But at this point it wouldn't be fully

4  briefed if we're filing.

5            THE COURT:  Is fully-briefed part of the rule?

6            MR. HARRIS:  I believe it is, Your Honor.

7            MS. GELERNT:  We would certainly be willing to

8  exclude the time in order to give the parties ample time to

9  brief the issues.

10           THE COURT:  On what grounds?

11           MS. GELERNT:  We think it's in the interests of

12  justice.  This is a pure possession case and if the Court

13  should rule in Mr. Alexander's favor, presumably that would be

14  the end of the case.

15           So in order to make sure it's fully litigated, and

16  to preserve his rights and the record, we would take the

17  additional time to file the written submissions.

18           THE COURT:  Does the Government think that that is

19  an appropriate period of excludable delay in the interests of

20  justice?

21           MR. HARRIS:  The Government has no objection.

22           It would just note that Defense is requesting two

23  weeks.  The Government would request another two weeks to

24  respond and at this point we're going to be approaching the

25  trial date.

1          THE COURT:  Yes, I didn't remember the trial date.

2          MR. HARRIS:  May 9th is the trial, May 2nd is jury

3    selection.

4          THE COURT:  Why don't I just ask the Defense to have

5    their papers due on April 11th.

6          Any response by the Government on April 21st, so we

7    have some time to address this.  The trial is scheduled on

8    the 9th.

9          THE COURTROOM DEPUTY:  Jury selection on May 2nd,

10   Judge.

11         THE COURT:  Yes.  So, let me ask you to follow that

12   schedule.

13         And then, I will hear whatever additional argument

14   we need on the issue on April 28th at 9:30.

15         THE COURTROOM DEPUTY:  Will that also be a Pre-Trial

16   conference?

17         THE COURT:  Yes.

18         MR. HARRIS:  April 28th at 9:30, will that be the

19   Pre-Trial conference?

20         THE COURT:  Yes.

21         And the parties still have no objection to the

22   exclusion of time in the interests of justice; is that

23   correct?

24         MR. BROWN:  No, Your Honor, that's correct.

25         THE COURT:  All right.

1          So, I will exclude time between now and April 28th

2     additionally in the interests of justice.

3                MR. HARRIS:  Thank you, Your Honor.

4                THE COURT:  All right, thank you.

5                ALL:  Thank you, Your Honor.

6

7                (Matter concluded.)

8

9                         ooo0ooo

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           <u>I N D E X</u>

2

3    <u>WITNESS</u>                                    <u>PAGE</u>

4

5     G E N A R O   B A R R E I R O

6         DIRECT EXAMINATION

7         BY MR. HARRIS                          13

8         VOIR DIRE

9         BY MR. BROWN                           23

10        DIRECT EXAMINATION (Continuing)

11        BY MR. HARRIS                          24

12        CROSS-EXAMINATION

13        BY MR. BROWN                           63

14        REDIRECT EXAMINATION

15        BY MR. HARRIS                          128

16

17    D A N I E L   G O L A T

18        DIRECT EXAMINATION

19        BY MR. HARRIS                          136

20        CROSS-EXAMINATION

21        BY MR. BROWN                           157

22

23    C H A R N A E   A L E X A N D E R          181

24        DIRECT EXAMINATION

25        BY MR. BROWN                           181

1    VOIR DIRE EXAMINATION

2    BY MR. HARRIS                              182

3    CROSS-EXAMINATION

4    BY MR. HARRIS                              189

5

6

7

8

9                    **E X H I B I T S**

10

11

12    Government's Exhibit 1                     18

13

14    Government's Exhibits 2, 3, 4, 5 and 6     24

15

16    Exhibits 7, 8, 9 and 10                    56

17

18    Exhibit 11                                 62

19

20    Defendant's Exhibit C so marked           89

21

22    Defendant's Exhibit D so marked           103

23

24

25

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - -  X

UNITED STATES OF AMERICA,    :   15 CR 635

                             :

    -against-                :
                                 United States Courthouse
                                 Brooklyn, New York
ROBERT ALEXANDER,            :

                                 April 28, 2016
         Defendant.          :   9:30 o'clock a.m.

- - - - - - - - - - - -  X


                 TRANSCRIPT OF CONFERENCE
           BEFORE THE HONORABLE CAROL BAGLEY AMON
               UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Government:        ROBERT L. CAPERS
                           United States Attorney
                           BY: RYAN C. HARRIS
                               WHITMAN KNAPP
                           Assistant United States Attorneys
                           271 Cadman Plaza East
                           Brooklyn, New York


For the Defendant:         MICHAEL L. BROWN, II, ESQ.
                           MICHELLE GELERNT, ESQ.
                           Federal Defenders of NY

Court Reporter:            Gene Rudolph
                           225 Cadman Plaza East
                           Brooklyn, New York
                           (718) 613-2538

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

1       THE CLERK:  The United States against Alexander.

2       Please state your appearances for the record.

3       MR. HARRIS:  Ryan Harris for the United States.

4  With me is Whitman Knapp, Assistant U.S. Attorney Whitman

5  Knapp.

6       Good morning.

7       MR. BROWN:  Good morning, Your Honor.

8       Michael Brown, Federal Defenders of New York.

9  Beside me is Michelle Gelernt on behalf of Mr. Alexander, who

10 is present as well.

11      THE COURT:  Good morning.

12      All right.  We had a suppression hearing in this

13 case.  There have been posthearing submissions and then there

14 are a series of motions in limine.

15      Do the parties want to be heard on the suppression

16 question?

17      MR. HARRIS:  I am happy to speak to that, Your

18 Honor.

19      THE COURT:  All right.

20      MR. HARRIS:  The post-trial briefing spoke

21 principally to the admissibility of the physical evidence.  I

22 don't think that there is a serious dispute about the

23 admissibility of the statements.  I won't go into those in

24 great detail.

25      But the statements on scene were not the result of a

1  custodial interrogation.  Two of those statements were not

2  even made in response to police questioning.

3       The statements made back at the precinct were made

4  after the defendant had been made aware of his Miranda rights

5  and had voluntarily and knowingly waived those Miranda rights.

6  Those should be admitted.

7       With respect to the physical evidence, there are two

8  questions.  One is, the admissibility of the drawstring bag

9  and the two firearms, which were recovered from the top of a

10  plastic chair at the top of the defendant's driveway.

11       There is a great amount of case law which the

12  government has cited in its brief saying that driveways are

13  not within the privilege of the home and therefore are not

14  entitled to Fourth Amendment protection.

15       In addition, the defendant did not have a reasonable

16  expectation of privacy in this area, both because it is

17  outside the curtilage of the home and because of severely

18  diminished expectation of privacy as a person on federal

19  supervised release.

20       That same analysis applies to the admissibility of

21  the bottle that was recovered in a side yard area to the right

22  of the driveway, adjacent to or within the vicinity of a

23  concrete --

24       THE COURT:  Do you agree that the bottle is a closer

25  question than the gun --

1        MR. HARRIS:  Yes, I do, Your Honor.

2        THE COURT:  -- that was actually recovered from the

3 backyard behind the house.  Correct?

4        MR. HARRIS:  The two officers had slightly different

5 recollection of where the bottle was recovered from.  I think

6 Officer Barreiro testified  that the bottle was just around

7 the turn of the back of the house, whereas Officer Golat

8 testified that it was in a grassy area much closer to a

9 concrete sidewalk leading to the back entrance and was not

10 behind the turn of the house, the difference of likely just a

11 few feet.

12        THE COURT:  Are you asking the Court to credit one

13 account over the other?

14        MR. HARRIS:  No, Your Honor.

15        I think the -- what I am getting at, however, is

16 that both of these areas are within mere steps of a concrete

17 walkway leading to a back entrance to the house.  It is an

18 unenclosed area that is accessible both from the driveway and

19 from this concrete walkway and I think that falls underneath

20 the same analysis that the Court performed in United States

21 versus Cousins, a case that the government cited extensively

22 in its brief, applying the Dunn factors to determine whether

23 evidence recovered from that area was admissible.

24        Applying those factors, the Court in Cousins

25 determined that this area, while within an immediate adjacent

1 space to the house, was not enclosed, was not used for

2 intimate activities associated with the home, at least not in

3 kind of regular or primary basis, and was not shielded from

4 public because it was accessible by a paved walkway that was

5 accessible to any person wishing to enter upon it.

6 These same factors apply equally to the area in this

7 case where the bottle was recovered, whether it be the grass

8 space that Officer Golat testified to or a few feet away where

9 Officer Barreiro recalled the bottle being.

10 For those reasons it is the government's position

11 that this bottle was not recovered within the curtilage of the

12 home. It is a closer question than the drawstring bag and the

13 two guns.

14 Moving on to the second test, the reasonable

15 expectation of privacy, those kind of rise and fall in the

16 same way that they do with respect to the drawstring bag and

17 the gun. The defendant has a severely diminished expectation

18 of privacy given his status on federal supervised release,

19 subject to home visits at any time, and he is not entitled to

20 any expectation of privacy in the area outside the curtilage

21 of his home.

22 I think in his brief defense counsel focused

23 extensively on the time of day to argue that the -- the

24 defendant somehow acquired an expectation of privacy in an

25 area that is outside the curtilage of the home simply because

1  it was dark out.  There is no case law to suggest that and it

2  would be contrary to the very concept of open field, which I

3  think the government discussed in a footnote on page -- the

4  final page, 21, of its brief.

5       I think at the time -- the time of day is frankly

6  irrelevant to the question of whether this area is protected

7  by the Fourth Amendment.  It kind of rises and falls on the

8  curtilage question and the government submits based on United

9  States versus Cousins and applying the Dunn factors that the

10  bottle was outside the curtilage of the home.

11       THE COURT:  All right.  Thank you.

12       Do you want to be heard?

13       MR. BROWN:  Yes, Your Honor.

14       So at the outset I would say I rely on my submission

15  with respect to the statements.

16       THE COURT:  What is the problem with the statements?

17       MR. BROWN:  The problem with the statements stems

18  from whether they came as the lack of probable cause and

19  whether they were in response to police activities.

20       THE COURT:  Wait a minute.

21       Are you claiming the statements are the fruit of an

22  arrest without probable cause?

23       MR. BROWN:  Yes.

24       In cross-examination --

25       THE COURT:  I don't think that's an argument you

1 made in your papers, that the statements were the fruit of an

2 arrest without probable cause. I don't think that statements

3 are suppressed on that ground.

4         MR. BROWN: So --

5         MS. GELERNT: I'm sorry, Judge. If we could just

6 have a moment?

7         (Pause.)

8         MR. BROWN: So the argument that I was trying to

9 make, Your Honor, is that when Officer Barreiro ordered

10 Mr. Alexander to stop he was in custody at that time and

11 subject to the Fifth Amendment. The statements that were made

12 violated his rights under the Fifth Amendment. That's what I

13 was trying to get at. At the hearing my recollection is

14 Officer Barreiro testified he couldn't say at what point in

15 time he told Mr. Alexander that he could not go back into his

16 home and so that's what I am referring to.

17         THE COURT: You are saying that he was in custody

18 and, therefore, his pre-formal arrest statements should be

19 suppressed?

20         MR. BROWN: Yes.

21         THE COURT: That's based on what testimony?

22         MR. BROWN: I questioned Officer Barreiro. In

23 response to one of my questions he said at a certain point he

24 told Mr. Alexander he could not go back into the home. He

25 couldn't tell when he did this. He just stated on the record

1  that he did in fact tell Mr. Alexander he could not go back

2  into his home.  He didn't identify when because his

3  recollection, he didn't know.  But it was clear that he

4  had -- he had ordered Mr. Alexander that he could thought go

5  into his house.  And there was no Miranda at that point in

6  time.

7  THE COURT:  Where is that testimony in the record,

8  do you recall?

9  MR. BROWN:  Your Honor, I have my paralegal bringing

10  the transcript right now.  I neglected to bring it.  I can

11  come back to it.

12  THE COURT:  I don't think you addressed it in your

13  posthearing submissions, did you?

14  MR. BROWN:  No.  In the posthearing submission, no.

15  I just relied on the argument from before.  I

16  thought I might have mentioned it in the hearing when we

17  briefly addressed argument.  I can cite to it before we finish

18  this, if I --

19  THE COURT:  Your contention is that once he told him

20  he could not go back into the house he was under arrest?  And

21  we don't know when the statements the government seeks to

22  admit took place?

23  MR. BROWN:  Yes, Your Honor.

24  THE COURT:  What statements precisely does the

25  government want?  There are statements that he makes upon

1   being confronted?

2           MR. HARRIS:  Yes, Your Honor.

3           THE COURT:  Those statements were what?

4           MR. HARRIS:  There are three on scene statements

5   that the government is seeking to admit.

6           THE COURT:  Okay.

7           MR. HARRIS:  The first statement was made when the

8   officers first arrived.  It was not made in response to any

9   police questioning.  The defendant stated, in sum and

10  substance, this is my house.  I am just having a drink on my

11  lawn.  That's my cousin.  Essentially that in sum and

12  substance.  Again, not the result of any kind of interrogation

13  by the police.  So again, regardless of whether or not he was

14  in custody, it's not subject to suppression.

15          The second statement that the defendant made was

16  during the time period when the two officers were searching

17  the car and recovering the cocaine.  At that point he stated,

18  in sum and substance, I am just going to put this in the back,

19  referring to the liquor bottle presumably that was in his

20  hand.  Again, not the result of a police interrogation.  It

21  was a spontaneous utterance made by the defendant.  So, again,

22  regardless of whether or not he was in custody at that point,

23  it is not subject to suppression.

24          The third statement was made to Officer Golat.

25  Officer Golat asked him later in time, at this point while

1  Officer Barreiro was proceeding to the back of the house to

2  look for the drawstring bag and to look for the liquor bottle,

3  Officer Golat asked him why he went into the back.  The

4  defendant stated, in sum and substance, I just wanted to put

5  the bottle down out of respect for you guys.

6         This statement, while the subject of a very brief

7  interrogation, one question, is not subject to suppression

8  because the defendant was not in custody.  In the government's

9  prehearing briefing, it briefed several of the factors the

10 Court could consider in determining whether a person is in

11 custody and several of those factors counsel against a finding

12 that the defendant was in custody at the time.

13        He was not in handcuffs.  He not -- he was not at a

14 police precinct.  He was standing in front of his own home.

15 And those are two factors that Courts have previously found to

16 be dispositive in the question of whether or not a person is

17 in custody when he makes a statement.

18        This issue was briefed a little more extensively in

19 the government's prehearing briefing, but analysis of those

20 factors leads to the conclusion that the defendant was not in

21 custody at the time he made the statement.  Therefore, it

22 should not be suppressed.

23        THE COURT:  What is your view with respect to the

24 statement that he can't go back in the house?  Or do you

25 recall that statement?

1    MR. HARRIS:  I believe that Officer Barreiro did

2    testify to that at some point.  I think that kind of brief

3    restriction does not amount to placing a person under arrest.

4    That's the real question here, whether the person was in an

5    arrest like circumstance.  The defendant here was not in

6    handcuffs when he was standing in front of his home and so

7    applying the factors that Courts must consider in determining

8    whether or not a person is in custody for purposes of the

9    Fifth Amendment, this -- the defendant's statements were still

10   not made as a result of a custodial interrogation.  That's

11   briefed extensively in my prehearing briefing.

12        THE COURT:  Do you want to be heard on the Fourth

13   Amendment issues?

14        MR. BROWN:  Yes, Your Honor.

15        So, Your Honor, I spent a large deal of time in my

16   posthearing briefing on Florida v Jardines, which I briefly

17   touched upon in the argument, more so than what the government

18   characterizes as the time of day.  The government sincerely

19   did thought respond.

20        As I was trying to say when we briefly approached

21   the argument, the area in which the evidence was found is

22   curtilage.  As Scalia said in that case, if a porch and a side

23   yard are clearly curtilage, there is a reasonable expectation

24   in society, everyone understands it to be curtilage.  I don't

25   think there is any question in this case that where the

1  evidence was found is curtilage and that's subject to Fourth

2  Amendment protections.

3          If we start with that as an initial question, then

4  it becomes, is there some exception to -- which I don't

5  believe the government addressed at all in their brief.

6          THE COURT:  They are not contending that it was the

7  subject of any exceptions such as search incident to an arrest

8  or anything like that.  I don't think that's their claim.

9          They are saying that it wasn't curtilage because a

10  number of cases say that driveways, which this was, do not

11  constitute curtilage and then they also go on and say that he

12  didn't have a reasonable expectation of privacy because this

13  area was open to the public.  You could see it from the

14  street.  Cars could pull into the driveway.

15          That is essentially the argument that is made here.

16          MR. BROWN:  I will start with the driveway argument,

17  Your Honor.

18          They did cite a number of cases.  We didn't have a

19  reply schedule.  I do think that, as I mentioned in my

20  posthearing brief, the two cases that they cited, Hayes and

21  Smith, that they are miss construing, somewhat misleading the

22  Court.

23          THE COURT:  Which cases are you talking about that

24  they cited?

25          MR. BROWN:  So they just mentioned, Cousins.  If I

1  go through the facts of Cousins, we cite a number of cases

2  from different circuits.  They spend a lot of time on Cousins

3  which is out of the Tenth Circuit, 2006 case.  This case is

4  pre Florida v Jardines.  A driveway and Dunn factors were

5  analyzed in that case.  However, in analyzing the Dunn factors

6  there, more critical to the Court --

7          THE COURT:  Let me ask you, do you question that the

8  Dunn factors apply?  Do you question that that is an

9  appropriate analysis?  Are the Dunn factors still in play?

10          MR. BROWN:  So, Your Honor, I believe that you get

11  to the Dunn factors when you don't start with -- we have a

12  Fourth Amendment search, do you have an exception to that

13  search.  I think over the years there have been close

14  questions where Courts could not tell is this area really a

15  part of the home.  I think you find more cases that even deal

16  with driveways in other circuits because you have rural areas.

17  You are looking at driveways that are visible from a public

18  highway, not an urban city context which we have generally in

19  Second Circuit.

20          THE COURT:  What different does it make whether it

21  is a public street or public highway if you can still see into

22  the driveway?

23          You haven't answered my question.  Do the Dunn

24  factors still apply?  Is that the appropriate analysis?

25          MR. BROWN:  Post Jardines, I think the Dunn factors

1   are relevant.  If you analyze the case under reasonable

2   expectation of privacy question, you are trying to figure out

3   if an area is in fact curtilage.  So I think that's where the

4   Dunn factors apply.

5         THE COURT:  The reasonable expectation of privacy is

6   a different test from curtilage.  I am not sure that I

7   understand what you are saying.

8         MR. BROWN:  So I think the first question has to be

9   is it curtilage.

10         THE COURT:  Right.

11         MR. BROWN:  So --

12         THE COURT:  In determining whether it is curtilage,

13   aren't the Dunn factors used to make that determination?

14         MR. BROWN:  I think the Dunn factors have been used

15   when Courts had a close question.  I think here yes, the Dunn

16   factors are important.  I think the evidence at the hearing

17   was not that you could see from the street at night, which in

18   all of these Dunn analysis is more of a totality of

19   circumstances situation, which is why night is important, the

20   area in which the evidence was recovered.

21         THE COURT:  Why does it make a difference as to

22   whether something is curtilage whether it is day or night?

23         MR. BROWN:  If it is curtilage then we are looking

24   for Fourth Amendment, is there an exception.  If the Court is

25   having a hard -- if it is curtilage, it is just Fourth

1    Amendment.

2           THE COURT:  All right.  In determining whether it is

3    or isn't curtilage, my question to you is, what difference

4    does it make if it is day or night?

5           MR. BROWN:  It does not, Your Honor.

6           THE COURT:  Okay.  So day or night somehow factors

7    into the reasonable expectation of privacy analysis?

8           MR. BROWN:  Yes.

9           THE COURT:  Okay.

10          MR. BROWN:  If you don't start with the premise that

11   this area is curtilage and that it is a Fourth Amendment

12   search that needs to have an exception, then the Court would

13   look at reasonable expectation of privacy and --

14          THE COURT:  You would argue that you have more of a

15   reasonable expectation of privacy at night than you do during

16   the day?

17          MR. BROWN:  I would argue that from all the cases

18   that have been cited on reasonable expectation of privacy, we

19   are looking at societal norms and what -- what has been

20   traditionally held by society.  I do think there is a

21   difference between day and night.

22          I do think the factors do become important there

23   because in this case it was testified to that you could not

24   see the area day or night behind the house, which the Court

25   has noted with respect to the bottle.  The placing of the

1  evidence with respect to the bag and the firearms is in

2  dispute.  But it's in grassy area that in the complaint was a

3  backyard.  Somehow became the top of the driveway, and now

4  based on Cousins I think the government is trying to make the

5  society argument.

6            The reason why I keep going back to Jardines is --

7            THE COURT:  No.  They don't contend the guns were

8  found in the side yard.  It was some dispute whether the

9  liquor bottle was in the side yard or behind the house.  But

10  the guns, my recollection of the testimony is, they were

11  sitting on top of the chair in a bag.

12            MR. BROWN:  So the bag --

13            THE COURT:  That was in front of the shed.

14            MR. BROWN:  So my understanding is that Officer

15  Barreiro testified that they were to the side of the shed on

16  the paved and in the government's post-hearing briefing they

17  asked the Court to ignore whether or not the path that Officer

18  Barreiro traveled was the side yard, and again they are citing

19  to Cousins.

20            Now going to Cousins.  The Dunn factors were looked

21  at and I think what was more important there than the driveway

22  and some of the other Dunn factors was the fact that in this

23  case, Cousins, there was side yard and on the house there was

24  a utility meter which once a month utility employees had to go

25  and read.  There were no steps taken to stop these public or

1   to stop the public from coming to that utility meter.  It's a

2   very different situation.  I think time is always important

3   but in that case, again, it was open to the public.  It

4   happened once a month.

5           The evidence adduced in that case said that there

6   was an easement that the defendants knew that people came to

7   this area.  So if you were in that area you would be there

8   legitimately, the side yard or a part of the house, and you

9   might be able to see into a further place in the house there

10  might be curtilage.  They are not dealing with the same issues

11  as here.

12          So when you talk about the other Dunn factors,

13  enclosures, use, intimate areas, there is no argument for

14  reasonable expectation of privacy where someone knows that

15  once a month, often people might traverse their driveway.

16          THE COURT:  How about that you are going to be

17  visited periodically by your probation officer?

18          MR. BROWN:  So I think that -- okay.  From the

19  driveway argument, we go to -- this is a novel argument, Your

20  Honor, that just came up posthearing.  I don't know if it is

21  properly before the Court.  But in responding, this is what I

22  would say.  They have created this argument about supervised

23  release.  They have cited to what you are familiar with, Your

24  Honor, the agreement that you impose.

25          On page three of that agreement, condition ten, it

1    says the defendant shall permit a probation officer, US

2    probation officer, to visit him or her at any time at home or

3    elsewhere and shall permit confiscation of any contraband

4    observed in plain view of the Probation Officer.

5            Once again, I didn't have time to reply to the

6    briefs, but in the cases that they have cited, once again, in

7    my opinion, misleading the Court, respectfully.

8            A lot of cases that deal with this issue come out of

9    California, the Ninth Circuit, and in California for parolees,

10   not people on supervised release, there is a difference, there

11   is an express condition for parole that you are subject to

12   warrantless searches.  So if they want to use contractual

13   language, we don't have a US Probation Officer here.  A visit

14   is not the same thing as a search.

15           THE COURT:  Why don't we have a US Probation Officer

16   here?

17           MR. BROWN:  This is NYPD, Your Honor.

18           THE COURT:  You mean, the people doing the search?

19           MR. BROWN:  Yes.  This is not a probation search.

20           As an aside, this is not a special needs search

21   which maybe if they were going curtilage would be Fourth

22   Amendment.  How these cases have been determined, I can go

23   through the cases in their brief.  It's not a US Probation

24   Officer.  A visit is a limit.  That's not the same thing as a

25   search.  And confiscation in plain view, that's not their

1    argument here, that anything was in plain view.

2         In these California cases that have made it to the

3    Supreme Court, the California system says that --

4         THE COURT:  In essence, I suppose, it is plain view

5    in this sense.  They are making the argument that they had a

6    right to be in the place where they were, which is in the

7    driveway, and from there they saw an object that -- I think

8    there was testimony the butt was sticking out of the bag and

9    in plain view they saw that argument.  I don't think they are

10   saying that.

11        Would it be your contention, the government's

12   contention, if there were a closed box sitting in the

13   driveway, they could have opened all the boxes sitting in the

14   driveway and taken what was in them.

15        MR. HARRIS:  Yes, Your Honor.  Because the defendant

16   did not have an expectation of privacy in this area.  It is

17   outside the curtilage of the home.  It is an open field.  The

18   defendant could not have an expectation of privacy in a closed

19   box in an open field.

20        THE COURT:  Okay.  So it's immaterial then to the

21   analysis whether someone could see what was in the bag or not?

22        MR. HARRIS:  Correct.

23        THE COURT:  Okay.

24        MR. BROWN:  So, Your Honor, just so I can touch that

25   point and go back.  This was the second search after the first

1  search where they saw the bottle and did not see this bag.

2  There was no knowledge of what was in the bag at this time.

3  So I just think that a plain view argument --

4          THE COURT:  They don't claim they are making that.

5          MR. BROWN:  Okay.  So in terms of -- so, even if,

6  going back to the argument that I was making about the

7  reasonable expectation of privacy, they are asking this Court

8  to hold that anyone on supervised release has a limited

9  expectation of privacy and anyone can just go down their

10  driveway.  Looking at the case -- that they are subject to a

11  warrantless searches by the police.

12          As I was speaking about the in California system,

13  the conditions of parole in that state, which is in the Ninth

14  Circuit, is that law enforcement or probation or parole, any

15  law enforcement officer can do a warrantless search.

16          There is nothing in the language that the government

17  is citing for Mr. Alexander's supervised release that gets

18  there.  But if we go to the cases they cited in their

19  posthearing memorandum, the Haynes case they cited, which is

20  actually out of the Second Circuit, is dealing with parole

21  officers specifically.  They do a line cite but it is

22  distinguishable because we have NYPD here and not parole

23  officers.

24          If we look at the Knight case, the Knight case was a

25  California case where an officer before he searched an

1  individual on the street actually radioed dispatch to make

2  sure that person was on parole and then had a legitimate

3  purpose in following California penal code 3067 and then

4  conducting a search.

5  　　　　Look at the Harrison case they cited, that's a

6  probation home visit, which is a legitimate purpose, unlike

7  what we have here, and the condition in that case was the

8  defendant shall submit his person, residence, place of

9  business, vehicle or any other premises under his control to a

10 search, not a visit, on the basis that the Probation Officer

11 has a reasonable belief that contraband or evidence of

12 violations of conditions of release may be found.

13 　　　　THE COURT:  I don't believe there was a search

14 condition in Mr. Alexander's --

15 　　　　MR. HARRIS:  No, there was not, Your Honor.

16 　　　　MR. BROWN:  Samson, another analysis, where there

17 is -- I'm sorry.  I mixed up Knight and Samson.  Samson

18 further went on and that was where the officer contacted radio

19 dispatch.  Whereas, Knight it was just about the fact that

20 California allows for warrantless searches.

21 　　　　So that whole section of the brief, which is novel,

22 Your Honor, I think does nothing to help this Court because if

23 you start with the contract language, if they are going to use

24 that type of argument, a visit is not a search.  There was no

25 US Probation Officer here that would give any notice, that

1   would give someone a lessened expectation of privacy on

2   supervised release.  That would imply that any law enforcement

3   officer, Connecticut, New Jersey, Hawaii 50, if they interact

4   with someone on supervised release in New York, could just

5   come and do a search as opposed to a visit.

6          And that logic doesn't hold from the language of the

7   release agreement.

8          As far as the cases they cited, I don't think they

9   help this Court because they are -- they are all interpreting

10  a condition that was expressed.  There was -- which did

11  establish a lowered sense of privacy under a totality of

12  circumstances analysis that the Court performed.  Any totality

13  of circumstances here, nighttime, that there was evidence at

14  the hearing that you could not see the area from the street,

15  there were steps taken to prevent the public from access.

16         THE COURT:  What were the steps taken to prevent the

17  public from access?  What steps were they?

18         MR. BROWN:  So there was a fence at one point in

19  time.  Mr. Alexander testified that due to money that fence

20  had fallen down.  They couldn't replace the front part of it

21  but there still was a physical border such that any --

22         THE COURT:  The border was a log in front of the

23  house?  It didn't cover the driveway, did it?

24         MR. HARRIS:  No, Your Honor.

25         MR. BROWN:  It did not cover the driveway but the

1   officer testified at the hearing that there was a car in the

2   driveway.  This path was 84 feet long.  It was nighttime.  So

3   it was dark and you could not see.  The officer had to use a

4   flashlight in order to see.  Therefore, a member of the public

5   would not feel comfortable walking down that path.  There were

6   no lights on the home that illuminated that driveway.

7           The government makes reference to a backdoor that is

8   not visible from the street.  The main ingress into the house

9   is not that driveway or that path.  There is another path that

10  clearly goes to a mailbox and address for the house.  In terms

11  of this case the officers testified there was bag.  A bag is

12  an enclosure.  So all those could be steps taken for that and

13  the area, just the area of being where it was, the backyard as

14  said in the complaint  --

15          THE COURT:  Are you saying there is a difference,

16  that someone has a greater expectation of privacy, reasonable

17  expectation of privacy, at night than they do during the day?

18  And that's the distinguishing factor?  In other words, do you

19  say during the day you are expecting deliveries, you

20  understand that someone might pull into the driveway to

21  deliver something, but at night you would have an expectation

22  that that area was more private than during the daytime?

23          MR. BROWN:  Yes, Your Honor, I am saying that.

24          I am also saying the reasonable expectation of

25  privacy analysis has generally considered totality of

1  circumstances.

2       THE COURT:  That doesn't have anything to do with

3  curtilage.  Something is or is not curtilage.  That doesn't

4  have anything to do with night or day.

5       MR. BROWN:  I agree.  Curtilage night or day is

6  irrelevant.  Fourth Amendment, do you have an exception.  We

7  are moving past that to analyze this case under reasonable

8  expectation of privacy.

9       THE COURT:  You say it makes a difference whether it

10  is day or night.

11       MR. BROWN:  Yes.  Every case cites the time when

12  police apply for search warrants.  The time is important.

13  Police conduct at night in terms of intrusiveness is important

14  to Courts.  The time of day does matter especially if it makes

15  a difference.  What you can see in the daytime might be

16  different than what you can see at night.

17       The trespassory analysis that the government cited

18  in their posthearing brief, trespass, burglary, all those

19  elements do deal with night.  So you can't just disregard the

20  time in which this happened.

21       If someone wanted to take more steps to shield

22  something from public view, not just in an enclosed bag, maybe

23  where they put it, getting to an area that is not visible from

24  the street at night, you have to do something different.  The

25  time of day does matter.  In the cases that the government are

1   citing to deal -- they mention the time of day or a reason,

2   Your Honor.

3        Again, with respect to that night element, the

4   flashlight was needed.  The officer testified twice that his

5   source of light for not only the bottle but for the bag was

6   the flashlight.  And the area was not visible from the street.

7   Not even from the lawn or where the people -- where the

8   officer said they were standing.  Everyone had to reemerge.

9   It was clear.

10       And so again, that's why the area is important,

11  because after a first search for the bottle, the perimeter

12  search with this flashlight,  he didn't discover the bag. He

13  came back.  Then you have to go back into a second search and

14  still needs the flashlight to discover this grassy area next

15  to what he is calling the driveway, the time of the driveway.

16       THE COURT:  All right.  Does the government want to

17  be heard on the relevance of night or day as to the reasonable

18  expectation of privacy argument?

19       MR. HARRIS:  Your Honor, the reasonable expectation

20  of privacy rises and falls on whether or not this is

21  curtilage.  If the area is not curtilage, then it is an open

22  field.  Again, I mean that in the legal sense, not in the

23  literal sense.

24       THE COURT:  You say whether or not it is curtilage

25  is dispositive?

1    MR. HARRIS:  Yes, Your Honor.

2        There has been no case law cited by the defendant

3    and none that I have seen that holds that a defendant can have

4    a reasonable expectation of privacy in an open field, whether

5    it be night or day.  This rises and falls essentially on the

6    curtilage question.

7        THE COURT:  So you say that the Dunn factors are

8    conclusive as to both arguments?

9        MR. HARRIS:  Yes, Your Honor.

10       THE COURT:  Okay.

11       MR. BROWN:  Your Honor, if I may, just to address

12   that?

13       Where the officer said he was standing when he

14   observed the bag and the bottle was not in the driveway but in

15   the grassy part of the house.  Clearly the backyard.  That's

16   important here.

17       Whether or not it's curtilage is not dispositive in

18   this case because that's how we get to the Dunn factors.  When

19   Courts have a hard time seeing if something is clearly a

20   person, property, the automobile, the exceptions that have

21   come, that's when we get these other factors.  So whether it

22   is curtilage or not, there still would be an analysis of the

23   Dunn factors and that analysis would get you to maybe consider

24   whether this is an open field.  I don't think the government

25   has put forth any evidence that this is an open field.

1     They have used the Dunn factors and tried to

2  undermine the testimony at the hearing but we have adjacent to

3  the home.  We have use for barbecues.  We have steps that were

4  taken, a fence at one point in time, and there is an

5  enclosure.  This is a clearly bounded area in the back of the

6  house.  We have that it's evident that you could not see this

7  area from the street.

8     So it is not dispositive whether it's curtilage.  I

9  am arguing that it is curtilage, based on Jardines.  It is

10  clear from that case.  Even if you don't analyze this under

11  Fourth Amendment exception to the rule, the reasonable

12  expectation of privacy then takes into account all these other

13  things because it is not just open fields versus curtilage.

14  Someone on the street has a reasonable expectation of privacy.

15     The Katz case, which they are using for the

16  reasonable expectation of privacy, it -- it's not dispositive

17  whether or not it's curtilage.  You still have to do an

18  analysis of reasonable expectation of privacy.

19     THE COURT:  Okay.  I understand that point.

20     Let's just move on a moment to the motions

21  in limine.

22     If the evidence is not suppressed, the government

23  has moved in limine to preclude questioning suggesting that

24  the search, or any argument suggesting that the search was

25  illegal.

1  that need to be discussed?

2         MR. HARRIS:  Your Honor, this is kind of a corollary

3  of a request to be able to cross-examine the defendant on his

4  prior criminal convictions if he testifies.  While the

5  government doesn't intend to get into the underlying facts of

6  the convictions, if the defendant should testify on the stand

7  contradictory to those facts, the government would request

8  to -- the door be opened to then cross-examine him.  If he

9  says, for example, that he's never had a gun in his life, I

10  think that opens the door to cross-examine on the fact that he

11  is -- he has previously been convicted of this exact crime.

12         THE COURT:  That should be understood, I take it.

13         MR. BROWN:  Yes.

14         MS. GELERNT:  Yes, that's clear, Your Honor.

15         MR. BROWN:  Your Honor, if I may?  I have the

16  citation of the transcript that you wanted.

17         THE COURT:  Okay.

18         MR. BROWN:  On page 90, starting with line 18, going

19  to 25, is where Officer Barreiro -- I can read it for you or I

20  can let you --

21         THE COURT:  No.  I can look it up.

22         I know we have jury selection Monday.  Jury

23  selection will go forward.  I will, however, consider all of

24  the arguments made here today and rule on them all on Tuesday

25  at 11:30.  I am definitely going to consider the arguments

1  that had been made by both sides.

2       Preliminarily, at least with respect to the

3  firearms, again, this is without prejudice to reading the

4  additional cases and considering arguments made by the

5  defendant today, preliminarily I would admit at the very least

6  the weapons as being outside of the curtilage, but I will take

7  into consideration the arguments that the defendant made

8  today.  Since I think the government has offered a fairly

9  persuasive argument on that point, I think it is sufficient to

10  let jury selection go forward, but I will consider the

11  arguments that had been made today and rule on that on Tuesday

12  and the other issues as well with respect to the motions

13  in limine.

14       Okay.  Thank you.

15       MR. HARRIS:  Thank you, Your Honor.

16       MR. BROWN:  Thank you.

17       (Matter concludes.)

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - -   X

UNITED STATES OF AMERICA,   :   15-CR-635(CBA)

       Plaintiff ,   :

                        United States Courthouse
  -against-   :   Brooklyn, New York

ROBERT ALEXANDER,   :

                        May 3, 2016
      Defendant.   :   11:30 o'clock  a.m.

- - - - - - - - - - - -   X

TRANSCRIPT OF PRE-TRIAL CONFERENCE
BEFORE THE HONORABLE CAROL BAGLEY AMON
UNITED STATES DISTRICT JUDGE.

APPEARANCES:


For the Government:      ROBERT L. CAPERS
                        United States Attorney
                        BY: RYAN HARRIS
                            WHITMAN KNAPP
                        Assistant United States Attorneys
                        271 Cadman Plaza East
                        Brooklyn, New York


For the Defendant:       FEDERAL DEFENDERS OF NEW YORK, INC.
                        One Pierrepont Plaza - 16th Floor
                        Brooklyn, NY 11201

                        BY: MICHAEL L. BROWN, II


Court Reporter:         Charleane M. Heading
                        225 Cadman Plaza East
                        Brooklyn, New York
                        (718) 613-2643

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

1          THE CLERK:  Criminal cause for a pretrial

2    conference, docket number 15-CR-635, USA v. Robert Alexander.

3          Counsel, please state your appearance.

4          MR. HARRIS:  Ryan Harris for the United States.

5    With me is Whitman Knapp, another U.S. Attorney in our office.

6          THE COURT:  Good morning.

7          MR. BROWN:  Michael Brown, Federal Defenders of

8    New York.  With me from my office is Michele Gelernt and also

9    Emma Schindler, a paralegal in our office, on behalf of

10   Mr. Alexander who is present with us at the table.

11         THE COURT:  Good morning.

12         The jury was selected in this case?

13         MR. HARRIS:  Yes, Your Honor.

14         MR. BROWN:  Yes, Your Honor.

15         THE COURT:  Was the jury satisfactory to the

16   government?

17         MR. HARRIS:  Yes, it was.

18         THE COURT:  Was it satisfactory to the defense?

19         MR. BROWN:  Yes, Your Honor.

20         THE COURT:  We have a number of outstanding issues

21   and some additional issues -- you all can be seated, I'm

22   sorry -- that have been raised and we have also had jury

23   instructions presented to the Court.

24         I would like to resolve anything we don't resolve

25   today on Friday, if we can set a conference on Friday at noon.

1  Can the parties make that?

2          MR. BROWN:  Yes, Your Honor.

3          MR. HARRIS:  Yes, Your Honor.

4          THE COURT:  Okay.

5          Let me just in short form resolve some issues and I

6  will put a lengthier statement on Friday.

7          In terms of the suppression motion, I am going to

8  deny the motion to suppress the bag containing the guns but I

9  am going to suppress the bottle basically finding that the

10 driveway area where the guns were found was not part of the

11 curtilage whereas the area where the bottle was found was part

12 of the curtilage.

13         In terms of post-arrest statements, I just have one

14 clarification.  The statements at the scene I am going to

15 admit.  I do not find that those were custodial interrogation.

16 Back at the station house, the defendant was advised of his

17 Miranda warnings and waived his Miranda warnings.  Those

18 statements in the Court's view were voluntary.

19         I don't know whether the defense is pressing any

20 issue with regard to statements that purportedly took place in

21 a car on the way to the station house.  Are you or are you

22 not?  The government doesn't intend to offer those, but I

23 don't know if you're making any further legal argument in that

24 regard.

25         MR. BROWN:  Your Honor, the legal argument with

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
 2
      - - - - - - - - - - - -    X
 3
    UNITED STATES OF AMERICA,    :   15-CR-635(CBA)
 4
             Plaintiff ,         :
 5
                                     United States Courthouse
      -against-                 :    Brooklyn, New York
 6
    ROBERT ALEXANDER,            :
 7
                                     May 6, 2016
            Defendant.          :    12:00 o'clock p.m.
 8
      - - - - - - - - - - - -    X
 9
10              TRANSCRIPT OF PRE-TRIAL CONFERENCE
            BEFORE THE HONORABLE CAROL BAGLEY AMON
11                UNITED STATES DISTRICT JUDGE.

12
    APPEARANCES:
13
    For the Government:         ROBERT L. CAPERS
14                              United States Attorney
                                BY: RYAN HARRIS
15                                  WHITMAN KNAPP
                                Assistant United States Attorneys
16                              271 Cadman Plaza East
                                Brooklyn, New York
17

18  For the Defendant:         FEDERAL DEFENDERS OF NEW YORK, INC.
                                One Pierrepont Plaza - 16th Floor
19                              Brooklyn, NY 11201

20                              BY: MICHAEL L. BROWN, II
                                    MICHELLE GELERNT
21

22  Court Reporter:            Charleane M. Heading
                                225 Cadman Plaza East
23                              Brooklyn, New York
                                (718) 613-2643
24
    Proceedings recorded by mechanical stenography, transcript
25  produced by computer-aided transcription.
```

1    THE CLERK:  The United States against Alexander.

2    Please state your appearances for the record.

3    MR. HARRIS:  Ryan Harris for the United States.

4  With me is Whitman Knapp, another Assistant U.S. Attorney in

5  our office.  Good morning or good afternoon.  I'm sorry.

6    THE COURT:  Good morning.

7    MR. BROWN:  Good afternoon.  Michael Brown, Federal

8  Defenders of New York.  Standing beside me is Michelle

9  Gelernt, standing beside her is Mr. Alexander and Emma

10  Schindler, a paralegal in our office.

11    THE COURT:  All right.  Please be seated.

12    There are a couple of matters preliminarily.  I will

13  read into the record the ruling on the suppression motions.  I

14  indicated what my rulings were at our last occasion, but I

15  will put the findings on the record.

16    The Defendant Robert Alexander is charged with being

17  a felon in possession of a firearm and possession of a defaced

18  firearm.  He has moved to suppress physical evidence as well

19  as statements made to the police, specifically, he moves to

20  suppress the liquor bottle and firearms recovered from his

21  property on the night of October 31, 2015.  He contends that

22  these items were recovered as a part of an unreasonable search

23  in violation of the Fourth Amendment.  He moves to suppress

24  the statements he made to the police prior to his arrest and

25  during an interview with a detective at the precinct, he

argues that these statements were made without proper <u>Miranda</u>

warnings and that the statements at the precinct were not

voluntary.

I held a suppression hearing on March 31, 2016.

There were two arresting officers who testified, Officer

Genaro Barreiro and Officer Daniel Golat, as well as

Ms. Charnae Alexander, defendant's sister.  I also received

post-hearing memoranda from the parties and heard argument on

April 28, 2016.

I am now going to explain the denial of

Mr. Alexander's motion to suppress the firearms, but the

reasons for granting the motion to suppress the liquor bottle.

I will also deny the motion to suppress his pre-arrest

statements and the statements he made during interrogation at

the precinct.

Turning to the motion to suppress the physical

items, Mr. Alexander argues that this evidence, the bottle and

the firearms, were discovered during a search that violated

his rights under the Fourth Amendment.

By its text, the Fourth Amendment protects the

rights of individuals to be secure in their persons, houses,

papers and effects against unreasonable search and seizures.

Additionally, the Supreme Court in <u>Katz versus The</u>

<u>United States</u>, 389 U.S. 347, a 1967 decision, held that areas

outside the four areas enumerated in the Amendment are still

protected if an individual has a reasonable expectation of privacy in that area. For example, the Court in <u>Katz</u> held that an individual had a reasonable expectation that his conversation in a public telephone booth is private even though the phone booth is not a house, person, effect or paper.

Here, Mr. Alexander argues that the searched areas fall within two categories of protected areas. He argues that the areas searched should be regarded as part of his home for the purposes of Fourth Amendment because they are protected curtilage. "Curtilage" is defined as the area immediately surrounding and associated with the home. He additionally argues that he had a reasonable expectation of privacy in the searched areas.

To determine whether an area was within the protected curtilage, the central inquiry is whether the area "harbors the intimate activity associated with the sanctity of the home and the privacies of life." In <u>United States versus Dunn</u>, 480 U.S. 294, 1987, the Supreme Court set forth four factors for courts to consider in order to determine "whether an individual reasonably may expect that the area in question should be treated as the home itself." Those factors are: First, the proximity of the area claimed to be curtilage to the home; second, whether the area is included within an enclosure surrounding the home; third, the nature of the uses

1   to which the are is put; and, fourth, the steps taken by the
2   residents to protect the area from observation by the people
3   passing by.

4   In their papers, the parties discussed the effect of
5   the Supreme Court's recent decisions in United States versus
6   Jones and Florida versus Jardines might have on the Dunn
7   factors. Jones and Jardines clarified that the four areas
8   enumerated in the Fourth Amendment, persons, houses, effects
9   and papers, are entitled to Fourth Amendment protection
10  regardless of whether the individual had a reasonable
11  expectation of privacy in them.

12  In Jones, for example, the Supreme Court held that a
13  Fourth Amendment search occurred when the government attached
14  a tracking device to an individual's car. Even though the
15  individual did not reasonably expect that the location of his
16  car to be private, the car was entitled to Fourth Amendment
17  protection because it was an effect, one of the categories
18  listed in the amendment.

19  These cases, however, do not affect how courts
20  determine what falls within these four categories; here
21  specifically, how the court determines the scope of the
22  curtilage that falls within the category of the home. And
23  following Jones and Jardines, the Second Circuit has continued
24  to consider the Dunn factors to determine the scope of the
25  curtilage, for example, in Harris versus O'Hare, 770 F.3d 224,

1  240 and 241, a Second Circuit decision of 2014.  Other

2  circuits have done so as well such as the Eighth Circuit in

3  United States versus Bausby, 720 F.3d 652 at 656, the

4  Eighth Circuit, 2013.

5       Therefore, I am going to apply the Dunn factors to

6  determine the scope of protected curtilage in the case and I

7  have to apply the Dunn factors to two relevant areas:  The

8  areas where the firearm were recovered and the location where

9  the bottle was recovered.

10      First, let me address the firearms.  Firearms were

11  discovered on a plastic chair at the top of Mr. Alexander's

12  driveway in front of the shed.  Applying the Dunn factors, I

13  conclude that this area is not part of the curtilage of

14  Mr. Alexander's home.

15      Addressing the first factor, the area in question

16  was fairly close to Mr. Alexander's home.  I think the

17  government concedes the proximity factor but takes the

18  position that proximity alone is insufficient to establish

19  curtilage.  I agree that proximity alone is not enough but

20  that proximity factor here is favorable for the defendant.

21      Second, the top of the driveway is not significantly

22  enclosed.  Although the fence surrounds three sides of the

23  property, the front of the property is open and nothing

24  obscures the visitor's path to the top of the driveway.  The

25  driveway is open to the street and the sidewalk.

1    Ms. Alexander testified that there was once a fence across the

2    front yard that has now been replaced with a log for financial

3    reasons.  I don't find the placement of this log to be

4    persuasive in establishing that the driveway was part of the

5    curtilage.

6            First of all, a log does not create an enclosure in

7    the way a fence does.

8            Secondly, but even more importantly, even if the

9    fence remained where the log is today, it would not enclose

10   the driveway where the firearms were found.  There is no

11   suggestion that the entrance to the driveway was ever

12   protected by a gate or signs indicating there would be no

13   trespassing on the property.  Visitors could walk up the

14   driveway unimpeded.

15           Third, I considered the nature of the uses to which

16   the area at the top of the driveway is put.  At our hearing,

17   Ms. Alexander testified that the rear portion of the driver

18   was used to park cars, have barbecues and to relax.  In other

19   words, the driveway was used functionally but also at least

20   occasionally for recreation.  The government cites cases that

21   distinguish similar occasional recreational uses in its

22   post-hearing memorandum at pages 12 and 13.  So, all that the

23   testimony establishes was that it was at least occasionally

24   used for more personal used than parking cars.

25           Fourth, I considered what steps Mr. Alexander took

1  to protect the area from observation by people passing by.
2  This factor is very persuasive to me because it appears that
3  no steps were taken to shield the driveway from observation
4  from the street or the sidewalk and although cars that are
5  parked in the driveway might occasionally partially shield
6  some of the top of the driveway from view, the top of the
7  driveway would still have been visible to passerby around the
8  parked cars for when those cars were at home.  This is true
9  despite the length of the driveway which has been testified to
10 as 84 feet.
11       Further, the top of the driveway is visible from the
12 side of the house since only a chain link fence separates
13 Mr. Alexander's property from his neighbors on the left.  No
14 steps were taken to protect the top of the driveway area from
15 view.
16       Considering these factors together, it's my
17 conclusion that the top of the driveway where the firearms
18 were found is not protected curtilage.  This area may be put
19 to occasional recreational use, but I find that its primary
20 use is clearly a functional one and not an intimate one.
21 Although the area is proximate to Mr. Alexander's house, it is
22 not enclosed from the street and would be visible to passerby.
23       Furthermore, the conclusion that a driveway is not
24 protected is supported by numerous cases cited by the
25 government.  These include a 1988 case from the Second

1   Circuit, <u>Krause versus Penny</u>, 837 F.2d 595, 597, which cites

2   the "substantial lower court authority for the proposition

3   that areas such as driveways that are readily accessible to

4   visitors" are not curtilage and a very recent opinion in the

5   Fifth Circuit, <u>United States versus Beene</u>, 2016 Westlaw

6   890127, decided March 8, 2016, which explicitly determined

7   that a driveway was not curtilage by applying the <u>Dunn</u>

8   factors.

9           The defendant has not pointed the Court to any

10  contrary cases that determined that an unenclosed, ungated

11  driveway such as this one was curtilage.  I, therefore,

12  conclude that the area where the firearms were recovered were

13  not curtilage entitled to the same protection as the home

14  under the Fourth Amendment.

15          I also conclude that defendant did not have a

16  reasonable expectation of privacy in the top of his driveway

17  such that it would be independently protected by the Fourth

18  Amendment under the Supreme Court's decision in <u>Katz</u> and I

19  reach that conclusion based on many of the same factors

20  considered in the curtilage analysis, namely, that the area

21  was visible from the street and the sidewalk as well as from

22  the side of the house through the chain link fence.  It was

23  accessible by unobstructed access from the street and as part

24  of the driveway would have been the access point for visitors

25  arriving by car.  Even a fence that once sat on the property

1   replaced by the log would not have protected the area.  There

2   were no "no trespassing" signs or gates or other indications

3   that the area was private.

4        The defendant emphasizes that this search took place

5   at night in the dark, but I am not convinced that this is a

6   relevant consideration.  If the area were protected curtilage,

7   the time of day might be relevant to the scope of any implied

8   license, but here, I have concluded that the area was not

9   protected curtilage.  The question is whether the defendant

10  otherwise had a reasonable expectation of privacy in the area

11  entitling it to Fourth Amendment protection.

12       The defendant has cited no cases supporting the

13  proposition that an area might be protected by the

14  Fourth Amendment at night but not during the day.  I don't

15  believe that the time of day here is relevant to the

16  considerations for the Court.  For example, the Second Circuit

17  did not consider the time of day when performing a reasonable

18  expectation of privacy analysis in United States versus

19  Titemore, 437 F.3d 251, 2006.

20       The remaining arguments presume that a search of

21  protected area has occurred and argues that no exception to

22  the warrant is applicable.  But the government is not relying,

23  as I understand it, on any exceptions to the Fourth Amendment,

24  such a search incident to an arrest, so it is not necessary to

25  do that analysis.

1    I have a different conclusion with respect to the

2  bottle.

3    I should begin by saying that there was inconsistent

4  testimony concerning the bottle's location.

5    Officer Barreiro, who initially searched for and

6  discovered the bottle, testified that the bottle was behind

7  the wall of the back left corner of Mr. Alexander's house.

8  When asked to circle the area where he found the bottle on a

9  photograph, he said he could not do so because in the

10  photograph, the location was obstructed by the house.  After I

11  questioned him to confirm that he found the bottle behind the

12  wall, he reiterated that it was right there behind the wall

13  once you take the turn.

14    This was different from what Officer Golat said.

15  Officer Golat saw the bottle when the officers returned to the

16  house after the chase and arrested Mr. Alexander.  He

17  testified that the bottle was "on the cement steps leading up

18  to the house."  On the same photograph, Officer Golat was able

19  to indicate that he saw the bottle in a spot that counsel

20  described at the hearing "as a piece of grass adjoining a

21  concrete walkway leading to a set of stairs in the rear of"

22  the house.

23    I find the testimony of Officer Barreiro to be more

24  substantial and more credible in terms of the location of the

25  bottle.  It was Officer Barreiro who conducted the search at

1   issue.  He testified where he himself searched for and

2   discovered the bottle.  Officer Golat could only testify to

3   where he recalled seeing the bottle after the arrest and his

4   testimony was less specific and detailed than

5   Officer Barreiro's.  As a factual matter, therefore, I

6   conclude that Officer Barreiro searched for and discovered the

7   bottle in the location that he described, on the ground behind

8   the back left corner of Mr. Alexander's house.

9          In applying the Dunn factors, I conclude that this

10  was within the curtilage of his home.

11         First of all, the back left corner of the house is

12  clearly proximate to the house.  It is harder to get more

13  proximate.  It was more of an enclosed area than the driveway.

14  There was no testimony concerning the nature of the use of the

15  area, but it seems very reasonable to conclude that a backyard

16  was put to some personal recreational use.  And, finally, and

17  most significantly, the area was not observable by people

18  passing by.  The house itself obscures the area from the view

19  of the street.

20         So, weighing the four factors in Dunn, I conclude

21  that the area behind the back left corner of Mr. Alexander's

22  house, where Officer Barreiro indicated he searched for and

23  discovered the liquor bottle, was in the curtilage of the

24  home.  The search was made without a warrant.  The government

25  does not argue that any exception to the warrant requirement

1  applies.  So, the evidence resulting from that search is

2  excluded.

3           Turning to the motion to suppress statements made to

4  the police before the arrest and during the interrogation at

5  the police station, let me first address the pre-arrest

6  statements.

7           The government does not contend that the defendant

8  received Miranda warnings before making these statements, the

9  pre-arrest statements.  If they were made under a custodial

10 interrogation, then they must be excluded.  To determine

11 whether an interview is custodial for Miranda purposes, the

12 first step is to determine whether, in light of the objective

13 circumstances, a reasonable person would have felt at liberty

14 to terminate the interrogation and leave.  That is from Howes

15 versus Field, 132 Supreme Court 1181, from 2012.  Some factors

16 the Supreme Court has identified as relevant to this

17 determination are the location of the discussion, its

18 duration, the contents of the statements made, any physical

19 constraints and whether the interviewee was released at the

20 end of the interview.  Under the second step, the court must

21 determine whether the relevant environment presents inherently

22 coercive pressures.  As the Supreme Court stated in Miranda

23 itself, "Any statement given freely and voluntarily without

24 any compelling influences is, of course, admissible in

25 evidence."

AO 245B (Rev. 10/15) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT
### Eastern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | |
| ROBERT ALEXANDER | Case Number: CR15-00635 (CBA) |
| | USM Number: 80042-053 |
| | Michael Brown, F/D (AUSA Ryan Harris) |
| | Defendant's Attorney |

**FILED**
IN CLERK'
U.S. DISTRICT
★ OCT 3 1
BROOKLYN C

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)   **one (1) of Indictment**
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18:922(g)(1); | Felon in possession of a firearm, a Class C felony. | 10/31/2015 | 1 |
| 18:924(a)(2) | | | |

    The defendant is sentenced as provided in pages 2 through   6   of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☑ The defendant has been found not guilty on count(s)   **two (2) of Indictment**

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

**10/24/2016**
Date of Imposition of Judgment

**s/Carol Bagley Amon**

Signature of Judge

**Carol Bagley Amon, USDJ**
Name and Title of Judge

_October 31, 2016_
Date

A000278

AO 245B (Rev. 10/15) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page __2__ of __6__

DEFENDANT: ROBERT ALEXANDER
CASE NUMBER: CR15-00635 (CBA)

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

fifty-one (51) months

☑ The court makes the following recommendations to the Bureau of Prisons:

That the defendant remain at the Metropolitan Detention Center to serve his sentence.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m. ☐ p.m. on _____.

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on _____.

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a _____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

A000279

AO 245B   (Rev. 10/15) Judgment in a Criminal Case
Sheet 3 — Supervised Release

| | Judgment—Page | 3 | of | 6 |
|---|---|---|---|---|

DEFENDANT:   ROBERT ALEXANDER
CASE NUMBER:   CR15-00635 (CBA)

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

three (3) years
(see page 4 regarding special conditions of release)

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐   The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse.   *(Check, if applicable.)*

☑   The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.   *(Check, if applicable.)*

☐   The defendant shall cooperate in the collection of DNA as directed by the probation officer.   *(Check, if applicable.)*

☐   The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense.   *(Check, if applicable.)*

☐   The defendant shall participate in an approved program for domestic violence.   *(Check, if applicable.)*

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) The defendant shall notify the probation officer at least ten days prior to any change in residence or employment, or if such prior notification is not possible, then within forty eight hours after such change.

7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

A000280

AO 245B  (Rev. 10/15) Judgment in a Criminal Case
Sheet 3A — Supervised Release

Judgment—Page __4__ of __6__

DEFENDANT:  ROBERT ALEXANDER
CASE NUMBER:  CR15-00635 (CBA)

## ADDITIONAL SUPERVISED RELEASE TERMS

The defendant shall:

1) participate in an alcohol treatment program as directed by the USPD;

2) participate in a mental health treatment program as approved by the USPD.  The defendant shall contribute to the cost of such services rendered and/or any psychotropic medications prescribed to the degree he is reasonably able, and shall cooperate in securing any applicable third-party payment.  The defendant shall disclose all financial information and documents to the USPD to assess his ability to pay;

3) maintain full-time verifiable employment and/or shall participate in an education or vocational program as approved by the USPD;

4) comply with a curfew for a period of six (6) months via electronic monitoring as directed by the USPD.  The defendant will remain at his place of residence from 7 pm to 7 am.  The USPD may designate another twelve-hour respective time period, if the defendant's employment, education, or observance of religious services preclude the above specified times;

5) submit his person, property, house, residence, and vehicle to a search conducted by a USPO.  Failure to submit to a search may be grounds for revocation of release.  The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition.  An officer my conduct a search pursuant to this condition only when reasonable suspicion exists that the defendant has violated a condition of his supervision and that the areas to be searched contain evidence of his violation.  Any search must be conducted at a reasonable time and in a reasonable manner.

A000281

AO 245B (Rev. 10/15) Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page __5__ of __6__

DEFENDANT:  ROBERT ALEXANDER
CASE NUMBER:  CR15-00635 (CBA)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $  100.00 | $ | $ |

☐  The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |

| | | | | | |
|---|---|---|---|---|---|
| **TOTALS** | $ | 0.00 | $ | 0.00 | |

☐  Restitution amount ordered pursuant to plea agreement  $ _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

  ☐  the interest requirement is waived for the   ☐ fine  ☐ restitution.

  ☐  the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

A000282

AO 245B  (Rev. 10/15) Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page **6** of **6**

DEFENDANT:  ROBERT ALEXANDER
CASE NUMBER:  CR15-00635 (CBA)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**   ☑  Lump sum payment of $   100.00   due immediately, balance due

    ☐  not later than _____ , or
    ☐  in accordance    ☐ C,   ☐ D,   ☐ E, or    ☐ F below; or

**B**   ☐  Payment to begin immediately (may be combined with    ☐ C,    ☐ D, or    ☐ F below); or

**C**   ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D**   ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

**E**   ☐  Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**   ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

    Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

**UNITED STATES OF AMERICA**

Docket Number: **15 CR 635 (CBA)**

-v-

**HONORABLE CAROL BAGLEY AMON**
(District Court Judge)

**ROBERT ALEXANDER**

Notice is hereby given that   **ROBERT ALEXANDER**

appeals to the United States Court of Appeals for the Second Circuit from the:

Judgment ⌊√⌋ :     Order ⌊__⌋ :     Other ⌊__⌋ :     _____ (specify)

entered in this action on _____ **10 / 24 /16** .

Offense occurred after November 1, 1987:     Yes ⌊√⌋     No ⌊__⌋

The appeal concerns:   conviction only ⌊__⌋ :   sentence only ⌊__⌋ :   conviction and sentence ⌊√⌋

Barry D., Leiwant, Esq.
(Counsel for Appellant)

Date: **OCTOBER 27, 2016**         Address: **Federal Defenders of New York,**  .

TO:   **RYAN C. HARRIS, Esq.**              52 Duane Street - 10th Floor
      **Assistant United States Attorney**
FROM:  **ROBERT ALEXANDER**              New York, NY 10007
       80042-053
      **Michael L. Brown II, Esq.**        Telephone Number: (212) 417-8700
      **Of Counsel**

| (TO BE COMPLETED BY ATTORNEY) | TRANSCRIPT INFORMATION - FORM B |

➤**QUESTIONNAIRE**

➤**TRANSCRIPT ORDER** ➤   DESCRIPTION OF PROCEEDINGS
FOR WHICH TRANSCRIPTS IS
REQUIRED (INCLUDE DATE)

⌊√⌋ I am ordering a transcript
⌊__⌋ I am not ordering a transcript
Reason:

⌊__⌋ Daily copy is available
⌊__⌋ U. S. Attorney has placed order
⌊__⌋ Other: Attach explanation

Prepare transcript of   Dates
⌊__⌋ Pre-trial proceedings _____
⌊__⌋ Trial          May 11, 2016
⌊√⌋ Sentence    October 24, 2016
⌊__⌋ Post-trial proceedings _____

The ATTORNEY certifies that he/she will make satisfactory arrangements with the court reporter for payment of the cost of the transcript
(FRAP 10(b)) ➤ Method of payment ☐ Funds     ☐ CJA Form 24

ATTORNEY'S SIGNATURE                DATE   **October 27, 2016**

*Michael L. Brown* **II**, *Esq./ccg.*

➤**COURT REPORTER ACKNOWLEDGMENT**

To be completed by Court Reporter and
forward to Court of Appeals

| Date order received | Estimated completion date | Estimated number of pages |
|---|---|---|
| | | |

Date: _____            Signature

_____
(Court Reporter)

A000284

**Certificate of Service**

I certify that a copy of this Appendix has been served by CM/ECF on the

United States Attorney/E.D.N.Y.; Attention: **RYAN HARRIS, ESQ.**, Assistant

United States Attorney, 271 Cadman Plaza East, Brooklyn, New York 11201.

Dated: New York, New York
      April 21, 2017

/s/_____
**Allegra Glashausser**